# Index for Appendix I

| Doc | Date | Description | Page # |
|-----|------|-------------|--------|
| 1. | 9-1-22 | Complaint for Declaratory and Injunctive Relief Requesting Litigation Disclosure in The "Public Interest" of Administrative Records And Waiver of All Costs and Fees to Conduct a Full Forensic Audit of 2020 Election Records | 1-43 |
| 2. Exhibit A | | 52 U.S.C. Subtitle II, Chapter 209, Subchapter III, Part A: Requirements (52 U.S.C. § 21081-§ 21085) | 44-52 |
| 3. Exhibit B | | Dunleavy and Meyer Election Integrity Bill (SB 167) | 53-74 |
| 4. Exhibit C | | Memo to Arizona AG regarding issues with ERIC | 75-90 |
| 5. Exhibit D | | Division of Elections, Absentee, Early and Questioned | 91-92 |
| | | PILF -Nationwide data on Mail Ballots Unaccounted For in the 2020 Election | 93-94 |
| | | Memorandum of Understanding regarding the National Voter Registration Act of 1993 (Alaska and U.S.DOJ) | 95-102 |
| 6. Exhibit E | | EAC Table for 2016, 2018, & 2020 (CVAP Totals, Active Registrations,And Inactive Registrations) | 103-05 |
| 7. Exhibit F | | Willful Blindness (Real Clear Investigations) article Illegal Alien ID Theft and DMV auto-registration to vote | 106-115 |
| 8. Exhibit G | | Aug. 31, 2020 Letter to Lt. Gov. Meyer demanding a Waiver of the absentee witness requirement | 116-120 |
| | | Sept. 4, 2020 Response refusing to ignore clear statutory | 121 |
| 9. Exhibit H | | Court Documents publicly available 3AN-20-07858CI | 122-130 |

Case 3:23-cv-00006-SLG   Document 1-1   Filed 01/13/23   Page 1 of 176

| 10. | 9-28-22 | Addendum to Citizen Complaint of September 1, 2022 | 131-138 |
| 11. | Exhibit I | Excerpts from the Hearing Officer Manual | 139-141 |
| 12. | Exhibit J | September 19, 2022 Letter from Division of Elections | 142-145 |
| 13. | Exhibit K | Division of Elections Report on RCV Tabulation | 146-148 |
| 14. | Exhibit L | Memo of Agreement -- state and MS-ISAC/EI-ISAC | 149-150 |
| 15. | Exhibit M | EO re: Foreign Interference -National Emergency | 151-155 |
| 16. | 10-31-22 | Second Addendum to Citizen Complaint of 9-1-22 | 156-164 |
| 17. | Exhibit N | October 17, 2022 Letter from Division of Elections | 165-170 |
| 18. | 11-4-22 | Letter from the Division of Elections | 171 |
| 19. | 12-5-22 | Email Request for an Impartial Hearing Officer And a Pre-Hearing Conference | 172-173 |
| 20. | 12-16-22 | December 16, 2022 Letter from Division of Elections | 174 |

**Complaint for Declaratory and Injunctive Relief Requesting Litigation Disclosure in the "Public's Interest" of Administrative Records and Waiver of All Costs and Fees to Conduct a Full Forensic Audit of 2020 Election Records**

**Plaintiffs**
Tomas W. Oels
David H. Johnson
Pamela Bickford
William C. de Schweinitz
Loy A. Thurman

Administrative Hearing No. _____

**Defendants**
Michael J. Dunleavy
Kevin Meyer
Treg Taylor
Gail Fenumiai

1. Plaintiffs, Citizen Complainants of the State of Alaska (hereinafter "CCSA") hereby allege:

   a) The Executive Branch of the State of Alaska has violated both federal and state law in malfeasance of State elections, by failing to amend federal election requirements with Alaska Law, and administrative regulations, and thereby not conducting "federal" elections in-compliance with federal requirements as required by the Alaska State Plan.

   b) The Requested Records are determinative of when Alaska Election Law was or was not in compliance, or was no longer in compliance, with the federal "minimum requirements" in the administration of state elections for federal candidates determined in an election.

   c) The Requested Records are determinative of when the Administration was first notified of potential non-compliance or recommendations to conform to compliance requirements.

   d) The Requested Records are determinative of state officials' unauthorized "stipulated agreement" to waive statutory election requirements without legislative authority.

   e) The Public Records are by law within the possession of the Executive Branch State officials, who review and prepare documents for legislative action, who codify and retain historical documents of legislative actions, and who are responsible to administer all policies, procedures, and practices of Alaska's statewide elections.

   f) The Requested Disclosure of Administrative Records for litigation purposes under AS 40.25.122 is warranted.

   g) The Requested Waiver of all fees and costs in the "public interest" is warranted.

h) The Requested Access to Election Records for purposes of a full forensic audit to determine whether the 2020 General Election was conducted in a manner to ensure that every legal vote was accurately counted and ascertain federal compliance, is warranted.

### Jurisdiction and Venue

2. CCSA file this action within the jurisdiction of the State-based administrative complaint procedures, a requirement of the Help America Vote Act of 2002 ("HAVA") 52 U.S.C. § 10101 – 30146, (defined as enforcement of Subtitle III, see 52 U.S.C. § 21112(b)(1)), to provide citizens an opportunity to grieve violations of 52 U.S.C. § 21081, § 21082, § 21083, § 21084, § 21085, § 21112, a means to inform state officials of potential violations (past, present, and future) and to enforce rights guaranteed by the Elections Clause; the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment; and the Guarantee Clause to the United States Constitution.

3. Jurisdiction in this election case is found in both Federal Election Law (52 U.S.C. § 21081-21085) (authority 52 U.S.C. § 21112), and Alaska State Election Law which provide citizens and state residents to file a state-based administrative complaint if a person believes that a violation of 42 U.S.C. § 15481 - 15485 (title III of the Help America Vote Act of 2002) has occurred, is occurring, or is about to occur (See 6 AAC 25.400-.490).

4. CCSA rely on the federal law in this State based administrative complaint procedure as the State-based administrative complaint procedures have not been adopted into Alaska State Statutes as required by the State Compliance Agreement with the Federal Government (hereinafter "State Plan") and the Alaska Administrative Procedure Act (hereinafter "APA").

5. CCSA alleges the State based administrative complaint procedures must provide jurisdiction to include complaints that state administrative officials have violated the same laws that they are bound by duty and oath that all have sworn to faithfully uphold.

6. CCSA alleges the state officials of the administrative branch have failed to provide timely notification to the Alaska State Legislature of state action under the APA to change or amend legislation as required in order to comply with the requirements of the State Plan by which the State of Alaska has continuously requested and received federal funding for years, and if proven, evidence of fraud.

7. CCSA alleges that the errors and omissions of the State Plan are fraudulent violations upon the Federal Government, threaten Alaska's sovereign State standing to maintain a Republic, and if our elected or appointed state officials do not correct the errors and omissions, citizens must.

8. CCSA alleges that numerous state officials, elected and non-elected, have failed to provide timely notification to citizens of the state-based administrative complaint procedures designed to provide notification and opportunity to bring grievances of a violation of election law.

9. CCSA alleges that state-based administrative complaint procedures are critical to alert state officials to potential violations of Alaska's centrally controlled administration of all elections.

10. CCSA alleges the state-based administrative complaint procedures, by reference to the specific problematic areas of compliance with the policies, procedures, and practices of the administration of state elections offer a civil resolution through citizen oversight of election officials as provided by federal law.

11. CCSA alleges that the state statutes must be reviewed with regards to federal compliance standards that provide the state has the ultimate discretion to adopt "minimum requirements" or may provide a "more strict" legal requirement.

12.. CCSA alleges regulation 6 AAC 25.400 is internally contradictory, the statutory authority is limited to the supervision of the Director of Elections (Defendant), and imposes limits not found in federal regulations, therefore CCSAs' citation is reliant on federal law for clarity:

    a.  52 U.S.C. § 21081 Voting System Standards for Federal Elections

    b.  52 U.S.C. § 21082 Provisional Voting Requirements for Federal Elections

    c.  52 U.S.C. § 21083 Voter Registration & By-Mail Requirements for Federal Elections

    d.  52 U.S.C. § 21084 Minimum Requirements for State Compliance

    e.  52 U.S.C. § 21085 Methods of Implementation left to Discretion of the State

    f.  52 U.S.C. § 21112 Requirement for State-based administrative complaint procedures.

13. CCSA reserves the right to add claims on appeal, of violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, the Rehabilitation Act, 29 U.S.C. § 791, 793; the Separation of Powers Doctrine, the Supremacy Clause, and the following Question of Constitutional Law:

"Define the extent of a state court's authority to reject rules adopted by a state legislature for use in conducting federal elections." Justice Alito, with whom Justice Thomas and Justice Gorsuch join, dissenting from the denial of application for stay, *Moore v. House of Representatives, et al.,* 595 U.S. ___ (2022) (March 7, 2022).


### Notification for Request of Preservation of All Election Records

### and Request to Access Public Election Records (AS 40.25.110 *et seq.)*

14. CCSA, by way of this Complaint and Request for Records, provide notification that this is also a notice of preservation of records – to include all election records as defined by State and Federal regulations and to preserve the entirety of the collected records until the completion of the legal timeline for appeal processes. See AS 15.15.470- .480 and 52 U.S.C. § 20701-20706.

15. CCSA, to ensure that the preservation of election records is understood to encompass the entire 2020 General Election records, we request the State of Alaska:

Sequester the 2020 Physical Ballots and all the digital assets, hard drives, logs, recording instruments, documents, worksheets, correspondence, mailing list, voter rolls, receipts, purchase orders, transactions and affidavits and or any materials which led up to the

execution of, transportation of, hiring for temp or permanent positions of, all forms of staffing and volunteers for the elections, including the mailing of ballots and the receipt thereof, processing of, handling of, returning of, counting of, storage of, logging of, documenting of, digitizing of said ballots plus, any and all requests of any and all information relating to the 2020 general election starting from January 2016 through July 2022. The 2020 General Election must be immediately protected from destruction.

16. 52 U.S.C. § 21081(b) defines the components of the "voting system" in general terms as each state has a different list depending on their manner of conducting an election, and all are subject to examination and referenced in 52 U.S.C. § 20701-20706.

17. AS 15.15.470 Preservation of election ballots, papers, and materials, provide "the director shall preserve all precinct election certificates, tallies, and registers for four years after the election, but does not reflect the addition of electronic devices that maintain access, revisions, and the essential records of the history and management of the election.

18. AS 15.15.470 provides that "the director may permit the inspection of election materials upon call by the Congress, the state legislature, or a court of competent jurisdiction." This complaint serves as notification of a controversy for which the election records are an essential element of the evidence of malfeasance or fraud, and notification is a recognized reason to forestall destruction of the evidence of an alleged election crime (fraud vitiates all!)

19. 52 U.S.C. § 20701 – 20706 provide for the federal requirements for the preservation and destruction of election records that mirror the provisions of Alaska Statutes, with the exception of the length of time to preserve the election records (state – four years vs. federal – 22 months) but provides guidelines for penalties for the untimely destruction or alteration of election records.

20. CCSA, provide notification at this time that as the election records are processed, CCSA request that the examiners endeavor to preserve the confidentiality of the records and if achievable, CCSA intends to request that the entire election records collection examined in these proceedings be preserved as historical documents to be used as a teaching tool for all future Alaskan students, for the following reasons:

> The General Election of 2020 is the single most historic election in modern US history and the second most historic election since the very first election held in the United States of America. The 2020 General Election will be talked about and studied quite possible for the next hundred years, therefore all relating materials and ballots must be kept for study, research, debate, examination, verification, and cross-examination.

### Preliminary Disclosure for Litigation – AS 40.25.122

21. CCSA seek declaratory and injunctive relief pursuant to AS 40.25.122 Litigation Disclosure, to obtain access to the following records to demonstrate:

> 1.) The state policies, practices, procedures, of the Division of Elections as reviewed (July 13, 2020) by the Department of Administration, Oversight and Review Unit,

*Review of the Effectiveness and Security of the Division of Elections in Administering Alaska's Elections,* state audit resulted in corrective recommendations, but the released copy is redacted to conceal, what we believe to be, past acts or omissions that would support CCSA allegations of failure to conduct administration of statewide elections in compliance with both State and Federal law. A review of the July 2020 state audit of the Division of Elections is warranted.

 2.) The past procedural errors, that may have been identified in the July 2020 review, may have impacted critical administrative decisions that may have contributed to erroneous judicial decisions that may have contributed to alleged malfeasance of the 2020 General election. An initial review of the unredacted July 2020 state audit of the Division of Elections is warranted.

3.) There is probable cause to suspect that an unknown number of past elections have been conducted unlawfully, not just the 2020 elections, and it falls upon citizens to determine the date and circumstances by which the legislature failed to incorporate federal election law into Alaskan election law and determine the failures that led to the damage to the law to ensure that our state officials will uphold Alaska's duty and responsibility to conduct free and fair elections.

4.) The forensic examination of Alaska's 2020 Election Records, to be considered admissible in future court proceedings, requires an examination by neutral third party with the expertise and experience to conduct such an audit of the election records and administrative procedures controlling the conduct of the election. The responsibility to ensure that the procedures remain neutral to all parties may require a special master to oversee the forensic examination, depending on the storage location of the records.

5.) Similarly, to the audit report of July 2020 (above), CCSA request the instigating documents that led to the June 13, 2022 Memorandum of Understanding between the Civil Rights Division of the U.S. Department of Justice and the State of Alaska, as it may provide additional information regarding violations of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20504; as the NVRA is applicable to the computerized list (52 U.S.C. § 21083), a subject to this complaint. See Exhibit D, pgs 5-12

### The Alaska Public Records Act, AS 40.25.100 – .295

22. The Alaska Public Records Act, AS 40.25.100 – .295, (hereinafter "APRA") was passed to enhance transparency to guarantee the public had access to records of government in Alaska.
23. The Alaskan Supreme Court has determined that access to public records is a "fundamental right" (*see Fuller v. City of Homer,* 75 P.3d 1059 (2003).
24. APRA, AS 40.25.122, require parties involved in litigation seek disclosure in accordance with the rules of procedure applicable in a court or an administrative adjudication.
25. APRA, AS 40.21.060(1) require the chief executive officer of each state agency to "make and preserve public records containing adequate and proper documentation of the organization,

functions, policies, decisions, procedures, and essential transactions of the agency, and designed to furnish the information necessary to protect the legal and financial rights of the state and of persons directly affected by the agency's activities."

26. APRA, AS 40.21.150(1) defines "agency" or "state agency" to mean "a department, office agency, state board, commission, public corporation, or other organizational unit of or created under the executive branch of the state government."

27. AS 40.21.150(6) defines "record" to mean "any document, paper, …. electronic record, … developed or received under law or in connection with the transaction of official business and preserved or appropriate for preservation by an agency or a political subdivision, as evidence of the organization, function, policies, decisions, procedures, operations, or other activities of the state or political subdivision or because of the informational value in them."

28. AS 40.25.110(a) provides "Unless specifically provided otherwise, the public records of all public agencies are open to inspection by the public under reasonable rules during regular office hours. The public officer having the custody of public records shall give on request any payment of the fee established under this section or AS 40.25.115 a certified copy of the public record."

29. AS 40.25.110(d) provides "A public agency may reduce or waive a fee when the public agency determines that the reduction or waiver is in the public interest."

30. CCSA respectfully submit that it is in the "public interest" to determine to what extent the alleged omissions of federal requirements violated the procedures that should have been in place to ensure that elections conducted by state officials of the State of Alaska were free and fair.

31. CCSA respectfully request the waiver of all costs and fees as each individual complainant has no personal interest in obtaining access to public election records beyond the necessary litigation to adjudicate whether the election laws in Alaska complied with the required standards of federal election law, and if not, were the procedural violations significant enough to determine the elections were not conducted in accordance with the law and both Constitutions.

32. State-based elections are administered by state officials but must comply with federal requirements in the manner and methods of how state officials prepare for, conduct a "federal" election, and the preservation of election records in the event a review of a "federal" election becomes necessary.

33. CCSA submits that the public available data on past election is voluminous and yet incomplete due to numerous exclusions by federal and state law that necessitate the inspection and evaluation of election records be conducted by a neutral third party to conduct such an examination and provide documentation and a report.

34. CCSA believe a complete forensic examination is in the "public interest" and therefore demand an impartial examination of all originally marked, physical paper ballots, and all election records in accordance with the legal standards of admissible evidence to satisfy both state and federal courts.

35. AS 40.25.120 provides exceptions to the right to inspect public records, but CCSA believe that the exceptions originally raised to protect individuals or investigations have lapsed.

36. CCSA is requesting access for public examination of governmental records under APRA and under separate federal authority cited below.

### State Officials Duty and Responsibility under the Administrative Procedures Act

37. Governor Michael J. Dunleavy, is the chief executive officer of the State of Alaska and the Commander-in-chief of the state's armed forces. The Governor is responsible for enforcing compliance with the law through appropriate court actions, granting pardons, commutations and reprieves, and suspending or remitting fines and forfeitures. As the chief executive officer of state government, the Governor must supervise each principal department and has the responsibility of changing the organization or reassigning functions for efficient administration of the executive branch (Article III, Constitution of the State of Alaska, AS 44.19, AS 37.07.020, AS 37.07.062). Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 8, (April 2021).

38. Defendant, Michael J. Dunleavy, has served as a legislator and as Governor, is familiar and responsible for compliance with the APA.

39. Defendant Michael J. Dunleavy is sued in his official capacity as the chief executive officer as the Governor of the State of Alaska.

40. Lieutenant Governor, Kevin Meyer, performs duties prescribed by law and delegated by the Governor, administers the state election laws, administers the provisions of the Administrative Procedure Act dealing with administrative regulations, and publishes the Alaska Administrative Code and the Alaska Administrative Journal. (AS 44.19.020). Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 10 (April 2021).

41. Defendant Kevin Meyer, in addition to his duties described above, has served as a legislator responsible for compliance with the APA.

42. Defendant Kevin Meyer is sued in his official capacity as the Lieutenant Governor of the State of Alaska.

43. The Lieutenant Governor appoints the director of the Division of Elections, which supervises the central and regional elections offices and the employment and training of election personnel. The Lieutenant Governor is responsible for the administration of all state elections, as well as those municipal elections that the state is required to conduct. The director of Elections assists the Lieutenant Governor in the administration of the Voter Registration Program and the modification of precinct boundaries. (Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 10 (April 2021).)

44. Defendant Gail Fenumiai is sued in her official capacity as the Director of the Division of Elections. Under state law, the Director "provide[s] general administrative supervision over the conduct of state elections and may adopt regulations under AS 44.62 (Administrative Procedures Act) necessary for the administration of state elections." AS 15.15.10. The Director also oversees general election administration by "act[ing] for the lieutenant governor in the supervision of central and regional election offices . . . and all matters relating to the employment and training of election personnel, and the administration of all state elections as well as those municipal elections that the state is required to conduct." AS 15.10.105(a).

45. Defendant the Division of Elections ("DOE") is the state agency charged with overseeing and administering elections in Alaska, its mission is to conduct impartial, secure and accurate elections. The Division's responsibilities include:

- Managing the statewide voter registration records. Update and maintain voter records and prepare voter rolls for local and statewide elections.

- Planning, preparing and conducting two statewide elections during even numbered years.

- Overseeing and supporting the initiative petition process including signature verification and printing and distribution of petition books.

- Overseeing the recall and referendum processes.

- Improving the efficiency and accessibility of the electoral process.

- Improving accuracy of the voter registration list.

- Encouraging higher voter participation.

(Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 10).

46. Defendant Treg Taylor is sued in his official capacity as the Attorney General for the State of Alaska.

47. The Department of Law is headed by the Attorney General. The department prosecutes violations of state laws, acts as the Governor's legal advisor, and provides legal services to all executive branch agencies and, in some instances, to the legislative and judicial branches. Alaska's attorney general is appointed by the Governor. Assistant attorneys general including prosecutors, are in turn appointed by and serve at the pleasure of the Attorney General. Unlike almost all other states, Alaska has a highly unified legal system. Many governmental legal activities handled at the county level in other states (such as courts and jails) are handled at the state level in Alaska. The Alaska Department of Law includes the Office of the Attorney General, a Civil Division, a Criminal Division, and an Administrative Services Division. (AS 44.23). (Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 54).

48. The Attorney General's Office supports the attorney general in his performance as legal advisor to the governor and chief administrator of the three divisions of the Department of Law. (Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 54.)

49. The Administrative Services Division provides for the normal day-to-day logistical needs and operations of the department, managing the department's budget, accounting, timekeeping and billing for legal services, technical oversight of the department's case management systems, and liaising with centralized and consolidated administrative functions within the Department of Administration. The division provides its support activities to the department's twenty offices located in thirteen communities across the state. (Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 54).

50. The Civil Division represents the state in civil court and administrative proceedings; reviews all regulations prepared by executive agencies; drafts all legislation for introductions by the Governor, drafts or reviews regulations of state agencies; and provides legal advice to the Governor and to executive agencies and officers.

- Legal Advice and Assistance to Agencies includes Attorney General Opinions and oral and written advice about the day-to-day operations of state government.

- General Litigation includes both court cases filed on behalf of or against the state and its employees and contested administrative, Court cases include trial level matters and appeals to the Alaska Supreme Court, federal circuit courts, and the Supreme Court of the United States.

- Drafting and Review of Legislation and Regulations includes advising all state agencies on the adoption of regulations and alerting agencies to the need for regulations to implement or clarify statutes. The Civil Division also prepares all the legislation for the executive branch. Additionally, when requested by the Governor, the Civil Division review legislation passed by the Legislature that is awaiting action by the Governor.

(Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 54).

51. The Legislation and Regulations Section provides legal advice and review for constitutional and statutory requirements in the preparation of state legislation and regulations, both civil and criminal. It also supervises all legislative drafting done on behalf of the Governor for introduction to the State Legislature and conducts final review of all regulations adopted by executive agencies. The legislative liaison for the Civil Division legislation matters is located in this section and assists with legislative requests related to legislation or other matters. (Handbook of Alaska State Government, State of Alaska Legislative Affairs Agency, p. 56).

52. The Opinions, Appeals, and Ethics Section oversees all civil division appeals and all attorney general opinions. The section is also responsible for interpretation and enforcement of the Executive Branch Ethics Act, (AS 39.52). (Handbook on Alaska State Government, p. 56, State of Alaska Legislative Affairs Agency, April 2021).

## Full Forensic Audit of Election Records

53. In our society, all American citizens are free to choose to live life in the way they choose to as long as they do not harm or infringe on the rights of others. Our country was founded by Americans that by declaration and enumeration provided a constitution that plainly states the manner our country would self-govern as states and as a Republic.

54. Fundamental to this aim is the preservation of the right to vote and preservation of the citizenry's confidence that elections are conducted in a free and fair manner.

55. When apparent irregularities in the voting process occur, they must be investigated fully – including all of the original ballots so that every citizen can have faith and confidence that the outcome of an election was fair and correct, regardless of how they voted.

56. Governments and their agents should not keep us from knowing if the outcome of an election was truly the will of the people, or, if the outcome of an election was tainted by fraud or other irregularities.

57. Election Integrity is founded on the belief that transparency and public examination of the voting process and all instruments, including forensic analysis of original ballots, used therein to create the original written record of each voters' ballot, therefore protecting the confidentiality of each voters' choice in the disposition of the races and issues of that election.

58. The Alaska Rules of Civil Procedure dictate that the original document is the best evidence.

59. An examination is not only proper it is required to provide a Court with the litany of contradictory and conflicting facts and circumstances surrounding election officials conduct of the 2020 General Election based on published election data and other concerning alterations in the policies, procedures, and practices which serve to further transparency and promote Election Integrity.

60. CCSA respectively submit that "election records" are "public records" subject to inspection and the State of Alaska can be compelled to produce "election records" as litigation documents.

61. Absent forensic analysis of the original paper ballots CCSA would not have admissible best evidence to prove their case resulting in utmost prejudice to their claims under the law.

62. There are questions that only the original election records can provide an answer to, and strong public policy in favor of election integrity indicates the original ballots cast by citizens of Alaska were actual ballots and whether they were properly cast and counted.

### Statement of Factual Allegations and Historical Background

63. All statewide elections in Alaska are centrally controlled by the Division of Elections and do not benefit from the checks and balances provided by a multi-level or multi-district system of administration, requiring a stricter scrutiny than a system that provides an auditable trail or a transparent and verifiable history of election administration.

64. Since statehood Alaska has conducted federal/state elections, as a "federal election" is defined by whether or not a federal office was determined in a state administered election. Every two years the seat for the House of Representatives is on the ballot and a candidate for a "federal election" is decided by Alaskans, with rare exceptions.

65. Public Law 107-252, dated October 29, 2002, was passed by the United States Congress to enact reclassification and renumbering sections of Title 52 – Voting and Elections.

66. General administrative supervision over the conduct of state elections includes the adoption of regulations under the Administrative Procedures Act and under the administrative supervision of the director of the Division of Elections. AS 15.15.010.

67. The State of Alaska has not reclassified or adopted the "minimum requirements" of federal election law regulation changes from sometime before the update of Public Law 107-252, as required by the Administrative Procedures Act in order to revise Alaska Statutes, Title 15 and thereby did not enact administrative regulations in order to conduct state elections in compliance with requirements of federal election law. 52 U.S.C. § 21084.

68. The methods of implementation and compliance with federal election law is left to the discretion of the State. 52 U.S.C. § 21085.

69. States receiving payment of federal funds are required to establish and maintain State-based administrative complaint procedures which meet the requirements of 52 U.S.C. § 21112(a)(2). See 52 U.S.C. § 2111(a)(1), 52 U.S.C. § 21004. State Plan (Pub. L. 107-252).

70. The Department of Law boasts that "Alaska has a highly unified legal system" that is central to the adoption of statutes and regulations in response to additions, updates, and re-classification of federal law. *Id.*

71. The Lieutenant Governor, administers the state election laws, administers the provisions of the Administrative Procedure Act dealing with administrative regulations, and publishes the Alaska Administrative Code and the Alaska Administrative Journal. (AS 44.19.020).

72. CC are concerned that, for the last two decades state administrative officials failed to comply with the required notification, administrative action, and reclassification/enaction of federal election law to ensure Alaskan election were conducted in compliance with federal election law.

73. To provide citizen oversight of state officials administration of elections in their state, the requirements of Subchapter III, identified by Sections 21081, 21082, and 21083 highlight federal requirements that state-based complaints provide citizen notification of potential problems requiring oversight and compliance, Section 21084 establishes the "minimum requirements" of compliance with federal law, and Section 21085 provides States discretion to choose specific methods to comply with the federal requirements.

74. "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." The Constitution of the United States of America, Article I, § 4.

75. The elections for United States President, United States Senate and United States House of Representatives, are elections for Federal positions, the term for the U. S. House of Representatives is two years, so every even year the State of Alaska conducts a federal election.

76. As a condition of receiving federal funds the State shall be required to establish State-based administrative complaint procedures to remedy grievances that meet the requirements of 52 U.S.C. § 21112.

77. Under Subchapter IV, Enforcement, 52 USC 21112, establishing State-based administrative complaint procedures to remedy grievances "not later than January 1, 2004" in all states, even states that did not receive payment must submit a compliance plan to the Attorney General which provides information to ensure that the state will meet the requirements of subchapter III, 52 U.S.C. § 21112(b)(1).

78. The Alaska State Legislature has not amended state election law to fully comply with federal "minimum requirements" although a regulation identifies the complaint procedures under 42

U.S.C. § 15481 thru 15485 (revised and codified as 52 U.S.C. § 21081 thru 21085). *See* 6 AAC 25.400.

79. The State-based administrative complaint procedures have not been amended into Alaska statutes to meet the "minimum requirements" standards of compliance with federal election law.

80. As a result, an unknown number of state elections with candidates for federal elections, may have **not** been conducted in accordance with both the Alaska Constitution and the Constitution of the United States. The extent of the non-compliance will be determined by this forensic litigation.

81. Further, the Defendants all participated in contested election cases adjudicated in State Superior Court and Alaska State Supreme Court that have relied on state statutes that might not reflect the "minimum requirements" of federal law and must be reconsidered and nullified.

82. "The judicial Power of the United States, shall be vested on one supreme Court, and in such interior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." The Constitution of the United States of America, Article III, § 1.

83. "The United States shall guarantee to every State in this Union a Republican Form of Government and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." The Constitution of the United States of America, Article IV, Section 4.

84. "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution…" The Constitution of the United States of America, Article VI.

85. Oath of Office – All public officers, before entering upon the duties of their offices, shall take and subscribe to the following oath or affirmation: "I do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of Alaska, and that I will faithfully discharge my duties as . . . to the best of my ability." The Constitution of the State of Alaska, Article XII, Section 5. (AS 39.52 et. seq.).

86. Every Defendant, elected or appointed state official, listed above have sworn or affirmed the above Oath of Office.

87. Unfortunately, citizens do not have confidence in the results of the 2020 General Election, and recent research erodes confidence in the results of previous elections and CCSA are left with the belief that we have been let down by our officials and reparation is required.

88. It is the providence of the judicial system to enforce the laws of this state that require disclosure and inspection of these election records, thereby ending the harmful speculation that clouds the results of the 2020 General Election.

89. The Courts are the last bastion of accountability in such instances. Public inspection of the actual ballots is a necessary and proper step in the direction of restoring the publics' confidence in Alaskan elections.

90. Future election integrity requires this analysis. Public statements of Lt Governor Meyer that any question regarding the accuracy or fairness of the election or how it was conducted is simply "misinformation" only exacerbates the concerns of Alaskan citizens rather than allay their fears.

91. Rather than providing utmost transparency and showing that there is nothing to hide, state officials have steadfastly prevented anyone from having access to the information that would once and for all demonstrate the election was either free and fair, or that it was not.

92. Lieutenant Governor Kevin Meyer, Gail Fenumiai, Director of the Division of Elections, and attorneys of the Department of Law, CCSA alleges, entered into an unconstitutional Settlement Agreement after being sued by political operatives (hereinafter the "Agreement") in the case of *Arctic Village v. Meyer*, which substantially altered election processing of ballots that were mailed, or dropped in collection boxes, contradicting the statutory witness signature requirements, without the required approval of the Alaska Legislature, and violative of the APA.

93. CCSA acknowledge that a judicial decision is not reviewable by an administrative hearing officer, but the conduct of state officials that acted on the behalf of the people of Alaska, without authority under the APA -- is, in fact under the jurisdiction of an administrative hearing officer.

94. CCSA do include allegations attached to this complaint that are preserved for appeal but are beyond the jurisdiction of an administrative hearing officer.

95. Precincts throughout the State of Alaska that conducted "in-person" elections on November 3, 2020, did not substantially alter the policies, practices, or procedures of the General Election.

96. But alternative methods of voting although convenient by their very nature, it is difficult to verify that a mailed ballot was cast by the person to whom the ballot was addressed to, or that the person receiving an absentee ballot is indeed a qualified voter.

97. Absentee ballots are the "largest source of potential voter fraud" as determined by the Commission on Federal Election Reform, *Building Confidence in U.S. Elections* (2005).

98. In an attempt to provide some degree of verification that ballots that were mailed, or dropped in collection boxes, were cast by the person for whom the ballot was intended, the Alaska Legislature adopted a signature verification regime.

99. The Agreement was sanctioned by multiple Court Orders that waived the required signature verification regime provisions of Alaskan Statutory Law and allowed many ballots to be cast and counted that otherwise would have been rejected.

100. The Agreement was sanctioned by the Superior Court and twice by the State Supreme Court, the decisions that must be remanded for reconsideration due to the administrative failure to amend State Statutes with the "minimum requirements" for federal compliance.

101. The state officials that were parties to the litigation, Lt. Governor Kevin Meyer, Director of the Division of Election, Gail Fenumiai, and legal counsel from the Department of Law – did not object or dissent – and thus, may have coerced the State Supreme Court to engage in mail fraud.

102. CCSA respectfully submit that, in order to appeal the decisions of the State Supreme Court, CCSA must provide evidence sufficient to support our allegations of election malfeasance by state election officials, and that must be determined by forensic analysis of the election records in accordance with the rules of evidence in such matters.

103. The State of Alaska's sovereign responsibility to conduct elections in a transparent manner rest on the state officials tasked with the shared responsibility to conduct free and fair elections – to protect the voting rights of the citizens of Alaska and to protect our Republic for all states of the United States.

### Request for Specific Records for Litigation

**Violation of 52 U.S.C. § 21112, by Alaska State Defendant's Failure to Enact the State-Based Complaint Procedures and amend State Statutes to meet the compliance "minimum requirements" of 52 U.S.C. § 21081-21085, required by federal election law. (Exhibit A)**

104. All foregoing Paragraphs are incorporated as if set forth fully herein.

105. No State statute authorizes the Defendants non-compliant conduct.

106. The Administrative Procedures Act (hereinafter "APA") provides the procedures by which an idea, or in this case a requirement for all federal elections, shall be reviewed for constitutional conformity to Alaska law in preparation for the legislative process, shall be drafted in the format of a Bill, and forwarded to the Alaska State Legislature to be amended to an existing statute, or enacted in a separate statute to become Alaskan law.

107. Once enacted into Alaska Statutes, the statutory authority transfers to state officials through a similar process to enact administrative regulations.

108. The legislative process to incorporate federal compliance requirements provides the public, legislators, and state officials - notification of a change in the law and an opportunity to learn, examine, or oppose proposed amendments to law and, if determined inadequate or unsuitable provide an opportunity to propose law "more strict" than federal "minimum requirements."

109. The legislative process provides the public, legislators, and state officials a written series of rules to track or explain the concept and how it is to be applied, with a policy to alter the current laws if "more strict" is necessary and the procedures to change the law as needed.

110. The strategy to correct the oversight from years past has been a topic of discussion for months, with the window closing for the federal retention of election records, CCSA is alleging

the State-based administrative complaint procedures, by which we must bring our complaints, are deficient by state law and without the authority to remedy our claims of malfeasance.

111. However, the federal requirement for State-based administrative complaint procedures, is mandated whether or not the State has applied for and has received federal funds for elections.

112. For purposes of this Complaint, CCSA references federal requirements to avoid confusion.

113. CCSA's Record Request for Administrative Records is based on SB167 (Exhibit B) the Administrations Election Integrity Bill for the last legislative session. Following this example, CCSA requests a list of the legislative records for each federal requirement, listed in Exhibit A, by section to include:

> 1.) the historical charging document citing the specific sections of the federal regulations, 52 U.S.C. §§ 21081 thru 21085, and the State-based procedures of 52 U.S.C. §§ 21112.
>
> 2.) the numbered draft of the bill to enact or amend, as submitted to the legislature,
>
> 3.) the date the bill was passed by the legislature or became operative,
>
> 4.) the date the statute became law,
>
> 5.) the date the proposed regulation was posted,
>
> 6.) the final version of the enacted regulation, and
>
> 7.) any resulting glossary or reference included to interpret the revised statutory authority.

114. The above request is to verify that the regulations of compliance to meet the "minimum requirements" standard have in fact been through the legislative process and are law in Alaska.

115. For federal requirements that cannot be found incorporated in Alaskan Statutes, a proposed draft for the upcoming session of the legislature may suffice for this litigation as an admission.

116. In preparation for litigation, CCSAs' request for administrative records is to establish, whether or not, the federal requirements were met in a timely manner and that we are referring to the same facts and set of rules to reference in this case on election law in administrative hearings and appeals, and reassurance that the laws and regulations are in fact based on Alaskan statutes.

117. CCSA preliminary request is to first determine if the legislative records exist and the current citations and references in Alaskan statutes that correspond to the federal requirements specified in 52 USC 21081 – 21085 and 52 USC 21112.

**Violation of 52 USC §§ 21112, 21081 through 21085, Failure to Provide Proper Public Notification of the Implementation of the State-Based Complaint Procedures and Federal Requirements for Administration of Elections (Exhibit A)**

118. All foregoing Paragraphs are incorporated as if set forth fully herein.

119. No State statute authorizes the Defendants non-compliant conduct.

120. The State Plan, described in 52 USC 21004, by application provides federal funding for ongoing state "improvement" to "meet the requirements" of "Subchapter III" including 52 USC 21004(a)(6)(A) "the costs of the activities required to be carried out to meet the requirements of subchapter III", and21004 (a)(9) a "description of the uniform, nondiscriminatory State-based administrative complaint procedures in effect under section 21112 of this title."

121. CCSA request access to the correspondence related to the application for federal funding that defines how the state proposed to use the federal funds and the report of how the funds were distributed, to determine the breakdown in communication:

    a. CCSA is prepared to present multiple witnesses and/or affidavits of multiple meetings with Governor Dunleavy, Lt. Governor Meyer, and their staff regarding the continued reliance and use of electronic election equipment with known vulnerabilities for years. The outcome of those meetings are apparently disputed, but what did not happen; - neither elected state officials notified the assembled aggrieved constituents that "electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) could have been the subject of the State-based administrative complaint procedures. See description of "voting systems" 52 USC 21081(b). The potential unreliability of the electronic equipment could have been addressed in a civil and thorough examination of their concerns and complaints.

    b. CCSA is prepared to present witnesses and/or affidavits of multiple requests for the voter registration information (including the master list), witnesses that found anomalies that were reported and corrected but the published reports were not revised or updated, witnesses who have raised concerns to election officials – that do not refer questions to the State-based administrative complaint procedures – and witnesses who serve as election officials – who were unaware that the federal law provided for a resolution.

    c. CCSA is prepared to present witnesses that will testify – that contacting their legislative representatives, from both Alaska State Senate and House, the concerned constituent was informed that if they were to provide the "evidence" to the senator or representative, he/she would champion the election integrity cause. Not one senator or representative (or their staff) mentioned the required State-based administrative complaint procedures.

122. CCSA, upon knowledge and belief, allege that multiple records requests submitted by Complainants and others, to Defendant state officials, if there was a response - did not include notification of the State-based administrative complaint procedures.

123. There is no reference in Alaska Statutes to State-based administrative complaint procedures.

### Violation of Voting System Standards 52 USC 21081(a) Requirements

124. All foregoing Paragraphs are incorporated as if set forth fully herein.

125. No State statute authorizes the Defendants non-compliant conduct.

### In-Person Voting "Ballot Cure"

126. 42 U.S.C. 15481(a)(1)(A) (currently 52 U.S.C. 21081(a)(1)(A)), set forth procedures to ensure "in-person" voters were provided notification and an opportunity to change their ballot or correct any error before the ballot is cast and counted:

> "Voting System Standards. Each voting system used in an election for Federal office shall meet the following requirements: the voting system shall – (i) permit the voter with the opportunity to verify (in a private and independent manner) the votes selected by the voter on the ballot before the ballot is cast and counted; (ii) provide the voter with the opportunity (in a private and independent manner) to change the ballot or correct any error before the ballot is cast and counted (including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error); and (iii) if the voter selects votes for more than one candidate for a single office – (I) notify the voter that the voter has selected more than one candidate for a single office on the ballot; (II) notify the voter before the ballot is cast and counted of the effect of casting multiple votes for the office; and (III) provide the voter with the opportunity to correct the ballot before the ballot is cast and counted." 52 USC 21081(a)(1)(A). See 42 U.S.C. 15481(a)(1)(A).

127. AS 15.15.225, .230, .250, and .260 reflect federal requirement of 52 USC 21081(a)(1)(A) for in-person voting.

### By mail Voting – No Provision for "Ballot Cure" in Federal Elections

128. 42 USC 15481(a)(1)(B) (currently 52 U.S.C. 21081(a)(1)(B)), sets forth procedures to ensure that mail-in absentee ballots and mail-in ballots are provided the same notification and opportunity to change their ballot or correct any error before the ballot is cast and counted:

> "A State or jurisdiction that uses a paper ballot voting system … **(including mail-in absentee ballots and mail-in ballots)**, may meet the requirements of subparagraph (A) (iii) by – (i) establishing a voter education program specific to that voting system that notifies each voter of the effect of casting multiple votes for an office; and (ii) providing the voter with instructions on how to correct the ballot before it is cast and counted (including instructions on how to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error)." 52 USC 21081(a)(1)(B) (emphasis added).

129. Alaska Statutes do not provide notification of, or procedures to correct an error before a by-mail ballot is cast, in violation of requirements for a federal election.

130. Determining the method of ascertaining the effect of a procedural error is common in business practices as the examination reveals what needs to be changed to avoid the same results.

131. The number of potential ballot errors, for which the voter should have been notified and given the opportunity to correct or "cure" their error, are difficult to ascertain as the error may be limited to one contest that is simply skipped altogether or repaired through adjudication, both offensive to the requirement that the voter be given the opportunity to correct their error.

132. Upon information and belief, there were approximately 361,400 ballots cast and counted in the November 3, 2020, General Election.

133. Potentially 205,597 of the ballots were cast and counted by a method other than "in-person" and an unknown number must be invalidated if the voter followed the mandates to "waive the signature requirement" according to the Agreement and the Court Order. See Exhibit D, p. 1.

134. In addition, according to the same table, the requested but not returned and counted ballots, resulted in 24,813 invalidated ballots or simply lost/missing ballots in Alaska in comparison to lower-48 locations, see Exhibit D, p. 3-4.

135. The voters who submitted a ballot by a method other than "In-Person" and who erred in marking their vote on races for which the voters were not provided notification nor opportunity to correct the error before the ballot is cast and counted (in violation of federal election law), cannot be determined by reported publicly available data.

136. Voters who erred in marking their "alternative methods of voting" ballots, in an unknown number of contests, resulting in an invalidated vote due to the lack of notification or opportunity to correct the error, resulted in an unknown number of violations of federal election law.

137. An unknown number of the "early vote" ballots were included in the published results on Election Day (the number cutoff was Thursday) and the balance of the early voting results were added to the precinct tallies after the precincts closed and all precinct election results were turned in, comingling methods of casting ballots which complicates any review or determination of actual "in-person" non-compromised number of votes.

138. The definition of "Absentee In-Person" and "Early Vote In-Person" have multiple interpretations depending on whether the voter cast their ballot in a local precinct or in an early vote center that processes all 40 districts and all 441 precincts. Not knowing the context of the use of the term confounds analytic determinations of publicly available data, and requires a forensic sort, to determine the method of cast and count – all to confound transparency and complicate any audit or review – and to ensure that only a cost-prohibitive full forensic audit would reveal the truth of how ballots were cast and how those same ballots were counted.

139. The conflicting terms, the conflicting data, the on/off procedures leading to conflicting unknown results, are meant to be a barrier to an examination employed by the election officials, who without protest by the same state officials, failed to argue vigorously against the Court orders, the same federal law safeguards that have been violated by state officials. See Exhibit D, p2.

140. Following the chain of custody for ballots issued by alternative methods of voting, and the unknown number of invalidated contests due to uncorrected error (or changed through adjudication), potentially affecting 205,597 cast ballots and 24,813 lost ballots (totaling 230,410 issued ballots), can be examined but this requires a full forensic audit to bring the chaos to light.

141. The practice of using audits for elections in the same manner as bankers use audits to detect human error, electronic error, or a combination of both, begins with the paper ballot and should

not be a deterrent to understanding how the election was conducted, and how an anomaly (or multiple) affected the outcome.

**Adjudication Is Not a Remedy to Override the Federal Requirement for Voter Correction**

142. There is probable cause, upon knowledge and belief, that ballots with a "mismark," "over vote" or "under vote" errors are simply "adjudicated" within the processes between the initial scanning of the ballot as inserted into the machine, the review and adjudicated revision of the ballot based on the software operation of adjudication, and the resulting ballot that was counted.

143. CCSA request the following: 1.) Cast Vote Record ("CVR") which includes the scanned forensic clone of the initial scan of a ballot (digital scan), the adjudication code or notification, and the resulting ballot scan as counted; 2.) Batch status reports or (tabulator batch reports); 3.) Tabulator logs (*.slog or *slog.txt); 4.) Ballot Images, and 5.) Election Project backup.

144. CCSA submits it is important to review the types of adjustments that were conducted to determine whether or not the electronic adjudication is an acceptable alternative to the voter correcting their own errors or omissions, and another aspect necessary to the forensic audit.

**Violation of Voting System Standards 52 USC 21081(a)(1)(C) Requires Notification of an Error, Preserve the "Privacy of the Voter" and "Confidentiality of the Ballot" in "cure"**

145. All foregoing Paragraphs are incorporated as if set forth fully herein.

146. No State statute authorizes the Defendants non-compliant conduct.

147. 52 USC 21081, referring to the voting system in general, provides: "The voting system shall ensure that any notification required under this paragraph preserves the privacy of the voter and the confidentiality of the ballot." 52 USC 21081(a)(1)(C).

148. The "In-Person" voting system provides for both privacy and confidentiality of the ballot (see above citation to AS 15.15.225, .230, .250, and .260).

149. The current State by-mail procedures do not provide notification of a potential error or an opportunity to privately correct an error before the ballot is cast and counted.

150. The Alaska Statutes do not provide similar procedures to ensure that any "error" notification process will preserves the privacy of the voter and ensures the confidentiality of the ballot for any of the alternative method of voting.

151. SB167, the election integrity bill introduced by Governor Dunleavy and Lt. Governor Meyer proposed a method "to improve the way the Division of Elections maintains voter rolls while providing additional tools to ensure a more secure system" with reference to the 2020 nationwide election, and "place trust back into the election process." did not pass. Exhibit B.

**Violation of the Voting System Standards, 52 USC 21081(a) chain of custody**

152. All foregoing Paragraphs are incorporated as if set forth fully herein.

153. No State statute authorizes the Defendants non-compliant conduct.

154. The "In-Person" voting system standards, provided by AS 15.15.225 - 15.15.350, ensure that each ballot supplied to the election board is accounted for and recorded in the tally at the end of the voting procedures, providing a verifiable "chain of custody" for each ballot issued.

155. Upon information and belief, in the election procedures leading to the November 3, 2020, General Election, there were multiple ways to submit a ballot:

> a. An unknown number of ballots were issued to an unknown number of regional centers that issued ballot from all 40 districts to "Early Vote" "In-Person" voters, that did not appear in-person at their assigned precinct, resulting in an unknown number of cast ballots and an unknown number of counted ballots, that are reported by Precinct and District, but not processed or reported by their assigned precinct, creating an additional chain-of-custody to be accounted for in the final tally for each precinct.

> b. An unknown number of ballots were issued to441 "In-Person" Election Day Precincts resulting in an unknown number of cast ballots and unknown number of counted ballots.

> c. An unknown number of absentee ballots from unknown depositors were collected in each of the "Early Vote" centers for the 14 days prior to election day, and an unknown number of absentee ballots from unknown depositors were collected in precinct drop box on Election Day.

> d. A reported number of alternative ballot types were issued (230,410) by the Division of Elections, a reported number of returned and voted ballots (205,597), and the difference is 24,813 ballots that are not accounted for or recorded, issued but not returned – lost.

156. The 24,813 ballots were presumably lost and/or have no reported chain-of-custody. DOE report Primary and General Election, Absentee, Early and Questioned Ballot Statistics, November 3, 2020, Election (Last Updated 12/04/2020). Exhibit D, p2.

**Violation of the Voting System Standards 52 USC 21081(a)(2)(B) manual audit capacity**

157. All foregoing Paragraphs are incorporated as if set forth fully herein.

158. No State statute authorizes the Defendants non-compliant conduct.

159. 52 USC 21081(a)(2)(A) provides, "Each voting system used in an election for Federal office shall produce a record with an audit capacity for such system."

160. 52 USC 21081(a)(2)(B) "Manual audit capacity. (i) The voting system shall produce a permanent paper record with a manual audit capacity for such system. (ii) The voting system shall provide the voter with an opportunity to change the ballot or correct any error before the permanent paper record is produced. (iii) The paper record produced under subparagraph (A) shall be available as an official record for any recount conducted with respect to any election in which the system is used." 42 USC 15481(a)(2)(B), and 52 USC 21081(a)(2)(B).

161. A significant number (unknown) of the 441 precincts in Alaska are hand-count.

162. Whatever manual audit capacity the state officials used prior to the consideration of the initiative petition has been overridden by the opinion of the Attorney General, in his narrow assessment of the constitutionality of the initiative, and in total disregard of federal election law.

**Violation of Voting System Standards 52 USC 21081(a)(5) Error Rate - EAC standards**

163. All foregoing Paragraphs are incorporated as if set forth fully herein.

164. No State statute authorizes the Defendants conduct.

165. The error rate of the voting system in counting ballots is required to comply with the error rate standards established under section 3.2.1 of the voting system standards issued by the Federal Election Commission which "are in effect on October 29, 2002." 52 USC 21081(a)(5).

166. CCSA requests the documentation to determine state compliance with the error rate standards and how the error rate of the voting system determines which "errors" are attributable to the voting system and which "errors" are attributable to an act of the voter, and how that information is publicly reported by state officials.

167. The EAC's Voting System Testing and Certification Program Manual (OMB 3265-0019) and the EAC Voting System Test Laboratory Program Manual, provide mandatory procedural requirements for participating states to ensure ongoing compliance with accreditation.

168. CCSA requests the documentation and history of the testing, certification, decertification, and recertification of voting system hardware and software by accredited laboratories as required by 52 USC 20971, prior to the determination by either federal or state standards of the error rate.

169. Voting system defined. The term "voting system" means – (1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used – (A) to define ballots; (B) to cast and count votes; (C) to report or display election results; and (2) the practices and associated documentation used – (A) to identify system components and versions of such components; (B) to rest the system during its development and maintenance; (C) to maintain records of system errors and defects; (D) to determine specific system changes to be made to a system after the initial qualification of the system; and (E) to make available any materials to the voter (such as notices, instructions, forms, or paper ballots). 52 USC 21081(b).

170. CCSA request the documentation to determine the error rate of the voting system used in the 2020 elections, with respect to each of the components of the voting system identified in the list above, including the certification by the manufacturer, independent laboratory testing of the software and firmware, and local testing prior to use of the recently purchased machines in Alaska, and history of the updates or alterations on all electronic equipment used in Alaskan elections in 2020.

171. CCSA request the documentation of replacement voting system components, prior to and after the 2020 elections, and all correspondence relating to the update and additions to the voting system components.

172. The same requirement that all voting systems and voting equipment meet federal voting system standards ("VSS") that were promulgated in 2002 by the FEC were determined by Court Order in Georgia to have been identified as "catastrophic vulnerabilities and failures in the Dominion electronic voting systems used in sixteen states," including Alaska. (See *Curling v. Raffensperger*, Case No. 1:17-cv-02989-AT (U.S. Dist. Ct., N.D. Ga.).

173. On June 3, 2022, the Cybersecurity and Infrastructure Security Agency ("CISA") released a security advisory, detailing nine unknown and untested vulnerabilities in Dominion's Democracy Suite® ImageCast X devices – and any components connected to those devices, such as the Election Management System ("EMS"). ICS Advisory ICSA-22-154-01, casting doubt on any past firmware/software certification and the use of machine and software potentially subject to abuse, see https://www.cisa.gov/uscert/ics/advisories/icsa-22-154-01.

174. Upon information and belief, the critical vulnerabilities identified by the expert witness in *Curling*, Prof. Halderman that gave rise to CISA's June 3, 2022, advisory applies to all Dominion electronic voting systems employing ImageCast X devices – including those systems used in Alaska.

175. CISA's advisory identified nine security vulnerabilities in Dominion ICX which were undetected by Voting System Testing Lab ("VSTL") certification testing.

176. The presence of these security vulnerabilities and failures identified in CISA's advisory warning regarding the Dominion ICX machines prevents ICX/D-Suite 5.13 compliance with various VSS standards, including but not limited to:

    a. VSS § 2.2.1 requires that any voting system ensures system security;

    b. VSS §2.2.11, citing 42 U.S.C. § 1974, requires that all data and records created by the system are maintained for purposes of an audit;

    c. VSS § 4.2.2 prohibits the use of self-modifying, dynamically loaded, or interpreted code in voting systems so that the software that was approved and certified retains its integrity;

    d. VSS § 6.2.1.2 requires that voting systems identify and control the individuals with access;

    e. VSS §6.4.1 requires that voting systems with resident software be retested prior to the start of election operations; and

    f. VSS § 6.4.2 requires that voting systems protect against malicious software.

177. None of the security failures CISA identified were detected through any prior certification or testing process used in preparation of the Georgia 2020 elections, however, depending on the methods and certification or testing process used in Alaska, were the security failures detected?

178. CCSA request that all of the digital devices, storage, etc. be preserved for examination to determine the potential non-compliance and potential security failures that may have affected the administration of the election of 2020 in Alaska and the published results.

**Violation of the Provisional Voting Requirements 52 USC 21082**

179. All foregoing Paragraphs are incorporated as if set forth fully herein.

180. No State statute authorizes the Defendants conduct.

181. An individual who is not on the precinct voter registration list, upon declaration that he is a registered voter in that jurisdiction, desires to vote, and is eligible to vote in an election for a federal office, is to be notified that the individual is permitted to cast a provisional ballot.

182. CCSA requests the documentation by which a "Questioned" or "Provisional" ballot is processed to verify citizenship, residency, and personal information to determine whether the voter is qualified to cast a ballot in Alaska.

183. CCSA requests the documentation as to how a "Questioned" or "Provisional" ballot is reported by the Division of Elections in the publicly reported data.

184. CCSA requests the documentation as to whether "provisional" or questioned voters are added to the voter registration list, or sub-lists of same, whether or not the individual was qualified to vote in the election.

**Violation of the Statewide Voter Registration List 52 USC 21083(a)(1)(A)**

185. All foregoing Paragraphs are incorporated as if set forth fully herein.

186. No State statute authorizes the Defendants non-compliant conduct.

187. "Statewide Voter Registration List requirements. Each State, **acting through the chief State election official,** shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, **centralized,** interactive computerized **statewide voter registration list defined, maintained, and administered at the State level** that **contains the name and registration information of every legally registered voter in the State** and assigns a unique identifier to each legally registered voter in the State (in this subsection referred to as the "computerized list")...." (Emphasis added) 52 USC 21083(a)(1)(A).

188. The State of Alaska Chief State Election Official is mandated to implement a statewide voter registration list - defined, maintained, and administered at the State level that contains the name and registration information of every legally register voter in the State.

189. CCSA requests the statutory authority by which the Chief State Election Official may delegate their duty and responsibility to define, maintain, or administer the Statewide Voter Registration List, containing personally identifiable information about every potential voter in the state of Alaska – to the Electronic Registration Information Center ("ERIC"), a third party non-governmental organization.

190. CCSA request the documentation provided to the Alaska State Legislature that approved the initial membership and ongoing agreement to allow the Chief State Election Official to waive their duty to supervise the voter registration database management operations and delegate that responsibility to ERIC. The question CCSA is posing – did the legislature knowingly approve exposing the personal information on all citizens to potential foreign influence?

191. CCSA request this administrative hearing officer to allow plaintiffs to subpoena Shane Hamlin, the Executive Director of ERIC, as CCSA would like to ascertain the information that has been requested of the Attorney General of Arizona on March 19, 2022, by Jovan Hutton Pulitzer, attached as Exhibit C. Both Arizona and Alaska are member states of the 31 states that have turned-over their list maintenance responsibilities to ERIC.

192. CCSA request the opportunity to ascertain whether state officials have compromised the identity of every citizen of Alaska without their knowledge or consent.

193. "House Bill 65 was passed by the Legislature during the 2007-2008 session and became law on July 1, 2009. It is found in the Alaska Statutes at AS 45.48. The law provides several protections for personal information, including: (1) a notice requirement when a breach of security concerning personal information has occurred; (2) the ability to place a security freeze on a consumer credit report; (3) various restrictions on the use of personal information and credit information; (4) the disposal of records containing personal information; (5) allowing a victim of identity theft to petition the court for a determination of factual innocence; and (6) truncation of credit card information." Alaska Personal Information Protection Act (http://law.alaska.gov.)

194. CCSA request verification that the Alaska State Legislature approved transference of the personal information of all individuals identified on the voter registration list and the use and dissemination of that information is beyond the control of Alaska State Government.

195. Protection of Social Security Number, AS 45.48, restrict violators from releasing "personal information" to the public and offers sound advice to prevent scam artists from stealing a person's identity, but does not contemplate the possibility that a state department would transfer personal data exposing every citizen to "identity theft" and put every qualified voter at risk for "identity theft" providing an opportunity for "scam artists" to vote on our behalf.

196. Since 2016 the applicants for requesting a permanent fund dividend have been automatically registered to vote and added to the Alaska statewide voter registration list raising concerns that the identity issues may not limited to eligible individuals (citizen, 18+, qualified) but all citizens.

197. Statewide Voter Registration List requirements …the "computerized list")" includes the following: (i) The **computerized list shall serve as the single system** for storing and managing the official list of registered voters throughout the State. (ii) **The computerized list contains the name and registration information of every legally registered voter in the State**. (iii) Under the computerized list, a unique identifier is assigned to each legally registered voter in the State. (iv) The **computerized list shall be coordinated with other agency databases within the State**. (v) Any election official in the State, including any local election official, may obtain immediate electronic access to the information contained in the computerized list. (vi) All voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official. (vii) The chief State election official shall provide such support as may be required so that local election officials are able to enter information as described in clause (vi).

(viii) The computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." (Emphasis added) 52 USC 21083(a)(1)(A).

### Violation of the Statewide Voter Registration List 52 USC 21083(a)(5)B) (i)

### Division of Elections is to cross check with DMV/SSN

198. All foregoing Paragraphs are incorporated as if set forth fully herein.

199. No State statute authorizes the Defendants non-compliant conduct.

200. Requirements for State officials sharing information in databases. The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration. The official responsible for the State motor vehicle authority shall enter into an agreement with the Commissioner of Social Security. 52 USC 21083(a)(5)(B)(i) & (ii).

201. CCSA request the instigating documents that led to the June 13, 2022, Memorandum of Understanding between the Civil Rights Division of the U.S. Department of Justice and the State of Alaska, as it may provide additional information regarding violations of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20504; as the NVRA is applicable to the computerized list (52 U.S.C. § 21083), a subject to this complaint. Exhibit D, pgs. 5-13


### Violation of Statewide Voter Registration List, 52 USC 21083(a)(2)(A) - (a)(2)(B)

202. All foregoing Paragraphs are incorporated as if set forth fully herein.

203. No State statute authorizes the Defendants non-compliant conduct.

204. To meet the federal requirement, "The appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis as follows: (i) If an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993, 52 USC 20501 et seq. and 20507. (ii) For purposes of removing names of ineligible voters from the official list of eligible voters – under 52 USC 20507(a)(3)(B), the State shall coordinate the computerized list with State agency records on felony status; and by reason of the death of the registrant under 52 USC 20507(a)(4)(A), the State shall coordinate the computerized list with State agency records on death." 52 USC 21083(a)(2)(A).

205. To meet the federal requirement, the list maintenance performed under 52 USC 21083(a)(2) (A) "shall be conducted in a manner that ensures that – (i) the name of each registered voter appears in the computerized list; (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list; and (iii) duplicate names are eliminated from the computerized list." 52 USC 21083(a)(2)(B).

206. The Voter Registration Table 4, based on State reported data indicates that the elections of 2016, 2018, and 2020 were over-registered by, 100.1%, 107.6%, and 111.7% respectively, (Exhibit E, p. 2.) which seconds the request to determine what ERIC accomplished with regards to the list management tasks for which the organization was employed to perform. Exhibit C, pgs. 7-16.

**Violation of SVR List 52 USC 21083 (a)(3) Adequate Technological Security Measures**

207. All foregoing Paragraphs are incorporated as if set forth fully herein.

208. No State statute authorizes the Defendants non-compliant conduct.

209. The appropriate State or local official shall provide adequate technological security measures to prevent the unauthorized access to the computerized list established under this section. 52 USC 21083(a)(3).

210. Campaigning legislators have referenced multiple technological security" breaches "and/or unauthorized access to the computerized list, CCSA request the documents pertaining to the research and findings of any investigation or report of known or suspected unauthorized access.

211. CCSA request documentation of all technological security breaches from 2000 to 2021, to be considered as part of the full forensic audit, to determine compliance with federal requirements.

**Violation of Statewide Voter Registration List 52 USC 21083(a)(4) List Maintenance**

212. All foregoing Paragraphs are incorporated as if set forth fully herein.

213. No State statute authorizes the Defendants non-compliant conduct.

214. Compliance with federal requirements, are measured by "Minimum standard for accuracy of State voter registration records. The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including the following: (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the National Voter Registration Act of 1993, 52 USC 20501 et. seq., registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote, and (B) safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 52 USC 21083(a)(4).

215. Although litigated by a separate case, CCSA request a full disclosure of the list maintenance procedures to be assessed as part of the full forensic audit.

**Violation of Statewide Voter Registration List 52 USC 21083(a)(5)(A)**

216. All foregoing Paragraphs are incorporated as if set forth fully herein.

217. No State statute authorizes the Defendants non-compliant conduct.

218. Compliance with federal requirements: "Verification of voter registration information requiring provision of certain information by applicants. In general, except as provided in clause (ii), notwithstanding any other provision of law, an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes – (I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or (II) in the case of any other applicant (other than an applicant to whom clause (ii) applies), the last 4 digits of the applicant's social security number." 52 USC 21083(a)(5)(A)(i).

219. And, "If an applicant for voter registration for an election for Federal office has not been issued a current and valid driver's license or a social security number, the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes. To the extent that the State has a computerized list in effect under this subsection and the list assigns unique identifying numbers to registrants, the number assigned under this clause shall be the unique identifying number assigned under the list." 52 USC 21083(a)(5)(A)(ii).

220. CCSA request documentation of State Law to provide "The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law." 52 USC 21083(a)(5)(A)(iii).

221. CCSA submits *Willful Blindness: Feds Ignore Illegal Alien ID Theft Plaguing Americans as U.S. Coffers Fill*, June 30, 2022 (attached as Exhibit F) to notify Alaska state officials that the procedures to ascertain legitimate citizenship must be reviewed to prevent the "identity-related" crimes against citizens, but also to determine the impact on our elections and potential fraud.

**Statewide Voter Registration List 52USC 21083(a)(5)B)(i) cross check with DMV/SSN**

222. All foregoing Paragraphs are incorporated as if set forth fully herein.

223. No State statute authorizes the Defendants non-compliant conduct.

224. Federal "Requirements for State officials sharing information in databases. The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration. The official responsible for the State motor vehicle authority shall enter into an agreement with the Commissioner of Social Security." 52 USC 21083(a)(5)(B)(i) & (ii).

225. CCSA allege that the closed signature verification proposed in SB167 that does not cross-check the voter's signature with the updated and verifiable signatures used to register drivers and vehicles offends the federal requirements, potentially an issue corrected in the MOU attached as Exhibit D.

**Statewide Voter Registration List 52 USC 21083(a)(5)(D), 21083(c), 21082(a) Privacy Act**

226. All foregoing Paragraphs are incorporated as if set forth fully herein.

227. No State statute authorizes the Defendants non-compliant conduct.

228. Federal law provides "In the case of a State which is permitted to use social security numbers, and provides for the use of social security numbers, on applications for voter registration, in accordance with section 7 of the Privacy Act of 1974 (5 U.S.C. 552a note), the provisions of this paragraph shall be optional." 52 USC 21083(a)(5)(D).

229. And, federal law provides: "Permitted use of last 4 digits of social security numbers. The last 4 digits of a social security number described in subsections (a)(5)(A)(i)(II) and (b)(3)(B)(i) (II) shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974 (5 U.S.C. 552a note)." 52 USC 21083(c).

230. Further, "States described in section 20503(b) of this title may meet the requirements of this subsection using voter registration procedures established under applicable State law. The appropriate State or local official shall establish and maintain reasonable procedures necessary to protect the security confidentiality, and integrity of personal information collected, stored, or otherwise used by the free access system established under paragraph (5)(B). Access to information about an individual provisional ballot shall be restricted to the individual who cast the ballot." 52 USC 21082(a).

231. Federal regulations permitting use of the social security number in routine activities in performing maintenance of the voter registration list were to provide an optional crosscheck to distinguish between individuals with similar name, address, etc.

232. Federal regulations cannot be interpreted to permit a chief state election official delegate their list maintenance responsibilities to a non-governmental organization that does not represent the people of Alaska. The Alaska Personal Information Protection Act, AS 45.48, is in direct contradiction to the list management scheme, on this and other issues.

233. CCSA requests documentation to support the state official's financial engagement with ERIC, the membership agreement, the bylaws, and the correspondence identified in Exhibit C, to be considered independently as an issue for appeal regarding the potential of risk for identity theft.

**Violation of 52 USC 21081- 21085 – AGO No. 2019200578, 19AKBE Ballot Measure Application Review**

234. All foregoing Paragraphs are incorporated as if set forth fully herein.

235. No State statute authorizes the Defendants non-compliant conduct.

236. CCSA allege that if - the State of Alaska had updated and maintained the "minimum requirements" for federal compliance prior to the August 29, 2019, Department of Law review of the ranked choice voting initiative, the opinion as a result of "reviewing initiative" to ensure the proposed initiative "meet all constitutional and **statutory requirements**" would have been legal. https://law.alaska.gov/pdf/opinion/opinions_2019/19-003_2019200578.pdf.

237. The statutory requirements CCSA allege that should have been part of the review are the federal requirements identified above, at a minimum include: the notification of error and opportunity to correct errors prior to the ballot being cast (for all ballot types), the chain of

custody (for all ballot types), the mandate to maintain the privacy of the voter, the mandate to maintain the confidentiality of the ballot (for all ballot types) and the manual audit capacity for each voting system. The omissions defeat the opinion.

238. CCSA requests verification that, after an adequate search for responsive records to verify Alaskan Statutes met the "minimum requirements" standards of federal requirements identified in 52 USC 21081 thru 21085, whether or not, the opinion of the Attorney General Clarkson considered the federal election requirements, specifically sections identified above.

239. CCSA alleges the August 29, 2019, Attorney General's review was fraudulent by omission of any consideration of federal requirements that should have been considered at that time.

240. CCSA allege that if the same opinion were requested today, the consideration of the federal requirements would defeat the initiative, but for the consideration for the 2020 elections and the resulting decisions it is important to establish that had the federal requirements be found in Alaskan Statutes, the decision would have considered federal election law in the opinion.

241. CCSA request the original initiative petition for be remanded to the Attorney General's office for a comprehensive review of the initiative petition and a revised opinion as to the constitutionality of the initiative petition with respect to the Alaska Constitution and the federal election requirements herein identified.

**Violation of 52 USC 21084-21085, State Officials Failed to Provide Public Notification of Reasonable Accommodations to Voters Disabled by March 11, 2020, Emergency Order**

242. All foregoing Paragraphs are incorporated as if set forth fully herein.

243. No State statute authorizes the Defendants non-compliant conduct.

244. On March 11, 2020, Governor Michael J. Dunleavy, under authority of AS 26.23.020, declared a public health emergency in response to the novel coronavirus disease (COVID-19) pandemic. FCCS SB 241 extended the public health emergency but did not address how state officials would ensure that existing "reasonable modifications" would be extended to the individuals now considered "disabled" by the public health emergency declaration. https://law.alaska.gov/pdf/bill-review/2020/007_2020200309.pdf.

245. The State of Alaska, Division of Elections, is a public entity subject to Title II of the Americans with Disabilities Act of 1990 ("ADA"). See 42 USC 12131(1)(B).

246. Voting in federal elections is a service, program, or activity provided by Defendants.

247. "Definition. 42 USC 12131. As used in this title: (1) Public entity. The term public entity means (A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 103(8) od the Rail Passenger Service Act). (2) Qualified individuals with a disability. The term qualified individual with a disability means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architecture, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential

eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." See Americans with Disabilities Act of 1990, Title II Subpart A.

248. Section 504 of the Rehabilitation Act of 1973 prohibits the exclusion of a "qualified individual with a disability" from participating in "any program or activity receiving "Federal financial assistance." 29 USC 794(a). Upon information and belief, the Division of Elections receives federal financial assistance which it utilizes to conduct federal elections, and therefore subject to the Rehabilitation Act. See AS 18.80.300(14)(C)(i)-(iii).

249. Title II of the ADA guarantees qualified individuals an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 28 CFR 35.130(b)(1)(ii)-(iii).

250. Public entities must make reasonable modifications to their policies, practices, and procedures when necessary to avoid discrimination against individuals with disabilities, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity. 28 CFR 35.130(b)(7)(i).

251. Definition of Discrimination. "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. Id, 42 USC 12132.

252. The alternative to voting "In-Person" has been the absentee ballot option, available to every qualified voter prior to every election by submitting a "no-excuse" request, but a by-mail ballot is known to be less secure and therefore less desired than casting a ballot at a local precinct.

253. The EO and emergency legislation directed the Division of Elections to send absentee ballots but did not provide notification of reasonable modifications to individuals (qualified voters disabled by executive order), who did not want to vote by-mail or in-person and risk their vote or their health.

254. The administrative modification did not consider the impact on the individual voter but provided guidance to the entire group of impacted voters, whether the proposed suggestion was appropriate to their individual needs, or not.

255. Public entities must make reasonable modifications to their policies, practices, and procedures **when necessary** to avoid discrimination against individuals with disabilities.

256. All qualified voters are entitled to the protections afforded under the ADA, without discrimination.

257. Not expanding or modifying traditional methods for the expanded class of COVID-19 disabled individuals who wish to cast a ballot safely and securely, was to direct all qualified voters to a ballot casting option with known security flaws, a violation of the ADA in that the first duty of election officials was to notify individuals of all "reasonable accommodations" available and provide the voter the nondiscriminatory procedures so that the voter determines what option meets their needs in order to cast their vote.

258. The second duty of election officials was to explain the temporary changes to the policies, practices and procedures, provide the contact information for each concerned voter to register or request an accommodation, and ensure that each voter is afforded the protections of the ADA.

259. In light of the COVID-19 public health emergency, failure to provide "reasonable modifications" to enable individuals an equal opportunity to access the activities of the public entity in order to cast a ballot in a manner that would not risk their health - violated the purpose and spirit of the ADA.

260. Defendant Lieutenant Governor Kevin Meyer, issued a June 2020 letter to all voters over the age of 65 with an application for an absentee ballot, and was sued to expand correspondence to voters of all ages, by legal counsel demanding action outside of his statutory authority. CCSA allege this would have been the appropriate opportunity to provide notification to all qualified voters that "reasonable accommodation" options were available.

261. There was no public notification of "reasonable accommodations" for voters concerned about the public exposure in order to cast their ballot.

262. The public data suggests that there were "reasonable accommodations" for some voters, in that there were "special needs" ballots received and counted. This evidence is significant in that the voter challenged with the pandemic issues was not provided reasonable accommodations or informed that an accommodation was available.


**Arctic Village Litigation Agreement was a violation of federal election law and state election law, and violation of the Administrative Procedure Act, AS 44.62 et seq.**

263. On August 31, 2020, Defendant Lieutenant Governor Meyer and Director Fenumiai received correspondence from Joshua A. Decker (American Civil Liberties Union of Alaska Foundation), Natalie Landreth (Native American Rights Fund), and Kristen Clarke (Lawyers' Committee for Civil Rights Under Law). The letter demanded that state officials "Let every Alaskan vote: waive the absentee witness requirement" and with reference to the above case, outlined their demands. (Exhibit G, p. 2-5)

264. On September 4, 2020, Defendant Lieutenant Governor Meyer sent a response to Stephen Koteff, Legal Director of ACLU of Alaska, explaining that he "lacks the power to unilaterally waive the statutory witness requirement" as demanded by the previous correspondence. (Exhibit G, p.6).

265. The plaintiffs sued Lieutenant Governor Meyer and Director Fenumiai, in the Superior Court Case No: 3AN-20-07858 CI, and to conclude the "terms of the order" granting "the plaintiffs' motion for a preliminary injunction" the State Defendants filed "STATE'S NOTICE OF FILING PROPOSED PRELIMINARY INJUNCTION ORDER" (Dated Oct. 6, 2020) with attached "[PROPOSED] PRELIMINARY INJUNCTION ORDER (Exhibit H).

266. The proposed order, on Department of Law Letterhead, detailed the waiver of the "Witness Requirement" for Absentee Ballots, as required by AS § 1520.066(b), AS 15.20.081(d), 6 AAC

25.550, and 6 AAC 25.680" as "an unconstitutional burden on the right to vote." (Exhibit H, pp 1-5)

267. The Defendants proposed order, then detailed the alterations to the upcoming election just weeks away and detailed the various notifications to be accomplished that would inform the public of the alteration in election procedures. (Exhibit H, pp 5-9)

268. Defendant Lieutenant Governor Meyer did not have the statutory authority to agree to or propose an unconstitutional compliance with the terms of the Preliminary Injunction.

269. Defendant Director of Elections Gail Fenumiai did not have the statutory authority to agree to or propose an unconstitutional compliance with the terms of the Preliminary Injunction.

270. Defendant Attorney General Treg Taylor did not have the statutory authority to agree to or propose an unconstitutional compliance with the terms of the Preliminary Injunction.

271. Defendant Governor Michael J. Dunleavy did not have the statutory authority to allow state officials to agree to or propose an unconstitutional compliance with the terms of the Preliminary Injunction.

272. The State of Alaska Administrative Procedures Act, AS 44.62, prohibits the foregoing Agreement in every Article of the Act:

> Article 01. Application and Effect
>
> Article 02. Submission, Filing, and Publication of Regulations
>
> Article 03. The Alaska Administrative Register and Code
>
> Article 04. Procedure for Adopting Regulations
>
> Article 05. Judicial Review
>
> Article 06. Open Meetings of Governmental Bodies

273. Under the APA, a "rule" is defined as "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the **amendment, suspension, or recession of the law** enforced or administered by the agency (emphasis added).

274. The statutory power is no greater than that delegated to it by the legislature. State officials' actions that exceed their statutory authority are *ultra vires* and must be invalidated.

275. A "rule" not promulgated in accordance with the APA's procedures is invalid. *Pharris v. Secretary of State,* 323 NW2d. 652 (1982).

276. The Defendants conduct was in excess of statutory authority under the APA.

277. The adoption and promulgation of the [PROPOSED] PRELIMINARY INJUNCTION ORDER was a major agency action that could not lawfully be conducted without compliance with the APA.

278. Defendants, Dunleavy, Meyer, Fenumiai, and Taylor are "agencies" within the meaning of the APA, and in their official capacities, are the head of the Departments subject to the APA.

279. The Defendants conduct alleged herein constitutes "final action" because it marks the consummation of the agency's decision-making process, *Bennett v. Spear*, 520 U.S. 154, 178 (1997) and directly affected the conclusion of the case, *Franklin v. Mass*, 505 U.S. 788, 797 (1992), that was not appealed by either party.

## FIRST CAUSE OF ACTION

### Violation of Elections Clause: Art. I, § 4, cl. 1 of U.S. Constitution; 42 USC § 1983

280. Plaintiffs, CCSA repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 279 of this Complaint as if fully set forth herein.

281. The Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State <u>by the Legislature thereof</u>." Art. I, § 4, cl. 1 (emphasis added).

282. The Legislature is "the representative body which ma[kes] the laws of the people." *Smiley v. Holm*, 285 U.S. 355, 365 (1932). Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." *Id.* At 367; *see also Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,* 135 S. Ct. 2652, 2668 (2015).

283. Defendants have violated and are engaged in the continued violation of the Elections Clause by usurping the Alaska State Legislature's constitutional authority to set the manner of elections.

284. Plaintiffs have suffered, and will continue to suffer, damage that is actual, as well as imminent and certainly impending, by reason of defendants' violation of the Elections Clause.

285. The damage Plaintiffs have suffered is capable of repetition, yet evading review, as there have been subsequent elections as alleged herein, and no change in how forthcoming elections will be conducted.

286. Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless violations of the Elections Clause are enjoined by an honest review of the administrative conduct alleged.

287. Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining the defendants' violations of the Elections Cause.

## SECOND CAUSE OF ACTION

### Denial of Equal Protection: 14th Amendment of U.S. Constitution; 42 USC § 1983

288. Plaintiffs, CCSA repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 287 of this Complaint as if fully set forth herein.

289. The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's); *Harper v. Virginia Board of Elections,* 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

290. Defendants have violated, and are engaged in the continued violation of, the Equal Protection Clause, including by diminishing the value of votes legally cast by and for the individual Plaintiffs by the application and enforcement of the laws, statutes, regulations, orders, and practices described herein.

291. Defendants have violated, and are engaged in the continued violation of, the Equal Protection Clause, including by intentionally failing to ensure that only legally cast ballots were included in the canvass for the 2020 general election in Alaska.

292. Defendants have violated, and are engaged in the continued violation of, the Equal Protection Clause, by treating in-person voters differently from multiple alternative methods of casting a vote that were permitted to be counted without ensuring the security requirements.

293. Defendants have violated, and are engaged in the continued violation of, the Equal Protection Clause, by waiving laws, regulations, orders and voting practices that disproportionately burden certain classes of voters by insufficient application of requirements.

294. Plaintiffs have suffered, and will continue to suffer, damage that is actual, as well as imminent and certainly impending, by reason of Defendants' violation of the Equal Protection Clause.

295. Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless enjoined from violation of the Equal Protection Clause.

296. Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining the defendants' violations of the Equal Protection Clause.

### THIRD CAUSE OF ACTION

### Denial of Due Process: 14th Amendment of U.S. Constitution; 42 USC § 1983

297. Plaintiffs, CCSA repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 296 of this Complaint as if fully set forth herein.

298. The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution. *Harper*, 383 U.S. at 663. *See also Reynolds v. Sims,* 337 U.S. 533, 554 (1964) (The Fourteenth Amendment protects the "right of all qualified citizens to vote, in state as well as in federal elections.").

299. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006).

300. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n. 29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

301. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

302. The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson,* 417 U.S. at 226.

303. Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, violate the Fourteenth Amendment by leading to the diminution in value of validly cast ballots. *See Reynolds,* 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

304. Defendants have violated, and are engaged in the continued violation of, the Due Process Clause, including by diminishing the value of votes legally cast by and for individual Plaintiffs by the application and enforcement of the laws, statutes, regulation, orders and practices described herein.

305. Defendants have violated, and are engaged in the continued violation of, the Due Process Clause, including by intentionally failing to ensure that only legally cast ballots were included in the canvass for the 2020 general election in Alaska.

306. Plaintiffs have suffered, and will continue to suffer, damage that is actual, as well as imminent and certainly impending, by reason of Defendants' violation of the Due Process Clause.

307. Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless the court enjoins defendants' violation of the Due Process Clause.

308. Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating or restraining the defendants' violations of the Due Process Clause.

## FOURTH CAUSE OF ACTION

### Violation of Guarantee Clause: Art. IV, § 4 of U.S. Constitution; 42 USC § 1983

309. Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 308 of this Complaint as if fully set forth herein.

310. The Guarantee Clause of the U.S. Constitution states that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion. . . ." (Art. IV, Sec 4.)

311. Defendants have violated, and are engaged in the continued violation of, the Guarantee Clause by implementing laws, regulations, orders and voting practices, and conducting elections, so as to deny Alaska and its citizens, including Plaintiffs, a republican form of government.

312. Defendants have further violated, and are engaged in the continued violation of, the Guarantee Clause by implementing laws, regulations, orders and voting practices, and conducting elections, so as to allow foreign interference in Alaska elections, denying Alaska and its citizens, including Plaintiffs, from protection against invasion.

313. Plaintiffs have suffered, and will continue to suffer, damage that is actual, as well as imminent and certainly impending, by reason of defendants' violation of the Guarantee Clause.

314. Plaintiffs have no adequate remedy at law and will suffer irreparable harm unless the court enjoins defendants' violation of the Guarantee Clause.

315. Plaintiffs are entitled to declaratory relief and temporary, preliminary and permanent injunctive relief invalidating or restraining the defendants' violations of the Guarantee Clause.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray judgment against Defendants as follows:

a. An order directing Defendants to preserve all voting machines, software, peripherals (including flash drives and other memory storage), computers, reports generated, and other data and equipment used to cast, examine, count, tabulate, modify, store or transmit

votes or voting data in the November 2020 elections in Alaska for inspection and audit by experts;

b. An order directing Defendants to preserve all ballots, ballot envelopes, remade or duplicated ballots, adjudicated ballots and other documents used to cast votes in the November 2020 elections in Alaska for inspection and audit by experts;

c. An order, upon the collection of legislative records to affirm or deny, that the administration has failed to enact or amend Alaskan Statutes and administrative regulations to comply with the "minimum" federal requirements and by omission of those procedural requirements are responsible for breach of their official duty;

d. An order directing the appointment of one or more special masters to oversee the evidence preservation and audit process (depending on location of documents);

e. An order directing the appointment of one or more special masters to oversee and monitor the accuracy of vote counting in Alaska's upcoming federal elections;

f. An order of declaratory judgment that a forensic evaluation and audit of the 2020 General Election is required to determine the procedural and substantive violations;

g. An order of declaratory judgment that this litigation is indeed in "the public interest" and therefore waive cost and fees for all requested access to governmental records; and

h. Such other relief as is just and proper.

_____

Dated:                                Citizen Complainants of the State of Alaska

                                      See Notarized Affidavits of Complainants (attached)

Affidavit of Complainant *Thomas W. Oels*

I, Citizen Complainant *Thomas W. Oels*, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint, Request for Administrative Records, and request for a full forensic audit of the 2020 General Election; are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records.

I voted in the November 3, 2020, election and I am concerned the General Election was not conducted in a free and fair manner. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote. and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election in Alaska.

I currently reside at: *4128 W. Discovery Loop*

*Wasilla*, Alaska *99687*

My mailing address is: *P.O. Box 873562 Wasilla Ak. 99687*

*08-31-22*
Date

Signature of Person Making this Affidavit

*Thomas W. Oels*
Printed Name

Subscribed and sworn to or affirmed before me at *Wasilla*, Alaska on *August 31, 2022*.

(SEAL)

Clerk of Court, Notary Public, or other Person authorized to administer oaths.

My commission expires *12/2/2025*

*Ph. 907-232-6782*
*email blake@mta online.net*

OLIVIA FARRELL
NOTARY
PUBLIC
STATE OF ALASKA
My Commission Expires December 2, 2025

**Affidavit of Complainant** _Loy A. Thurman_

I, Citizen Complainant _Loy A Thurman_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint, Request for Administrative Records, and request for a full forensic audit of the 2020 General Election; are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records.

I voted in the November 3, 2020, election and I am concerned the General Election was not conducted in a free and fair manner. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election in Alaska.

I currently reside at: _14166 W. Knights Dr._

_Big Lake_, Alaska _99623_.

My mailing address is: _P.O. Box 520011_

_8/31/2022_
Date

Signature of Person Making this Affidavit
_Loy A. Thurman_
Printed Name

Subscribed and sworn to or affirmed before me at _Wasilla_, Alaska on
_August 31, 2022_.

(SEAL)

Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _12/2/2025_

_Loythurman @ outlook_
_(907) 357-2244_

**Affidavit of Complainant** _David H Johnson_

I, Citizen Complainant _David H Johnson_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint, Request for Administrative Records, and request for a full forensic audit of the 2020 General Election; are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records.

I voted in the November 3, 2020, election and I am concerned the General Election was not conducted in a free and fair manner. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election in Alaska.

I currently reside at: _6360 East Homeburnt Circle_

_Wasilla_ , Alaska _99645._

My mailing address is: _P.O. Box 870966_

_31/08/22_
Date

Signature of Person Making this Affidavit
_David H Johnson_
Printed Name

Subscribed and sworn to or affirmed before me at _Wasilla_ , Alaska on
_August 31, 2022_ .

(SEAL)

Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _12/2/2025_.

907 232 6867
dhjohnson113@gmail.com

**Affidavit of Complainant** William C. de Schweinitz

I, Citizen Complainant William C. de Schweinitz, the undersigned individual, a citizen of the
United States of America, a resident of the State of Alaska, deposes and says that the averments
in the foregoing Complaint, Request for Administrative Records, and request for a full forensic
audit of the 2020 General Election; are true and correct to the best of my knowledge,
information, and belief; and further that these averments are made without personal or financial
benefit from access to the requested public records.

I voted in the November 3, 2020, election and I am concerned the General Election was not
conducted in a free and fair manner. As an Alaskan, I have the right to an election process that
accurately counts every legal vote cast; and, our confidence in the integrity of that election
process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's
election process may identify any weaknesses in that process and also provide Alaskans with the
confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore,
I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election in
Alaska.

I currently reside at: 3260 Sooth Curcle

Anchorage, Alaska 99507

My mailing address is: 1530 Gambell St. Anchorage Ak 99501

2022/8/31
_____
Date

_____
Signature of Person Making this Affidavit

William C. deSchweinitz
Printed Name

Subscribed and sworn to or affirmed before me at Anchorage, Alaska on
August 31, 2022.

(SEAL)

_____
Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires 07.19.22.

**Affidavit of Complainant** *Pamela L. Bickford*

I, Citizen Complainant *Pamela Bickford*, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint, Request for Administrative Records, and request for a full forensic audit of the 2020 General Election; are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records.

I voted in the November 3, 2020, election and I am concerned the General Election was not conducted in a free and fair manner. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election in Alaska.

I currently reside at: *16840 Tide View Drive*

*Anchorage*, Alaska *99516*  *Pam bickford 2020@ gmail.com*

My mailing address is: *(above)* phone: *(907) 223-8829*

*Sept 1, 2022*
Date

*Pamela S. Bickford*
Signature of Person Making this Affidavit

*PAMELA L. BICKFORD*
Printed Name

Subscribed and sworn to or affirmed before me at *ANCHORAGE*, Alaska on
*SEPTEMBER 01, 2022*.

(SEAL)

Notary Public
M. N. ANDRES
State of Alaska
My Commission Expires July 13, 2023

*m.n. C*
Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires *JULY 13, 2023*.

CERTIFICATE OF SERVICE

I certify that I mailed (USPS) a copy of this document to the state officials listed below at the following addresses:

Governor Michael J. Dunleavy
State of Alaska
P.O. Box 110001
Juneau, Alaska 99811-0001

Lieutenant Governor Kevin Meyer
P.O. Box 110015
Juneau, Alaska 99811-0015

Attorney General Treg Taylor
P.O. Box 110300
Juneau, Alaska 99811

Director of Elections Gail Fenumiai
P.O. Box 110017
Juneau, Alaska 99811-0017

CERTIFICATE OF SERVICE

Pamela L. Bickford, Pro Se Clerk

9-1-2022

Dated

# Exhibit A

52 USC Subtitle II, CHAPTER 209, SUBCHAPTER III, Part A: Requirements

From Title 52—VOTING AND ELECTIONS
    Subtitle II—Voting Assistance and Election Administration
    CHAPTER 209—ELECTION ADMINISTRATION IMPROVEMENT
    SUBCHAPTER III—UNIFORM AND NONDISCRIMINATORY ELECTION TECHNOLOGY AND
    ADMINISTRATION REQUIREMENTS

PART A—REQUIREMENTS

## §21081. Voting systems standards

**(a) Requirements**

Each voting system used in an election for Federal office shall meet the following requirements:

**(1) In general**

(A) Except as provided in subparagraph (B), the voting system (including any lever voting system, optical scanning voting system, or direct recording electronic system) shall—
    (i) permit the voter to verify (in a private and independent manner) the votes selected by the voter on the ballot before the ballot is cast and counted;
    (ii) provide the voter with the opportunity (in a private and independent manner) to change the ballot or correct any error before the ballot is cast and counted (including the opportunity to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error); and
    (iii) if the voter selects votes for more than one candidate for a single office—
        (I) notify the voter that the voter has selected more than one candidate for a single office on the ballot;
        (II) notify the voter before the ballot is cast and counted of the effect of casting multiple votes for the office; and
        (III) provide the voter with the opportunity to correct the ballot before the ballot is cast and counted.

(B) A State or jurisdiction that uses a paper ballot voting system, a punch card voting system, or a central count voting system (including mail-in absentee ballots and mail-in ballots), may meet the requirements of subparagraph (A)(iii) by—
    (i) establishing a voter education program specific to that voting system that notifies each voter of the effect of casting multiple votes for an office; and
    (ii) providing the voter with instructions on how to correct the ballot before it is cast and counted (including instructions on how to correct the error through the issuance of a replacement ballot if the voter was otherwise unable to change the ballot or correct any error).

(C) The voting system shall ensure that any notification required under this paragraph preserves the privacy of the voter and the confidentiality of the ballot.

**(2) Audit capacity**

**(A) In general**

The voting system shall produce a record with an audit capacity for such system.

**(B) Manual audit capacity**

(i) The voting system shall produce a permanent paper record with a manual audit capacity for such system.
(ii) The voting system shall provide the voter with an opportunity to change the ballot or correct any error before the permanent paper record is produced.
(iii) The paper record produced under subparagraph (A) shall be available as an official record for any recount conducted with respect to any election in which the system is used.

**(3) Accessibility for individuals with disabilities**

The voting system shall—

(A) be accessible for individuals with disabilities, including nonvisual accessibility for the blind and visually impaired, in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters;

(B) satisfy the requirement of subparagraph (A) through the use of at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place; and

(C) if purchased with funds made available under subchapter II on or after January 1, 2007, meet the voting system standards for disability access (as outlined in this paragraph).

### (4) Alternative language accessibility

The voting system shall provide alternative language accessibility pursuant to the requirements of section 10503 of this title.

### (5) Error rates

The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission which are in effect on October 29, 2002.

### (6) Uniform definition of what constitutes a vote

Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State.

### (b) Voting system defined

In this section, the term "voting system" means—

(1) the total combination of mechanical, electromechanical, or electronic equipment (including the software, firmware, and documentation required to program, control, and support the equipment) that is used—

   (A) to define ballots;
   (B) to cast and count votes;
   (C) to report or display election results; and
   (D) to maintain and produce any audit trail information; and

(2) the practices and associated documentation used—

   (A) to identify system components and versions of such components;
   (B) to test the system during its development and maintenance;
   (C) to maintain records of system errors and defects;
   (D) to determine specific system changes to be made to a system after the initial qualification of the system; and

   (E) to make available any materials to the voter (such as notices, instructions, forms, or paper ballots).

### (c) Construction

#### (1) In general

Nothing in this section shall be construed to prohibit a State or jurisdiction which used a particular type of voting system in the elections for Federal office held in November 2000 from using the same type of system after the effective date of this section, so long as the system meets or is modified to meet the requirements of this section.

#### (2) Protection of paper ballot voting systems

For purposes of subsection (a)(1)(A)(i), the term "verify" may not be defined in a manner that makes it impossible for a paper ballot voting system to meet the requirements of such subsection or to be modified to meet such requirements.

### (d) Effective date

Each State and jurisdiction shall be required to comply with the requirements of this section on and after January 1, 2006.

(Pub. L. 107–252, title III, §301, Oct. 29, 2002, 116 Stat. 1704.)

EDITORIAL NOTES

CODIFICATION

Section was formerly classified to section 15481 of Title 42, The Public Health and Welfare, prior to editorial reclassification and renumbering as this section.

# §21082. Provisional voting and voting information requirements

## (a) Provisional voting requirements

If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot as follows:

(1) An election official at the polling place shall notify the individual that the individual may cast a provisional ballot in that election.

(2) The individual shall be permitted to cast a provisional ballot at that polling place upon the execution of a written affirmation by the individual before an election official at the polling place stating that the individual is—

(A) a registered voter in the jurisdiction in which the individual desires to vote; and

(B) eligible to vote in that election.

(3) An election official at the polling place shall transmit the ballot cast by the individual or the voter information contained in the written affirmation executed by the individual under paragraph (2) to an appropriate State or local election official for prompt verification under paragraph (4).

(4) If the appropriate State or local election official to whom the ballot or voter information is transmitted under paragraph (3) determines that the individual is eligible under State law to vote, the individual's provisional ballot shall be counted as a vote in that election in accordance with State law.

(5)(A) At the time that an individual casts a provisional ballot, the appropriate State or local election official shall give the individual written information that states that any individual who casts a provisional ballot will be able to ascertain under the system established under subparagraph (B) whether the vote was counted, and, if the vote was not counted, the reason that the vote was not counted.

(B) The appropriate State or local election official shall establish a free access system (such as a toll-free telephone number or an Internet website) that any individual who casts a provisional ballot may access to discover whether the vote of that individual was counted, and, if the vote was not counted, the reason that the vote was not counted.

States described in section 20503(b) of this title may meet the requirements of this subsection using voter registration procedures established under applicable State law. The appropriate State or local official shall establish and maintain reasonable procedures necessary to protect the security, confidentiality, and integrity of personal information collected, stored, or otherwise used by the free access system established under paragraph (5)(B). Access to information about an individual provisional ballot shall be restricted to the individual who cast the ballot.

## (b) Voting information requirements

### (1) Public posting on election day

The appropriate State or local election official shall cause voting information to be publicly posted at each polling place on the day of each election for Federal office.

### (2) Voting information defined

In this section, the term "voting information" means—

(A) a sample version of the ballot that will be used for that election;

(B) information regarding the date of the election and the hours during which polling places will be open;

(C) instructions on how to vote, including how to cast a vote and how to cast a provisional ballot;

(D) instructions for mail-in registrants and first-time voters under section 21083(b) of this title;

(E) general information on voting rights under applicable Federal and State laws, including information on the right of an individual to cast a provisional ballot and instructions on how to contact the appropriate officials if these rights are alleged to have been violated; and

(F) general information on Federal and State laws regarding prohibitions on acts of fraud and misrepresentation.

## (c) Voters who vote after the polls close

Any individual who votes in an election for Federal office as a result of a Federal or State court order or any other order extending the time established for closing the polls by a State law in effect 10 days before the date of that election may only vote in that election by casting a provisional ballot under subsection (a). Any such ballot cast under the preceding sentence shall be separated and held apart from other provisional ballots cast by those not affected by the order.

## (d) Effective date for provisional voting and voting information

Each State and jurisdiction shall be required to comply with the requirements of this section on and after January 1, 2004.

(Pub. L. 107–252, title III, §302, Oct. 29, 2002, 116 Stat. 1706.)

EDITORIAL NOTES

CODIFICATION

Section was formerly classified to section 15482 of Title 42, The Public Health and Welfare, prior to editorial reclassification and renumbering as this section.

## §21083. Computerized statewide voter registration list requirements and requirements for voters who register by mail

### (a) Computerized statewide voter registration list requirements

#### (1) Implementation

##### (A) In general

Except as provided in subparagraph (B), each State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State (in this subsection referred to as the "computerized list"), and includes the following:

(i) The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State.

(ii) The computerized list contains the name and registration information of every legally registered voter in the State.

(iii) Under the computerized list, a unique identifier is assigned to each legally registered voter in the State.

(iv) The computerized list shall be coordinated with other agency databases within the State.

(v) Any election official in the State, including any local election official, may obtain immediate electronic access to the information contained in the computerized list.

(vi) All voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local official.

(vii) The chief State election official shall provide such support as may be required so that local election officials are able to enter information as described in clause (vi).

(viii) The computerized list shall serve as the official voter registration list for the conduct of all elections for Federal office in the State.

##### (B) Exception

The requirement under subparagraph (A) shall not apply to a State in which, under a State law in effect continuously on and after October 29, 2002, there is no voter registration requirement for individuals in the State with respect to elections for Federal office.

#### (2) Computerized list maintenance

##### (A) In general

The appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis as follows:

(i) If an individual is to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) [now 52 U.S.C. 20501 et seq.], including subsections (a)(4), (c)(2), (d), and (e) of section 8 of such Act (42 U.S.C. 1973gg–6) [now 52 U.S.C. 20507].

(ii) For purposes of removing names of ineligible voters from the official list of eligible voters—

(I) under section 8(a)(3)(B) of such Act (42 U.S.C. 1973gg–6(a)(3)(B)) [now 52 U.S.C. 20507(a)(3)(B)], the State shall coordinate the computerized list with State agency records on felony status; and

(II) by reason of the death of the registrant under section 8(a)(4)(A) of such Act (42 U.S.C. 1973gg–6(a)(4)(A)) [now 52 U.S.C. 20507(a)(4)(A)], the State shall coordinate the computerized list with State agency records on death.

(iii) Notwithstanding the preceding provisions of this subparagraph, if a State is described in section 4(b) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–2(b)) [now 52 U.S.C. 20503(b)], that State shall remove the names of ineligible voters from the computerized list in accordance with State law.

### (B) Conduct

The list maintenance performed under subparagraph (A) shall be conducted in a manner that ensures that—
  (i) the name of each registered voter appears in the computerized list;
  (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list; and
  (iii) duplicate names are eliminated from the computerized list.

### (3) Technological security of computerized list

The appropriate State or local official shall provide adequate technological security measures to prevent the unauthorized access to the computerized list established under this section.

### (4) Minimum standard for accuracy of State voter registration records

The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including the following:
  (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters. Under such system, consistent with the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) [now 52 U.S.C. 20501 et seq.], registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters, except that no registrant may be removed solely by reason of a failure to vote.
  (B) Safeguards to ensure that eligible voters are not removed in error from the official list of eligible voters.

### (5) Verification of voter registration information

#### (A) Requiring provision of certain information by applicants

##### (i) In general

Except as provided in clause (ii), notwithstanding any other provision of law, an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes—
  (I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or
  (II) in the case of any other applicant (other than an applicant to whom clause (ii) applies), the last 4 digits of the applicant's social security number.

##### (ii) Special rule for applicants without driver's license or social security number

If an applicant for voter registration for an election for Federal office has not been issued a current and valid driver's license or a social security number, the State shall assign the applicant a number which will serve to identify the applicant for voter registration purposes. To the extent that the State has a computerized list in effect under this subsection and the list assigns unique identifying numbers to registrants, the number assigned under this clause shall be the unique identifying number assigned under the list.

##### (iii) Determination of validity of numbers provided

The State shall determine whether the information provided by an individual is sufficient to meet the requirements of this subparagraph, in accordance with State law.

#### (B) Requirements for State officials

##### (i) Sharing information in databases

The chief State election official and the official responsible for the State motor vehicle authority of a State shall enter into an agreement to match information in the database of the statewide voter registration system with information in the database of the motor vehicle authority to the extent required to enable each such official to verify the accuracy of the information provided on applications for voter registration.

##### (ii) Agreements with Commissioner of Social Security

The official responsible for the State motor vehicle authority shall enter into an agreement with the Commissioner of Social Security under section 405(r)(8) [1] of title 42 (as added by subparagraph (C)).

#### (C) Omitted

#### (D) Special rule for certain States

In the case of a State which is permitted to use social security numbers, and provides for the use of social security numbers, on applications for voter registration, in accordance with section 7 of the Privacy Act of 1974 (5 U.S.C. 552a note), the provisions of this paragraph shall be optional.

## (b) Requirements for voters who register by mail

### (1) In general

Notwithstanding section 6(c) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–4(c)) [now 52 U.S.C. 20505(c)] and subject to paragraph (3), a State shall, in a uniform and nondiscriminatory manner, require an individual to meet the requirements of paragraph (2) if—

(A) the individual registered to vote in a jurisdiction by mail; and

(B)(i) the individual has not previously voted in an election for Federal office in the State; or

(ii) the individual has not previously voted in such an election in the jurisdiction and the jurisdiction is located in a State that does not have a computerized list that complies with the requirements of subsection (a).

### (2) Requirements

#### (A) In general

An individual meets the requirements of this paragraph if the individual—

(i) in the case of an individual who votes in person—

(I) presents to the appropriate State or local election official a current and valid photo identification; or

(II) presents to the appropriate State or local election official a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or

(ii) in the case of an individual who votes by mail, submits with the ballot—

(I) a copy of a current and valid photo identification; or

(II) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter.

#### (B) Fail-safe voting

##### (i) In person

An individual who desires to vote in person, but who does not meet the requirements of subparagraph (A)(i), may cast a provisional ballot under section 21082(a) of this title.

##### (ii) By mail

An individual who desires to vote by mail but who does not meet the requirements of subparagraph (A)(ii) may cast such a ballot by mail and the ballot shall be counted as a provisional ballot in accordance with section 21082(a) of this title.

### (3) Inapplicability

Paragraph (1) shall not apply in the case of a person—

(A) who registers to vote by mail under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–4) [now 52 U.S.C. 20505] and submits as part of such registration either—

(i) a copy of a current and valid photo identification; or

(ii) a copy of a current utility bill, bank statement, government check, paycheck, or government document that shows the name and address of the voter;

(B)(i) who registers to vote by mail under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–4) [now 52 U.S.C. 20505] and submits with such registration either—

(I) a driver's license number; or

(II) at least the last 4 digits of the individual's social security number; and

(ii) with respect to whom a State or local election official matches the information submitted under clause (i) with an existing State identification record bearing the same number, name and date of birth as provided in such registration; or

(C) who is—

(i) entitled to vote by absentee ballot under the Uniformed and Overseas Citizens Absentee Voting Act [52 U.S.C. 20301 et seq.];

(ii) provided the right to vote otherwise than in person under section 20102(b)(2)(B)(ii) of this title; or

(iii) entitled to vote otherwise than in person under any other Federal law.

### (4) Contents of mail-in registration form

**(A) In general**

The mail voter registration form developed under section 6 of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg–4) [now 52 U.S.C. 20505] shall include the following:

(i) The question "Are you a citizen of the United States of America?" and boxes for the applicant to check to indicate whether the applicant is or is not a citizen of the United States.

(ii) The question "Will you be 18 years of age on or before election day?" and boxes for the applicant to check to indicate whether or not the applicant will be 18 years of age or older on election day.

(iii) The statement "If you checked 'no' in response to either of these questions, do not complete this form.".

(iv) A statement informing the individual that if the form is submitted by mail and the individual is registering for the first time, the appropriate information required under this section must be submitted with the mail-in registration form in order to avoid the additional identification requirements upon voting for the first time.

**(B) Incomplete forms**

If an applicant for voter registration fails to answer the question included on the mail voter registration form pursuant to subparagraph (A)(i), the registrar shall notify the applicant of the failure and provide the applicant with an opportunity to complete the form in a timely manner to allow for the completion of the registration form prior to the next election for Federal office (subject to State law).

**(5) Construction**

Nothing in this subsection shall be construed to require a State that was not required to comply with a provision of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg et seq.) [now 52 U.S.C. 20501 et seq.] before October 29, 2002, to comply with such a provision after October 29, 2002.

**(c) Permitted use of last 4 digits of social security numbers**

The last 4 digits of a social security number described in subsections (a)(5)(A)(i)(II) and (b)(3)(B)(i)(II) shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974 (5 U.S.C. 552a note).

**(d) Effective date**

**(1) Computerized statewide voter registration list requirements**

**(A) In general**

Except as provided in subparagraph (B), each State and jurisdiction shall be required to comply with the requirements of subsection (a) on and after January 1, 2004.

**(B) Waiver**

If a State or jurisdiction certifies to the Commission not later than January 1, 2004, that the State or jurisdiction will not meet the deadline described in subparagraph (A) for good cause and includes in the certification the reasons for the failure to meet such deadline, subparagraph (A) shall apply to the State or jurisdiction as if the reference in such subparagraph to "January 1, 2004" were a reference to "January 1, 2006".

**(2) Requirement for voters who register by mail**

**(A) In general**

Each State and jurisdiction shall be required to comply with the requirements of subsection (b) on and after January 1, 2004, and shall be prepared to receive registration materials submitted by individuals described in subparagraph (B) on and after the date described in such subparagraph.

**(B) Applicability with respect to individuals**

The provisions of subsection (b) shall apply to any individual who registers to vote on or after January 1, 2003.

(Pub. L. 107–252, title III, §303, Oct. 29, 2002, 116 Stat. 1708.)

EDITORIAL NOTES

REFERENCES IN TEXT

The National Voter Registration Act of 1993, referred to in subsecs. (a)(2)(A)(i), (4)(A) and (b)(5), is Pub. L. 103–31, May 20, 1993, 107 Stat. 77, which is classified principally to chapter 205 (§20501 et seq.) of this title. For complete classification of this Act to the Code, see Tables

Par. (8) of section 405(r) of title 42, referred to in subsec. (a)(5)(B)(ii), was redesignated par. (9) of section 405(r) by Pub. L. 116–260, div. FF, title VIII, §801(a)(4), Dec. 27, 2020, 134 Stat. 3202.

Section 7 of the Privacy Act of 1974, referred to in subsecs. (a)(5)(D) and (c), is section 7 of Pub. L. 93–579, which is set out as a note under section 552a of Title 5, Government Organization and Employees.

The Uniformed and Overseas Citizens Absentee Voting Act, referred to in subsec. (b)(3)(C)(i), is Pub. L. 99–410, Aug. 28, 1986, 100 Stat. 924, which is classified principally to chapter 203 (§20301 et seq.) of this title. For complete classification of this Act to the Code, see Tables.

#### CODIFICATION

Section was formerly classified to section 15483 of Title 42, The Public Health and Welfare, prior to editorial reclassification and renumbering as this section.

Section is comprised of section 303 of Pub. L. 107–252. Subsec. (a)(5)(C) of section 303 of Pub. L. 107–252 amended section 405 of Title 42, The Public Health and Welfare.

<sup></sup> [1] See References in Text note below.

## §21084. Minimum requirements

The requirements established by this subchapter are minimum requirements and nothing in this subchapter shall be construed to prevent a State from establishing election technology and administration requirements that are more strict than the requirements established under this subchapter so long as such State requirements are not inconsistent with the Federal requirements under this subchapter or any law described in section 21145 of this title.

(Pub. L. 107–252, title III, §304, Oct. 29, 2002, 116 Stat. 1714.)

#### EDITORIAL NOTES

#### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this title", meaning title III of Pub. L. 107–252, Oct. 29, 2002, 116 Stat. 1704, which is classified principally to this subchapter. For complete classification of title III to the Code, see Tables.

#### CODIFICATION

Section was formerly classified to section 15484 of Title 42, The Public Health and Welfare, prior to editorial reclassification and renumbering as this section.

## §21085. Methods of implementation left to discretion of State

The specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.

(Pub. L. 107–252, title III, §305, Oct. 29, 2002, 116 Stat. 1714.)

#### EDITORIAL NOTES

#### REFERENCES IN TEXT

This subchapter, referred to in text, was in the original "this title", meaning title III of Pub. L. 107–252, Oct. 29, 2002, 116 Stat. 1704, which is classified principally to this subchapter. For complete classification of title III to the Code, see Tables.

#### CODIFICATION

Section was formerly classified to section 15485 of Title 42, The Public Health and Welfare, prior to editorial reclassification and renumbering as this section.

# Exhibit B

DECEMBER 28, 2021 AUTHOR: SUZANNE DOWNING

# Dunleavy and Meyer have an election integrity bill for legislative session

Alaska Lt. Gov. Kevin Meyer and Gov. Mike Dunleavy today announced the Election Integrity Bill, intended to improve the way the Division of Elections maintains voter rolls while providing additional tools to ensure a more secure system.

"After the 2020 nationwide election, we saw that election integrity was a concern for many Americans," said Meyer. "Alaskans deserve to feel confident that the election process is conducted fairly and with integrity. At the end of the day, The Election Integrity bill will help place trust back into the election process."

In the Election Integrity Bill, there are changes to the Permanent Fund Dividend – Automatic Voter Registration process, giving the option to request voter registration. These changes will allow for more secure data to come from the Department of Revenue to the Division of Elections to clean up the voter lists.

The bill includes amendments and provisions that would require the Division of Elections to maintain the master voter file differently and issue a required report every other year to the legislature. There will also be increases in the transparency of the election process, an improved ballot-counting process, and a toll-free election offense hotline.

The bill will provide additional ways to verify that the person voting an absentee ballot is the voter whose name is on it, such as using signature verification equipment. There will be a more thorough definition of crimes around election fraud and election interference.

In addition, the bill sets up future training for police officers on election offenses, so if they are called upon to investigate these new crimes, they have the training to complete the investigation appropriately.

The proposed bill will make Alaska's elections more secure and efficient while increasing confidence and integrity in election processes and results. The Election Integrity Bill will be introduced in the next few weeks.

"This Election Integrity Bill will ensure confidence with Alaskans and help rebuild trust in the election process," Dunleavy said. "We are making the current system more secure through improvements. By consolidating ideas from past bills introduced in the Legislature and incorporating practices from other states, we hope to establish a more trustworthy elections system."

Highlights from the proposed bill:

- The changes to the Permanent Fund Dividend – Automatic Voter Registration come after more than 5 years of experience with the process. PFD applicants will have to request voter registration. These changes will allow for more secure data to come from the Department of Revenue to the Division of Elections to clean up our voter lists.
- New statutory changes amend the list maintenance language statute to require the Division of Elections to review certain records, such as deceased voters, voters registered in other states, certain felony convictions, among others. The Division of Elections will be required to consult a subject-matter expert to audit the list of registered voters and issue a report every other year.
- Within the bill, there will be increases in the transparency of the election process for election observers and an improved ballot-counting process to ensure accuracy. The bill includes the creation of a toll-free election offense hotline for voters to use if they see questionable activity at the polls.
- The bill reinforces the belief that absentee ballot signatures should be witnessed and it pays the postage costs for the return envelopes. This legislation requires free online bill tracking to be set up. The bill will provide additional ways to verify that the person voting an absentee ballot is the voter whose name is on it, such as using signature verification equipment. Absentee voting integrity will be improved through the future acquisition of new signature verification equipment.
- The bill gives voters the option to request an absentee ballot for a 4-year window application, instead of a permanent absentee option.
- The bill provides voters the option to fix any minor errors to their ballot by establishing ballot curing. Ballot curing is a popular way for voters to fix any problems with an absentee or mail ballot to ensure their vote is counted.
- Working in conjunction with smaller communities and villages, this bill gives the Division of Elections the ability to mail ballots should it be required to give some Alaskans the chance to vote, even during a pandemic.
- The bill will require new regulations for routine forensic examinations and chain of custody protocols for tabulators to be created and followed. When questions arise, there will be tools set forth to ensure an accurate accounting of election results.
- The bill introduces a more thorough definition of crimes around election fraud and election interference that will provide clarity in the case of unlawful interference with voting.
- The bill also sets up future training for police officers on election offenses, so if they are called upon to investigate these new crimes, they have the training to complete the investigation appropriately.

The bill will be introduced early in the next legislative session.

**WRITTEN BY** <u>SUZANNE DOWNING</u>  Suzanne Downing had careers in business and journalism before serving as the Director of Faith and Community-based Initiatives for Florida Gov. Jeb Bush and returning to Alaska to serve as speechwriter for Gov. Sean Parnell. Born on the Oregon coast, she moved to Alaska in 1969.

SENATE BILL NO. 167

IN THE LEGISLATURE OF THE STATE OF ALASKA

THIRTY-SECOND LEGISLATURE - SECOND SESSION

**BY THE SENATE RULES COMMITTEE BY REQUEST OF THE GOVERNOR**

Introduced: 1/18/22
Referred: State Affairs, Finance

A BILL

FOR AN ACT ENTITLED

1    "An Act relating to elections, voter registration, ballots, and a system of tracking and

2    accounting for ballots; establishing an election offense hotline; relating to election fraud,

3    election interference, and election official misconduct; requiring signature verification,

4    notice, and the opportunity to cure; and providing for an effective date."

5    BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF ALASKA:

6       * **Section 1.** AS 15.07.060(e) is amended to read:

7                (e) For an applicant requesting initial registration by mail, by facsimile or

8        other electronic transmission approved by the director under AS 15.07.050, or

9        **requesting registration on** [BY COMPLETING] a permanent fund dividend

10       application, the director shall verify the information provided in compliance with

11       (a)(2) and (3) of this section through state agency records described in

12       AS 15.07.055(e). If the applicant cannot comply with the requirement of (a)(2) of this

13       section because the applicant has not been issued any of the listed numbers, the

14       applicant may instead submit a copy of one of the following forms of identification: a

1     driver's license, state identification card, current and valid photo identification, birth

2     certificate, passport, or hunting or fishing license.

3   **\* Sec. 2.** AS 15.07.070(i) is amended to read:

4         (i)   The division shall register voters who **request to be registered on**

5     [SUBMIT] an application to receive a permanent fund dividend in accordance with (j)

6     - (m) of this section. **The division shall treat a permanent fund dividend applicant**

7     **who requests to be registered and who provides the information required under**

8     **AS 15.07.060(a)(1) - (4) and (7) - (9) as a new or updated registered voter.**

9   **\* Sec. 3.** AS 15.07.070(j) is amended to read:

10         (j)   The division shall cooperate with the Department of Revenue under

11     AS 43.23.101 to ensure that the permanent fund dividend application form furnished

12     by the Department of Revenue under AS 43.23.015 allows an applicant, a person who

13     is designated in a power of attorney to act on behalf of an applicant, or a person acting

14     on behalf of a physically disabled applicant to **request to be registered and** submit

15     voter registration information required under AS 15.07.060(a)(1) - (4) and (7) - (9),

16     and an attestation that such information is true. The director may require proof of

17     identification of the applicant, if not already in the Department of Revenue's

18     possession, as required by regulations adopted by the director under AS 44.62

19     (Administrative Procedure Act).

20   **\* Sec. 4.** AS 15.07.070(k) is amended to read:

21         (k)   Upon receipt of the registration information, the director shall, as soon as

22     practicable and in accordance with a schedule established by the director by rule,

23     notify by United States mail and any other means authorized by the director, each

24     applicant **who requested voter registration** [NOT ALREADY REGISTERED TO

25     VOTE] at the address provided in the applicant's application

26         (1) of the processes to

27             (A) decline to be registered as a voter;

28             (B)   maintain an existing voter registration or be newly

29     registered at a valid place of residence not provided in the applicant's

30     application; and

31             (C) adopt a political party affiliation; and

1                   (2) that failure to respond to the notification shall constitute the

2    applicant's consent to cancel any registration to vote in another jurisdiction.

3   **\* Sec. 5.** AS 15.07.070(*l*) is amended to read:

4                   (*l*) If an applicant **requested to be registered and** does not decline to be

5    registered as a voter within 30 calendar days after the director issues the notification,

6    the application under AS 43.23.015 will constitute a completed registration form. The

7    name of the applicant shall be placed on the master register if the director determines

8    that the person is qualified to vote under AS 15.05.010, and the director shall forward

9    to the applicant a registration card. If registration is denied, the applicant shall

10    immediately be informed in writing that registration was denied and the reason for

11    denial.

12   **\* Sec. 6.** AS 15.07.130 is amended by adding new subsections to read:

13                   (g) The division shall adopt regulations to review voter registration records

14    and update the master register. The regulations must include reviews for deceased

15    voters, persons convicted of a felony involving moral turpitude, persons not qualified

16    to vote under AS 15.05, persons registered to vote in another state, whether the

17    number of registered voters on the master register exceeds the number of eligible

18    voters in the state, and voter registration information data breaches. When reviewing

19    voter registration records, the division shall review available records and databases,

20    which may include United States Postal Service forwarding databases, the Electronic

21    Registration Information Center, motor vehicle records, Department of Corrections

22    records, property and sales tax records, Social Security Administration databases, jury

23    duty records, National Change of Address records, and similar records.

24                   (h) The division shall, in consultation with an external, nationally recognized

25    subject-matter expert selected by the division, biennially audit the master register. The

26    division shall consider the subject-matter expert's recommendations. By February 1 of

27    each year of a general election, the division shall publish a report describing the most

28    recent biennial audit and expert recommendations, identifying protocols used under

29    (g) of this section, providing election information, including the number of voters on

30    the master register and the total population eligible to vote, and highlighting voting

31    data problems, irregularities, errors, and vulnerabilities identified in the audit. The

1      division shall submit the report to the senate secretary and the chief clerk of the house

2      of representatives and notify the legislature that the report is available on or before the

3      date the report is published.

4      * **Sec. 7.** AS 15.10 is amended by adding a new section to read:

5            **Sec. 15.10.106. Prohibition on private funding.** Notwithstanding any other

6      provision of state law, the division may not accept or expend any grants or donations

7      for the administration of elections from private individuals, corporations, or

8      organizations.

9      * **Sec. 8.** AS 15.10.170 is amended to read:

10          **Sec. 15.10.170. Appointment and privileges of watchers.** (a) <u>In a general</u>

11     <u>election, special election, or special primary election, a</u> [THE] precinct party

12     committee, where an organized precinct committee exists, or the party district

13     committee where no organized precinct committee exists, or the state party

14     chairperson where neither a precinct nor a party district committee exists, may appoint

15     one or more [PERSONS AS] watchers in each precinct and counting center [FOR

16     ANY ELECTION]. <u>A</u> [EACH] candidate may appoint one or more watchers for each

17     precinct or counting center in the candidate's respective district or the state [FOR

18     ANY ELECTION]. Any organization or organized group that sponsors or opposes an

19     initiative, referendum, or recall may have one or more [PERSONS AS] watchers at the

20     polls and counting centers after first obtaining authorization from the director. A state

21     party chairperson, a precinct party committee, a party district committee, or a

22     candidate may not have more than one watcher on duty at a time in any precinct or

23     counting center. [A WATCHER MUST BE A UNITED STATES CITIZEN. THE

24     WATCHER MAY BE PRESENT AT A POSITION INSIDE THE PLACE OF

25     VOTING OR COUNTING THAT AFFORDS A FULL VIEW OF ALL ACTION OF

26     THE ELECTION OFFICIALS TAKEN FROM THE TIME THE POLLS ARE

27     OPENED UNTIL THE BALLOTS ARE FINALLY COUNTED AND THE

28     RESULTS CERTIFIED BY THE ELECTION BOARD OR THE DATA

29     PROCESSING REVIEW BOARD. THE ELECTION BOARD OR THE DATA

30     PROCESSING REVIEW BOARD MAY REQUIRE EACH WATCHER TO

31     PRESENT WRITTEN PROOF SHOWING APPOINTMENT BY THE PRECINCT

1    PARTY COMMITTEE, THE PARTY DISTRICT COMMITTEE, THE
2    ORGANIZATION OR ORGANIZED GROUP, OR THE CANDIDATE THE
3    WATCHER REPRESENTS.]

4        (b) In [ADDITION TO THE WATCHERS APPOINTED UNDER (a) OF
5    THIS SECTION, IN] a primary election [OR SPECIAL PRIMARY ELECTION OR
6    SPECIAL ELECTION UNDER AS 15.40.140], each candidate may appoint one <u>or</u>
7    <u>more watchers for</u> [WATCHER IN] each precinct and counting center <u>in the</u>
8    <u>candidate's respective district or the state. An organization or organized group</u>
9    <u>that sponsors or opposes a ballot proposition or recall may have one or more</u>
10    <u>watchers at the polls and counting centers after first obtaining authorization</u>
11    <u>from the director</u>.

12     * **Sec. 9.** AS 15.10.170 is amended by adding a new subsection to read:

13        (c) A watcher appointed under this section may be present at a position inside
14    the place of voting or counting that affords a full view of all action of the election
15    officials taken from the time the polls are opened until the ballots are finally counted
16    and the results certified by the election board or the data processing review board. The
17    election board or the data processing review board may require each watcher to
18    present written proof showing appointment by the respective precinct party committee,
19    party district committee, organization or organized group, or candidate the watcher
20    represents that is signed by the respective chairperson of the precinct party committee,
21    party district committee, state party chairperson, organization or organized group, or
22    candidate. A watcher must be a United States citizen.

23     * **Sec. 10.** AS 15.15 is amended by adding a new section to read:

24        **Sec. 15.15.057. Election offense hotline.** The director shall establish a toll-
25    free election offense hotline to receive telephone calls reporting election offenses
26    under this chapter. The director shall publicize the availability of the toll-free hotline
27    and encourage the public to provide information to the division related to voter
28    misconduct or other election offenses under this chapter.

29     * **Sec. 11.** AS 15.15.240 is amended to read:

30        **Sec. 15.15.240. Voter assistance.** A qualified voter needing assistance in
31    voting may request an election official, a person, or not more than two persons of the

1  voter's choice to assist. If the election official is requested, the election official shall
2  assist the voter. If any other person is requested, the person shall state upon oath
3  before the election official that the person will not divulge the vote cast by the person
4  assisted. **Those providing assistance may not influence the voting decision of the**
5  **person assisted.**
6  * **Sec. 12.** AS 15.15.350(a) is amended to read:
7  (a)  The director **shall** [MAY] adopt regulations prescribing the manner in
8  which the precinct ballot count is accomplished so as to ensure accuracy in the count
9  and to expedite the process. The election board shall account for all ballots by
10  completing a ballot statement containing (1) the number of official ballots received;
11  (2) the number of official ballots voted; (3) the number of official ballots spoiled; (4)
12  the number of official ballots unused and [EITHER DESTROYED OR] returned
13  [FOR DESTRUCTION] to the elections supervisor or the election supervisor's
14  designee. The board shall count the number of questioned ballots and compare that
15  number to the number of questioned voters in the register. Discrepancies shall be
16  noted and the numbers included in the certificate prescribed by AS 15.15.370. The
17  election board, in hand-count precincts, shall count the ballots in a manner that allows
18  watchers to see the ballots when opened and read. A person handling the ballot after it
19  has been taken from the ballot box and before it is placed in the envelope for mailing
20  may not have a marking device in hand or remove a ballot from the immediate vicinity
21  of the polls.
22  * **Sec. 13.** AS 15.15.430(a) is amended to read:
23  (a) The review of ballot counting by the director shall include only
24  (1) a review of the precinct registers, tallies, and ballots cast;
25  (2)  a review of absentee and questioned ballots as prescribed by law;
26  and
27  (3)   unless the ballot for the house district contains nothing but
28  uncontested offices, a hand count of ballots from one **or more** randomly selected
29  **precincts** [PRECINCT] in each house district that accounts for at least five percent of
30  the ballots cast in that district.
31  * **Sec. 14.** AS 15.15.470 is amended to read:

1    **Sec. 15.15.470. Preservation <u>and destruction</u> of election ballots, papers,**

2    **and materials.** The director shall preserve all precinct election certificates, tallies,

3    <u>election data on an electronic storage device,</u> and registers for <u>22 months</u> [FOUR

4    YEARS] after the election. All ballots and stubs for elections [OTHER THAN

5    NATIONAL ELECTIONS] may be destroyed <u>22 months</u> [30 DAYS] after the

6    certification of the state ballot counting review unless an application for recount has

7    been filed and not completed, or unless their destruction is stayed by an order of the

8    court. All ballots for national elections may be destroyed in accordance with federal

9    law<u>, including 52 U.S.C. 20701</u>. The director may permit the inspection of election

10    materials upon call by the Congress, the state legislature, or a court of competent

11    jurisdiction. <u>The original used and unused ballots, absentee ballot certificates and</u>

12    <u>envelopes, and the paper records of electronically generated ballots under</u>

13    <u>AS 15.15.032 must be destroyed at a location designated by the division. The</u>

14    <u>division may designate up to two destruction locations, one in the southcentral</u>

15    <u>region and one in the southeast region of the state. The director or the director's</u>

16    <u>designee shall witness the destruction. The director shall then certify before a</u>

17    <u>notary public that the ballots, absentee ballot certificates and envelopes, and</u>

18    <u>paper records have been destroyed.</u>

19    * **Sec. 15.** AS 15.20.020 is amended to read:

20    **Sec. 15.20.020. Provision for general administrative supervision.** The

21    director shall provide general administrative supervision over the conduct of absentee

22    voting. The director shall make available instructions to absentee voters regarding the

23    procedure for absentee voting <u>and the free online system for tracking absentee</u>

24    <u>ballots</u>.

25    * **Sec. 16.** AS 15.20.030 is amended to read:

26    **Sec. 15.20.030. Preparation of ballots, envelopes, and other material.** The

27    director shall provide ballots for use as absentee ballots in all districts. The director

28    shall provide a secrecy sleeve in which the voter shall initially place the marked ballot,

29    and shall provide <u>a postage-paid return</u> [AN] envelope with the prescribed voter's

30    certificate on it, in which the secrecy sleeve with ballot enclosed shall be placed. The

31    director shall prescribe the form of and prepare the voter's certificate, envelopes, and

1    other material used in absentee voting. The voter's certificate shall include a

2    declaration, for use when required, that the voter is a qualified voter in all respects, a

3    blank for the voter's signature, a certification that the affiant properly executed the

4    marking of the ballot and gave the voter's identity, blanks for the attesting official or

5    witness, and a place for recording the date the envelope was sealed and witnessed. The

6    envelope with the voter's certificate must include a notice that false statements made

7    by the voter or by the attesting official or witness on the certificate are punishable by

8    law.

9    * **Sec. 17.** AS 15.20.081(b) is amended to read:

10            (b) An application requesting delivery of an absentee ballot to the applicant by

11    mail must be received by the division of elections not less than 10 days before the

12    election for which the absentee ballot is sought. An application for an absentee ballot

13    for a state election from a qualified voter requesting delivery of an absentee ballot to

14    the applicant by electronic transmission must be received by the division of elections

15    not later than 5:00 p.m. Alaska time on the day before the election for which the

16    absentee ballot is sought. An absentee ballot application submitted by mail under this

17    section must permit the person to register to vote under AS 15.07.070 and to request

18    an absentee ballot for each state election held within that calendar year for which the

19    voter is eligible to vote. An absentee ballot application submitted by electronic

20    transmission under this section may not include a provision that permits a person to

21    register to vote under AS 15.07.070. **Except as provided in AS 15.20.800, an**

22    **absentee ballot may not be distributed to a voter who does not specifically**

23    **request an absentee ballot under this section.**

24    * **Sec. 18.** AS 15.20.081 is amended by adding a new subsection to read:

25            (m) An absentee ballot application must include an option for a qualified voter

26    to choose to receive absentee ballots by mail for future statewide elections for a period

27    of four years. After four years, the division shall provide notification that the voter

28    may reapply to receive absentee ballots by mail for another four years. If the voter's

29    previous absentee ballot sent under this section or any other mail sent by the division

30    is returned as undeliverable, the division shall stop sending the voter absentee ballots.

31    A voter may reapply every four years.

SB 167

-8-

SB0167A

New Text Underlined [DELETED TEXT BRACKETED]

Exhibit B

Page 11 of 22

Appendix I

Page 63 of 174

Case 3:23-cv-00006-SLG   Document 1-1   Filed 01/13/23   Page 65 of 176

1    * **Sec. 19.** AS 15.20.201(a) is amended to read:

2        (a) No less than **10** [SEVEN] days preceding the day of election, the election

3    supervisor, in the presence and with the assistance of the district absentee ballot

4    counting board, shall **begin to** review all voter certificates of absentee ballots received

5    by that date. The review of absentee ballots shall continue at times designated by the

6    election supervisor until completed. **An absentee ballot may not be counted until**

7    **the accompanying voter certificate has been reviewed.**

8    * **Sec. 20.** AS 15.20.203(a) is amended to read:

9        (a) The district absentee ballot counting board shall examine each absentee

10    ballot envelope and shall determine whether the absentee voter is qualified to vote at

11    the election**, whether the signature on the certificate is consistent with the voter's**

12    **signature in voter registration records,** and whether the absentee ballot has been

13    properly cast.

14    * **Sec. 21.** AS 15.20.203(b) is amended to read:

15        (b) An absentee ballot may not be counted if

16          (1) the voter has failed to properly execute the certificate;

17          (2) an official or the witnesses authorized by law to attest the voter's

18    certificate fail to execute the certificate, except that an absentee ballot cast in person

19    and accepted by an absentee voting official or election supervisor may be counted

20    despite failure of the absentee voting official or election supervisor to properly sign

21    and date the voter's certificate as attesting official as required under AS 15.20.061(c);

22          (3) the ballot is not attested on or before the date of the election;

23          (4) the ballot, if postmarked, is not postmarked on or before the date of

24    the election;

25          (5) after the day of election, the ballot was delivered by a means other

26    than mail; [OR]

27          (6) the voter voted

28            (A) in person and is a

29              (i) first-time voter who initially registered by mail or by

30    facsimile or other electronic transmission approved by the director

31    under AS 15.07.050, has not provided the identification required by

1    AS 15.15.225(a), was not eligible for waiver of the identification

2    requirement under AS 15.15.225(b), and has not provided the

3    identifiers required in AS 15.07.060(a)(2) and (3) that can be verified

4    through state agency records described in AS 15.07.055(e); or

5             (ii) voter other than one described in (i) of this

6    subparagraph, did not provide identification described in

7    AS 15.15.225(a), was not personally known by the election official,

8    and has not provided the identifiers required in AS 15.07.060(a)(2) and

9    (3); or

10             (B) by mail or electronic transmission, is a first-time voter who

11    initially registered by mail or by facsimile or other electronic transmission

12    approved by the director under AS 15.07.050 to vote, has not met the

13    identification requirements set out in AS 15.07.060, and does not submit with

14    the ballot a copy of a

15             [(i)] driver's license, state identification card, current

16    and valid photo identification, birth certificate, passport, or hunting or

17    fishing license [;OR

18             (ii) CURRENT UTILITY BILL, BANK

19    STATEMENT, PAYCHECK, GOVERNMENT CHECK, OR OTHER

20    GOVERNMENT DOCUMENT; AN ITEM DESCRIBED IN THIS

21    SUB-SUBPARAGRAPH MUST SHOW THE NAME AND

22    CURRENT ADDRESS OF THE VOTER]; or

23    (7) the signature on the certificate is inconsistent with the voter's

24    signature in voter registration records.

25    * Sec. 22. AS 15.20.203 is amended by adding new subsections to read:

26    (k) The district absentee counting board shall determine whether a voter's

27    signature on the certificate is consistent with the voter's signature in voter registration

28    records under (a) of this section using a signature verification process that includes

29    signature comparison software, according to a procedure provided in regulations

30    adopted by the director.

31    * Sec. 23. AS 15.20 is amended by adding a new section to read:

Sec. 15.20.221. Ballot tracking system. (a) The director shall establish a free online system, available through the division's Internet website, through which a voter may

    (1) confirm that the voter's ballot has been sent by the division;

    (2) track the date of the ballot's delivery to the voter;

    (3) confirm the division's receipt of the voter's ballot;

    (4) determine whether the voter's certificate has been reviewed; and

    (4) determine whether the voter's ballot has been counted.

(b) The online system established under (a) of this section must indicate to a voter

    (1) the process by which the voter may cure the lack of signature or verify the voter's identity, if the signature on the voter's ballot was missing or was determined to not match the signature in the voter's registration record under AS 15.20.203(k); and

    (2) the reason the voter's ballot was not counted, if the ballot was not counted.

(c) The online system established under (a) of this section must allow an election official access to the names and political affiliations of all persons

    (1) named on the master register, including those persons whose voter registrations are inactivated under AS 15.07.130(b); and

    (2) whose names must be placed on the official registration list under AS 15.07.070(c) or (d).

(d) In establishing the online system under (a) of this section, the director shall ensure that the design of the system allows a voter to access information easily under (a) and (b) of this section through a mobile electronic device.

Sec. 15.20.222. Procedure for curing uncounted ballot. (a) If a voter returns a ballot and the voter does not have a signature stored in voter registration records, the certificate is missing a signature, or the signature on the certificate is determined under AS 15.20.203 to not match the signature in voter registration records, the director shall, within 48 hours, but in no event later than two days after election day, send a notification by first class, non-forwardable mail to the address indicated in the voter's

1     registration record and, if provided, by electronic mail to the voter's electronic mail

2     address or by telephone call or text message to the voter's telephone number.

3        (b)  The notification provided to the voter under (a) of this section must

4     include an explanation of the need for a signature for verification purposes and

5     provide the voter a form and instructions for the voter to, within the period specified in

6     (c)(1) of this section,

7            (1)  confirm that the voter returned a ballot to the division;

8            (2)  provide a copy of a form of identification accepted by the division

9     under AS 15.07.060(e); and

10           (3)  provide a signature for verification.

11       (c)  A voter's ballot that is not counted for a reason set out in (a) of this section

12     may be counted only if

13           (1)  the division receives the form sent to the voter under (b) of this

14     section from the voter within 14 days after election day and the form confirms that the

15     voter returned a ballot to the division;

16           (2)  the voter provides a signature for verification and includes a copy

17     of a form of identification accepted by the division under AS 15.07.060(e); and

18           (3)  the ballot is otherwise valid.

19       (d)  A voter's ballot may not be counted and the director shall, if applicable,

20     send copies of the signature on the voter's return envelope and the signature stored in

21     voter registration records to the attorney general for investigation if

22           (1)  the voter returns the form received under (b) of this section and the

23     form indicates that the voter did not return a ballot to the division; or

24           (2)  the voter does not return the form received under (b) of this section

25     within 14 days after election day.

26       (e)  An election official may not determine that the signature on a voter's return

27     envelope does not match the signature stored in the voter's registration record solely

28     based on substitution of initials or use of a common nickname.

29       (f)  The director shall provide training in signature comparison and the use of

30     signature comparison software to election officials who compare signatures under this

31     section.

1        (g)  The division shall update the signature stored in voter registration records

2    if the voter, after providing a copy of a form of identification accepted by the division

3    under AS 15.07.060(e), either provides a signature for the voter's missing signature or

4    cures a nonmatching signature under this section.

5    * **Sec. 24.** AS 15.20.900 is amended by adding new subsections to read:

6        (c)  The division shall adopt regulations that provide for a routine forensic

7    examination of each precinct tabulator before and after each election.

8        (d)  A precinct tabulator may not be connected to the Internet from 24 hours

9    before the polls open on election day until 14 days after the polls close. During this

10    time, all tabulator data must be loaded from the tabulator onto a separate storage

11    device and transmitted from a computer that is not connected to the tabulator.

12        (e)  The division shall adopt regulations prescribing strict chain-of-custody

13    protocols for precinct tabulators.

14    * **Sec. 25.** AS 15.56.035(a) is amended to read:

15        (a)  A person commits the crime of unlawful interference with voting in the

16    second degree if the person

17            (1)  has an official ballot in possession outside of the voting room

18    unless the person is an election official or other person authorized by law or local

19    ordinance, or by the director or chief municipal elections official in a local election;

20            (2)  makes, or knowingly has in possession, a counterfeit of an official

21    election ballot;

22            (3)  knowingly solicits or encourages, directly or indirectly, a registered

23    voter who is no longer qualified to vote under AS 15.05.010, to vote in an election;

24            (4)  as a registration official

25                (A)  knowingly refuses to register a person who is entitled to

26    register under AS 15.07.030; or

27                (B)  accepts a fee from an applicant applying for registration;

28            (5)  violates AS 15.20.081(a) by knowingly supplying or encouraging

29    or assisting another person to supply to a voter an absentee ballot application form

30    with a political party or group affiliation indicated if the voter is not already registered

31    as affiliated with that political party or group;

1                 (6)  knowingly designs, marks, or encourages or assists another person

2    to design or mark an absentee ballot application in a manner that suggests choice of

3    one ballot over another as prohibited by AS 15.20.081(a); [OR]

4                 (7)  knowingly submits or encourages or assists another person to

5    submit an absentee ballot application to an intermediary who could control or delay

6    the submission of the application to the division of elections or who could gather data

7    from the application form as prohibited by AS 15.20.081(a); or

8                 (8)  knowingly possesses a ballot provided to another voter under

9    this title unless the person is

10                 (A)  a family member of the voter;

11                 (B)  a caregiver of the voter; or

12                 (C)  engaged in official duties as an election official or a

13    worker for the United States Postal Service or a private commercial

14    delivery service.

15   * Sec. 26. AS 15.56.060(a) is amended to read:

16           (a)  A person commits the crime of unlawful interference with an election if

17    the person

18                 (1)  induces or attempts to induce an election official to fail in the

19    official's duty by force, threat, intimidation, or offers of reward;

20                 (2)  intentionally changes, attempts to change, or causes to be changed

21    an official election document including ballots, tallies, and returns;

22                 (3)  intentionally delays, attempts to delay, or causes to be delayed the

23    sending of the certificate, register, ballots, or other materials whether original or

24    duplicate, required to be sent by AS 15.15.370; [OR]

25                 (4)  intentionally tampers with, or opens without the express

26    authorization from the director, a sealed absentee ballot certificate, absentee

27    ballot envelope, or package of ballots;

28                 (5)  intentionally breaches, hacks, alters, or tampers with election

29    machinery, including a tabulator machine, program, system, server, or software

30    used to verify identity, count, tabulate, manage, or control any election function;

31    or

1        (6) is contracted or employed by the state to print or reproduce in any
2     manner an official ballot, and the person knowingly
3              (A) personally appropriates, or gives or delivers to, or permits
4        to be taken by anyone other than a person authorized by the director, official
5        ballots; or
6              (B) prints or reproduces or has printed or reproduced official
7        ballots in a form or with a content other than that prescribed by law or as
8        directed by the director.
9     * **Sec. 27.** AS 15.56 is amended by adding a new section to read:
10        **Sec. 15.56.065. Election fraud.** (a) A person commits the crime of election
11       fraud if the person violates AS 15.56.060 and causes the outcome of an election to
12       change.
13           (b) Election fraud is a class B felony.
14    * **Sec. 28.** AS 15.56.070(a) is amended to read:
15           (a) A person commits the crime of election official misconduct in the first
16       degree if while an election official, the person
17              (1) intentionally fails to perform an election duty or knowingly does an
18       unauthorized act with the intent to affect an election or its results;
19              (2) knowingly permits or makes or attempts to make a false count of
20       election returns; [OR]
21              (3) intentionally conceals, withholds, destroys, or attempts to conceal,
22       withhold, or destroy election returns: or
23              (4) knowingly shares with, discloses, or reports to a person who is
24       not an election official election returns, results, or similar confidential election
25       data before the polls close on election day.
26    * **Sec. 29.** AS 15.58.020(a) is amended to read:
27           (a) Each general election pamphlet must contain
28              (1) photographs and campaign statements submitted by eligible
29       candidates for elective office in the region;
30              (2) information and recommendations filed under AS 15.58.050 on
31       judicial officers subject to a retention election in the region;

1            (3)  a map of the house district or districts of the region;

2            (4)  sample ballots for house districts of the region;

3            (5)  an absentee ballot application;

4            (6)  for each ballot proposition submitted to the voters by initiative or

5 referendum petition or by the legislature,

6                     (A)  the full text of the proposition specifying constitutional or

7 statutory provisions proposed to be affected;

8                     (B)  the ballot title and the summary of the proposition prepared

9 by the director or by the lieutenant governor;

10                   (C)  a statement of the costs to the state of implementing the law

11 proposed in an initiative, or of voter approval or rejection of the act that is the

12 subject of a referendum;

13                   (D)  a neutral summary of the proposition prepared by the

14 Legislative Affairs Agency;

15                   (E)  statements submitted that advocate voter approval or

16 rejection of the proposition not to exceed 500 words;

17           (7)  for each bond question, a statement of the scope of each project as

18 it appears in the bond authorization;

19            (8)  a maximum of two pages of material submitted under

20 AS 15.58.040 by each political party;

21            (9)  additional information on voting procedures that the lieutenant

22 governor considers necessary;

23           (10)  for the question whether a constitutional convention shall be

24 called,

25                   (A)  a full statement of the question placed on the ballot;

26                   (B)  statements not to exceed 500 words that advocate voter

27 approval or rejection of the question;

28           (11)  under AS 37.13.170, the Alaska permanent fund annual income

29 statement and balance sheet for the two fiscal years preceding the publication of the

30 election pamphlet;

31           (12)  under AS 15.10.090, notice of

1          (A) the establishment or abolition of a precinct;

2          (B)   the designation, abolition, or modification of precinct

3    boundaries; and

4          (C) a change in the location of a polling place;

5          (13) **the division's election offense hotline phone number; and**

6          **(14)** the following statement written in bold in a conspicuous location:

7    Each candidate may designate the political party or political group that the

8    candidate is registered as affiliated with. A candidate's political party or

9    political group designation on a ballot does not imply that the candidate is

10   nominated or endorsed by the party or political group or that the party or group

11   approves of or associates with that candidate.

12   In each race, you may vote for any candidate listed. If a primary election was

13   held for a state office, United States senator, or United States representative,

14   the four candidates who received the most votes for the office in the primary

15   election advanced to the general election. However, if one of the four

16   candidates who received the most votes for an office at the primary election

17   died, withdrew, resigned, was disqualified, or was certified as incapacitated 64

18   days or more before the general election, the candidate who received the fifth

19   most votes for the office advanced to the general election.

20   At the general election, each candidate will be selected through a ranked-

21   choice voting process and the candidate with the greatest number of votes will

22   be elected. For a general election, you must rank the candidates in the

23   numerical order of your preference, ranking as many candidates as you wish.

24   Your second, third, and subsequent ranked choices will be counted only if the

25   candidate you ranked first does not receive enough votes to continue on to the

26   next round of counting, so ranking a second, third, or subsequent choice will

27   not hurt your first-choice candidate. Your ballot will be counted regardless of

28   whether you choose to rank one, two, or more candidates for each office, but it

29   will not be counted if you assign the same ranking to more than one candidate

30   for the same office.

31   * **Sec. 30.** AS 18.65.240(a) is amended to read:

1        (a)    A person may not be appointed as a police officer, except on a

2    probationary basis, unless the person (1) has satisfactorily completed a basic program

3    of police training approved by the council, which includes at least 12 hours of

4    instruction regarding domestic violence**, as that term is defined in AS 18.66.990,**

5    [AND] at least 12 hours of instruction regarding sexual assault, as **that term is**

6    [THOSE TERMS ARE] defined in AS 18.66.990, **and at least four hours of**

7    **instruction in detecting and investigating election offenses;** and (2) possesses other

8    qualifications the council has established for the employment of police officers,

9    including minimum age, education, physical and mental standards, citizenship, moral

10    character, and experience. The council shall prescribe the means of presenting

11    evidence of fulfillment of these requirements.

12    **\* Sec. 31.** AS 43.23.015(b) is amended to read:

13        (b)    The department shall prescribe and furnish an application form for

14    claiming a permanent fund dividend. The application must include

15            (1) notice of the penalties provided for under AS 43.23.270;

16            (2) a statement of eligibility and a certification of residency;

17            (3) the means for an applicant eligible to vote under AS 15.05, or a

18    person authorized to act on behalf of the applicant, to **request the applicant be**

19    **registered to vote and** furnish information required by AS 15.07.060(a)(1) - (4) and

20    (7) - (9), and an attestation that such information is true.

21    **\* Sec. 32.** AS 43.23.101 is amended to read:

22    **Sec. 43.23.101. Voter registration.** The commissioner shall establish by rule a

23    schedule by which the commissioner will provide, and shall provide as soon as is

24    practicable the director of elections with

25            (1) electronic records from the permanent fund dividend applications

26    of the information required by AS 15.07.060(a)(1) - (4) and (7) - (9), and the

27    attestation that such information is true, for each permanent fund dividend applicant

28    who **requested to be registered to vote and is**

29            (A) [IS] a citizen of the United States; and

30            (B) [IS] at least 18 years of age or will be within 90 days of the

31    date of the application; and

1          (2) the mailing addresses for all permanent fund dividend applicants.

2     * **Sec. 33.**   AS 15.15.225(a)(2);  AS 15.20.081(f)(2),  15.20.203(j),  15.20.207(k),  and

3     15.20.211(f) are repealed.

4     * **Sec. 34.** The uncodified law of the State of Alaska is amended by adding a new section to

5     read:

6          APPLICABILITY.  AS 15.56.035(a),  as  amended  by  sec.  25  of  this  Act,

7     AS 15.56.060(a), as amended by sec. 26 of this Act, AS 15.56.065, enacted by sec. 27 of this

8     Act, and AS 15.56.070(a), as amended by sec. 28 of this Act, apply to offenses committed on

9     or after the effective date of secs. 25 - 28 of this Act.

10     * **Sec. 35.** The uncodified law of the State of Alaska is amended by adding a new section to

11     read:

12          TRANSITION: REGULATIONS. The director of elections may adopt regulations to

13     implement  the  changes  made  by  this  Act.  The  regulations  take  effect  under  AS 44.62

14     (Administrative Procedure Act), but not before the effective date of the law implemented by

15     the regulations.

16     * **Sec. 36.** Sections 20 - 24 of this Act take effect July 1, 2022.

17     * **Sec. 37.** Section 35 of this Act takes effect immediately under AS 01.10.070(c).

18     * **Sec. 38.** Except as provided in secs. 36 and 37 of this Act, this Act takes effect April 1,

19     2022.

# Exhibit C

Exhibit C                                                        Page 1 of 16

**Jovan Hutton Pulitzer**

# Memo

| | |
|---|---|
| **To:** | Arizona Attorney General Mark Brnovich |
| **From:** | Jovan Hutton Pulitzer |
| **cc:** | All Related Parties |
| **Date:** | March 19, 2022 |
| **Re:** | **SUBPEONA – <u>ERIC - The Electronic Registration Information Center</u>** |

Attorney General Brnovich,

As our Investigation has already provided evidence of, Arizona has a severe issue with dead voters being on its voter rolls combined with phantom and no longer residents of Arizona being part of its voter rolls.

Therefore, in order to gain an accurate and transparent understanding of how the voter rolls are maintained in Maricopa County, Arizona, we need an accurate and transparent understanding of how the database management operations of ERIC, the Electronic Registration Information Center, operates.

At this moment, we are unable to conceive of how the ERIC program works when it has only what seems to be 5 full-time employees, none of which are data or technology experts or professionals whose experience match the stated mission of the organization.

This further leads us to believe that incredibly private voter registration files (which contain full names, dates of birth, driver's license numbers, social security numbers and physical addresses) may be located somewhere on the internet where third party contractors have full access to such highly private data sets. Therefore, we seek clarification on exactly how ERIC operates and how the data exchanges happen, which occurs regularly, and are assured to be fully secure.

The mission statement of the Electronic Registration Information Center is a noble and logical one, but our research indicates the information may not actually be utilized by the member states for the purpose stated.

Our research has shown that Maricopa County might not even be accepting the reports from ERIC, which the state pays for, and ignoring the identification of dead voters that should be immediately removed from the voter rolls.

An example of the tremendous disconnect between the ERIC mission statement and its reporting to the State of Arizona and Maricopa County is the following comparison we present between ERIC state reports when comparing it to deep forensic research of actual voter rolls in Arizona. The following chart details some of the ERIC "list maintenance activities":



| | | Number of Active Voters | Number of Voters | In-State Transfers | Cross-State 2 |
|---|---|---|---|---|---|
| 2013 | Seven states | 92,322 | 534,814 | 13,887 | 21,831 |
| 2014 | 11 states | 186,791 | 1,235,023 | 19,994 | 50,571 |
| 2015 | 12 states + DC | 249,824 | 742,246 | 14,030 | 61,276 |
| 2016 | 12 states + DC | 476,111 | 1,365,625 | 42,662 | 37,574 |
| 2017 | 18 states + DC | 801,926 | 2,374,418 | 31,570 | 55,527 |
| 2018 | 19 states + DC | 696,501 | 1,600,115 | 177,118 | 37,219 |
| 2019 | 23 states + DC | 1,089,041 | 1,505,370 | 90,450 | 73,906 |
| 2020 | 23 states + DC | 1,524,301 | 1,340,344 | 156,091 | 72,906 |
| 2021 | 28 states + DC | 3,557,895 | 4,811,390 | 281,996 | 101,923 |
| Total | 29 states + DC | 8,674,712 | 18,446,103 | 807,990 | 502,407 |

As of December 31, 2021

However, between July 2021 and September 2021, the State of Arizona new voter registration system data was cross checked with the Social Security Administration data sets and egregious mismanagement and maladministration of the Arizona Voter Rolls was discovered. Fifty-eight percent (58%) of the voter records investigated came back as NO MATCH with the Social Security Administration as being a real SSN or individual. *NOTE: ERIC also provides value by identifying out-of-date records found by comparing voter registration data between states to motor vehicle licensing agency data and to the Social Security Administration master death index list. ERIC began providing list maintenance data to members in July of 2013.*

### AZ New Voter Registration Verification w/ Social Security Administration
When NO Drivers License Can Be Produced - State Submits Last 4 digits of SSN, Name, and DOB

| DATE | STATE | TOTAL TRANSACTIONS | UN PROCESSED TRANSACTIONS | TOTAL NON MATCHES | TOTAL MATCHES | SINGLE MATCH ALIVE | SINGLE MATCH DECEASED | MULTIPLE MATCH ALIVE | MULTIPLE MATCH DECEASED | MULTIPLE MATCH MIXED | % NON MATCH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/11/21 | Arizona | 226 | 0 | 82 | 144 | 142 | 11 | 0 | 1 | 1 | 36% |
| 9/4/21 | Arizona | 64,135 | 0 | 19,617 | 39,718 | 38,678 | 246 | 0 | 1 | 9 | 58% |
| 6/18/21 | Arizona | 75,933 | 0 | 42,073 | 13,860 | 13,569 | 114 | 4 | 8 | 1 | 55% |
| 6/21/21 | Arizona | 76,289 | 0 | 42,219 | 34,040 | 33,765 | 245 | 0 | 1 | 2 | 55% |
| 6/24/21 | Arizona | 65,153 | 0 | 36,048 | 29,145 | 28,927 | 218 | 0 | 0 | 0 | 55% |
| 8/1/21 | Arizona | 76,573 | 0 | 42,247 | 34,254 | 13,942 | 242 | ... | 2 | 0 | 55% |
| 7/11/21 | Arizona | 52,351 | 0 | 32,156 | 20,066 | 20,052 | 258 | 0 | 0 | 1 | 61% |
| 7/24/21 | Arizona | 72,434 | 0 | 45,184 | 27,713 | 27,419 | 298 | 0 | 11 | 1 | 62% |
| 7/17/21 | Arizona | 82,954 | 0 | 51,013 | 32,029 | 32,476 | 543 | 0 | 3 | 0 | 62% |
| 7/19/21 | Arizona | 71,727 | 0 | 46,151 | 28,116 | 28,055 | 437 | 0 | 1 | 0 | 62% |
| 7/3/21 | Arizona | 43,283 | 0 | 26,249 | 17,034 | 17,712 | 147 | 0 | 1 | 0 | 61% |
| **TOTALS** | | **673,360** | **0** | **393,017** | **280,543** | **277,907** | **2,634** | **0** | **0** | **2** | |

If such invalid and/or illegal records were identified and provided to Maricopa County election officials, then such officials and representatives blatantly ignored the warnings; data and information provided. We have to wonder if this information when passed along to the Secretary of State in Arizona is just simply ignored or just mishandled.



On December 27th, 2017, Arizona became the 22nd state to participate in the Electronic Registration Information Center. In the press release announcing this participation Arizona acknowledged *"It is estimated that 1 in 8 records in the Country needs to be updated."* Arizona further acknowledged the premise *"ERIC compares official data provided by participating states as well as U.S. Postal Service addresses and Social Security death records to identify out-of-date records because they have moved, changed their names, or died. The results data is then shared with member states allowing election officials to update their voter registration rolls."*

Our deep forensic audit of the Maricopa County, Arizona, 2020 General Election clearly shows the Maricopa County voter rolls are both compromised and woefully lacking. Of further concern is the fact that the Electronic Registration Information Center (ERIC) is a nation-wide voter data-gathering system, funded by the Pew Center and an *"anonymous"* donor, the Soros Open Society. Designed by activists in 2014, it is a membership organization established to maintain states' voter rolls. It is our belief the mishandling of this *"information of bad voter files"* was used to significantly change the outcome of the 2020 General Election in Maricopa County, Arizona.

If information is obtained about *"out of state moves"*, *"dead voters"*, and *"bad voter registration"*, this information can be used to *"cast votes illegally for those not legally present to vote"*. This information can be used as a *"voter slush fund"* or what we call a *"fungible voter asset"* if nefarious parties know exactly where to *"discover"* such obscure assets. The chart below shows how we track these *"dormant and reactivatable assets"* in our deep forensic audit of Maricopa County, Arizona, as it relates to the 2020 General Election.

PKAD • FUNGIBLE VOTER REPORT • 2020       0001 ACACIA

| V-ASSETS | ACTIVE | REACT | ACT+RE | INACTIVE | TURNOUT |
|---|---|---|---|---|---|
| 5447 | 4388 | 437 | 4825 | 622 | 3351 |

| % PREC | % PREC | % PREC | | % PREC | % PREC |
|---|---|---|---|---|---|
| 100% | 80.56% | 8.02% | | 11.42% | 61.52% |

| % CNTY | % CNTY | % CNTY | % CNTY | % CNTY | % CNTY |
|---|---|---|---|---|---|
| 0.18953 | 0.17990 | 0.24357 | 0.19782 | 0.02164 | 0.16037 |

Maricopa 2020 Reported Stats: 2,873,062 total voter registered count, 2,438,071 active voter count, 179,418 reactivated voter count, 255,493 inactive voter pool, 2,0689,663 votes 2020

© 2021 Tesla Laboratories, llc & JHP

3

In an election ostensibly won with a margin of .0509%, one can easily see that between reactivating *"dormant voters"* in partial {REACT BOX} or reactivating *"dormant voters"* in full {INACTIVE BOX}, any and all elections can result in a *"selected winner"* versus a *"duly elected winner"*, and this does not even include the abundant crop of dead but still active and registered voters which can be weaponized.

This is why we must secure information from ERIC and gain transparency of their relationship with the State of Arizona (specifically Maricopa County) and determine if the information provided by ERIC to Maricopa County (State of Arizona) was used for good or nefarious purposes.

*"Each member state is mandated by the ERIC bylaws to submit ALL details on every voter, both active and inactive, to ERIC every 60 days. Along with this, states must give over all data from their motor vehicle registration divisions. This provides ERIC the information on everyone with a driver's license or even a learner's permit PLUS all ID recipients which include illegals, elderly shut-ins, etc. For this, ERIC then gives each member state a targeted list of all those NOT registered to vote and requires that the state contact a minimum of 95% of these people within 90 days, soliciting them to register. Where updates in individual profiles are garnered, those voters must be contacted within 90 days as well."* Furthermore, *"Member states are encouraged but not required to "update" their lists once every year. ERIC sends their data updates approximately every 425 days, whether or not it is requested."*

Let us highlight this provision of ERIC membership from its own bylaws: *"Under no circumstances shall the members transmit any record indicating an individual is a non-citizen of the U.S."* The one thing that is NOT mandated is that voter rolls be purged, and we strongly believe Maricopa County, and the State of Arizona, has potentially used the ERIC supplied research, records, and information for creating votes for those non-eligible to vote so they could make a material difference to the outcome of the election in Maricopa County, Arizona.

We request and pray for the following subpoena and/or information request and investigation be submitted and initiated regarding the Electronic Registration Information Center (ERIC).

---

**ELECTRONIC REGISTRATION INFORMATION CENTER INC**

[illegible text] American Nation Organization and Columbia, [illegible]

See all 4 employees on LinkedIn

+ Follow    Visit website ⧉    More

---

**MARICOPA COUNTY FACTS REGARDING THE 2020 GENERAL ELECTION**

4

- ❖ **Maricopa County, Arizona, REACTIVATED 179,418 previously "deemed inactive" voters for the 2020 General Election.**
- ❖ **This REACTIVATION accounts for 7.3532841169014% of the total active voter count, additionally:**
  - o **The number of those reactivated is an amount equal to 17 times the margin of victory in the 2020 General Election.**
- ❖ **Maricopa County also shows 255,493 "INACTIVE" voters still able to be reactivated at any time, additionally:**
  - o **This fungible voter asset represents 24 times the margin of victory in the 2020 General Election, or a 10.471149042345% "fungibility" which could be used at a future date.**





**E.R.I.C. - Electronic Registration Information Center a/k/a (ERIC) https://ericstates.org/ Electronic Registration Information Center, Inc. 1155 F Street NW Suite 1050, Washington, DC 20004, Phone: (202)695-3464, Fax: (866)200-2651, info@ericstates.org OR 1201 CONNECTICUT AVE NW STE 600, WASHINGTON, DC, 20036-2605 - UBI 604154251 and/or ELECTRONIC REGISTRATION INFORMATION CENTER was incorporated on Aug 02, 2017, as a NONPROFIT Regular Corporation Type registered at 711 CAPITOL WAY S STE 204, OLYMPIA, WA. NOTE: Electronic Registration Information Center, Inc. is located in Washington, DC, United States. Electronic Registration Information Center, Inc. has 5 total employees across all of its locations. NTEE code, primary: R40: Voter Education, Registration, NAICS code primary: 813319: Social Advocacy Organizations, Parent/child status: Independent – EIN 45-5389681**

**INFORMATION REQUEST FOR BUT NOT LIMITED TO:** (Former and Current Associates) John Lindback – Non–Voting Board Member, Janie Petty – Treasurer, Gail Fenumiai – Director, Sarah Whitt – Data Specialist, Mandi Grandjean – Director of Elections, Deputy Secretary of State – Ohio, Ericka Haas, Systems Engineer and Technical Liaison, Rick Retzman – Information Assurance Consultant, Shane Hamlin – Executive Director (Shane Hamlin of Olympia, WA., former Co-Director of Elections in the Washington Secretary of State's Office), Edgardo Cortes-Chair-Commissioner, Virginia Department of Elections, Mark Thomas-Vice-Chair-Director of Elections, Utah Lt. Governor's Office, Elaine Manlove-Treasurer-Commissioner of Elections, Delaware, Steve Trout-Secretary-Director, Oregon Elections Division, Angie Rogers-Immediate Past Chair-Director of Elections, Louisiana Secretary of State, Peggy Reeves-Executive Committee member-Director of Elections, Connecticut Secretary of State, Wayne Thorley-Executive Committee member-Deputy Secretary for Elections, Nevada, C T CORPORATION SYSTEM- agent, DEBORAH SCROGGIN- governor, MEAGAN WOLFE- governor, ROB ROCK – governor, KORI LORICK – governor, BRITTANY WESTFALL – governor, JONATHAN BRATER – governor, CLAY HELMS – governor, GAIL FENUMIAI – governor, JUDD CHOATE- governor, TED BROMLEY, governor, ANTHONY ALBENCE – governor, JORDAN FUCHS – governor, BERNADETTE MATTHEWS – governor, HEIDI BURHANS – governor, JARED DEARING -governor, SHERRI HADSKEY – governor, LINDA LAMONE – governor, DAVID MAEDA -governor, CHRISSY PETERS – governor, MANDY VIGIL – governor, MANDI GRANDJEAN -governor, JONATHAN MARKS – governor, MARCI ANDINO – governor, JUSTIN LEE -governor, WILL SENNING – governor, CHRIS

5

Exhibit C

PIPER- governor, STUART HOLMES – governor, ALICE MILLER – governor, MARIA MATTHEWS – governor, KEITH INGRAM - governor, MARIA MATTHEWS – governor, KEITH INGRAM – governor,

**INFORMATION REQUEST:**

1. Each member state is mandated by the ERIC bylaws to submit ALL details on every voter, both active and inactive, to ERIC every 60 days.
   a. How does the State of Arizona transfer the voter roll information to ERIC?
      i. Who is responsible for this transfer function for the State of Arizona?
         1. Is there a specific ERIC liaison or project manager assigned at the State level for ERIC?
         2. Who in the ERIC organization is responsible for managing the relationship with the State of Arizona?
         3. What are their duties and procedures?
         4. Since membership enrollment in ERIC, has the State of Arizona provided the required (by bylaws) active and inactive voter information to ERIC?
         5. When was the initial transfer of the starting voter rolls to ERIC as part of membership?
            a. How large was the file transfer in data size, individual voter IDs, and overall fields per UID?
            b. What were your first initial findings when work initially began on the services provided by ERIC to the State of Arizona?
            c. When was the date of the first report back to the State of Arizona?
               i. Who made the report for Arizona on behalf of ERIC?
               ii. Who accepted the data for the State of Arizona on behalf of the State?
         6. Please list, since the date of inception and membership, the following:
            a. Each data transfer to ERIC from the State of Arizona
            b. Each data transfer from the State of Arizona to ERIC
            c. The file size, format, and number of individual voter files represented in said transfers
            d. When first running the data files provided by the State of Arizona, did ERIC detect duplicate voters or voters with the same or relatively the same identifying information but unique voter registration numbers?
               i. Did ERIC notify the State of Arizona of such duplicate or bad records from the start?
               ii. How many of these types of records were initially discovered?
               iii. Who did ERIC report the findings of such to at the State of Arizona?
               iv. Upon the next test of data or systems were the bad files still present?

6

Exhibit C                                                          Page 7 of 16

7. Does the State of Arizona provide you with a new complete voter file each 60 days or just new registrations?
8. After ERIC's initial receipt of the complete voter files from the State of Arizona, does ERIC ever request the full data set at a later date to cross check IF the State of Arizona is making voter roll adjustments based on the findings of ERIC?
   a. Has the above scenario of rerunning ALL TO DATE VOTER ROLLS from the State of Arizona back through to assure compliance ever occurred?
      i. If YES, please state each instance this has occurred by date.
      ii. If NO, please state how you are able to assure, or even check for, the State of Arizona even utilizing your services effectively or in a prudent and fiduciary manner.
      iii. If you do NOT run cross checks for compliance by member states, please explain why such is not policy.
9. Is it possible for ERIC to have a different voter list, in part, partial, or whole, which is different and/or materially different than the State of Arizona?
   a. If YES, please explain why such difference could occur and what would cause such an occurrence.
   b. If NO, please explain HOW ERIC and the State are able to cross check each other's compliance and fiduciary efforts IF only updated batches are being transferred back between each other every 60 days and not complete top-to-bottom list maintenance and compliance measures are not in practice.

10. Additionally, provide by data delivery or transfer the total number of the following:
    i. How many voters from Arizona were found to have moved out of the State of Arizona (by batch transfer, date, size, number of unique records, etc.)?
    ii. How many voters were found to have moved out of state when the data was checked for Arizona (by batch transfer, date, size, number of unique records, etc.)?
    iii. When a MOVED OUT-OF-STATE VOTER is detected by ERIC and reported to the State of Arizona, does ERIC keep reporting the presence of a moved out of state voter for each instance the voter is continually detected past the initial discovery?
    iv. Does ERIC only report a moved out-of-state voter to the State one time and then never follow up?

7

     v.  If ERIC reports an instance of a moved out-of-state voter, yet finds in subsequent runs the voter is still on the roll, what steps does ERIC take, such as:
1. Continue to report the instances to the State?
2. Ignore the file flag since it had been previously reported?

    vi.  How does ERIC keep track of moved out-of-state voters which may have been previously detected and/or reported?
1. Where is this information stored?
2. In what format?
3. In what numbers?
4. In what logging, flagging or detection system?

11. How many voters were found to be mis-matched social security numbers when the data was checked (by batch transfer)?

    i.  When a mismatched social security number is detected by ERIC and reported to the State of Arizona, does ERIC keep reporting the presence of a mismatched social security number voter for each instance the voter is continually detected past the initial discovery?

    ii.  Does ERIC only report a mismatched social security number voter to the State one time and then never follow up?

    iii.  If ERIC reports an instance of a mismatched social security number voter, yet finds in subsequent runs the voter is still on the roll, what steps does ERIC take, such as:
1. Continue to report the instances to the State?
2. Ignore the file flag since it had been previously reported?

    iv.  How does ERIC keep track of mismatched social security numbers of voters which may have been previously detected and/or reported?

    v.  Where is this information stored?
1. In what format?
2. In what numbers?
3. In what logging, flagging or detection system?

    vi.  Additionally, provide by data delivery (by batch transfer, date, size, number of unique records, etc.), the following:
1. Mismatched social security numbers
2. Voters from Arizona found to have moved out of the State of Arizona

8

3. Voters found to have moved out of state when the data was checked for Arizona

12. WHEN A MOVED DECEASED VOTER is detected by ERIC and reported to the State of Arizona, does ERIC keep reporting the presence of the deceased voter for each instance the voter is continually detected past the initial discovery?
    i. Does ERIC only report a deceased voter to the State one time and then never follow up?
    ii. If ERIC reports an instance of a deceased voter, yet finds in subsequent runs the voter is still on the roll, what steps does ERIC take, such as:
        1. Continue to report the instances to the State?
        2. Ignore the file flag since it had been previously reported?
    iii. How does ERIC keep track of deceased voters which may have been previously detected and/or reported?
        1. Where is this information stored?
        2. In what format?
        3. In what numbers?
        4. In what logging, flagging or detection system?

13. Has the State of Arizona missed providing any of the required every-60-day data dumps to ERIC?
    a. If so, please identify each 60-day period said transfers of data were not made, and note the following:
        i. Did ERIC notify the State of Arizona of the information lapse?
        ii. If YES, who did ERIC report this to? (Full contact information please)
            1. Did the State of Arizona respond?
            2. What was the response?
            3. Did the State of Arizona remedy the situation?
            4. If yes, when and how?
        iii. If NO, and it is a requirement of membership in ERIC, why did ERIC choose to NOT report such to the State of Arizona?
            1. Who at ERIC was responsible for making the decision to NOT notify the State of Arizona?
    b. Does ERIC have a liaison at each county level, such as Maricopa County, Arizona, and if yes, who is this individual?
    c. How does Maricopa County provide this information and data transfer to the state?

9

Exhibit C                                                                      Page 10 of 16

d. In what manner does Maricopa County transfer this data to the State (procedures and formats of data)?
e. Who is responsible for the assembling of the state for said transfer of data to ERIC at the State level?

14. How does the State of Arizona transfer to ERIC the data from the motor vehicles registration divisions?
    ii. Who is responsible for this data at the motor vehicles registration divisions?
    iii. Please list, by date and batch, all transfers of data to ERIC by the motor registration divisions in the State of Arizona.

15. Is the ERIC system or data base, when combined with other official State Databases (specifically the dataset of the Social Security Administration and motor vehicles division) able to identify any individuals which may be a non-citizen of the US?

16. If the bylaws of ERIC demand the following, **"Under no circumstances shall the members transmit any record indicating an individual is a non-citizen of the U.S."**, how do the following compliance procedures occur?
    i. How does ERIC assure that it has not accidentally been given, inadvertently, records of individuals which are, in fact, non-citizens of the US?
    ii. If ERIC does not verify or assure US Citizenship, how does ERIC just assume the member state, in this case the State of Arizona, has made sure that such files are not transferred to ERIC?
    iii. Does ERIC automatically assume, due to its written bylaws and membership agreement with a member state, the State is automatically complying with such non-citizen rules?
        a. What happens if a member state does not comply with this bylaw of ERIC?
        b. What does ERIC do if it is able to tell, identify, flag, recognize, or in some way detect, by either file information, Social Security Administration information, or motor vehicle division information, IF a file has been sent which does not represent a legal US Citizen?
            i. Is there published procedure for such?
            ii. Has this type of event ever occurred?
            iii. If YES, how many voter files or individual files have been flagged in this manner?
            iv. Who has this information been sent to at the State of Arizona?

17. Can ERIC assure the State, Legislative Officials, Lawmakers, Investigators or Auditors that it does not have any files in its systems or

10

databases which do/could/or may belong to a file – also known as a voter – who is in fact NOT a legal US citizen?

18. Is ERIC able to confirm which member states have updated their voter rolls on the recommended one-a-year cycle?

      i.    How does ERIC confirm the State is complying with the once-a-year update?

      ii.   If ERIC does not confirm the State in fact does a once-a-year update, why not?

      iii.  If State is not utilizing the information and data provided by ERIC, would that in fact mean the State is not keeping up with their voter rolls effectively?

      iv.  If the State is contracting with ERIC and becoming a member, yet they neglect updating their voter rolls, then is the ERIC program and membership of any use to the member state?

19. If ERIC is obtaining information from member states, why is ERIC only providing a data update to the State approximately every 425 days, whether or not it is requested by the member state?

      i.    Has the State of Arizona requested in any form, written or otherwise, their update from ERIC on or before the 425-day mark for any given update?

      ii.   Has the State of Arizona ever failed to request an updated voter roll file from ERIC either on or before the 425-day mark?

            a.  If YES, what years did this occur?

      iii.  What is the significance of using the term set at 425 days?

            a.  With elections going on regularly and voters moving in and out of the State of Arizona regularly, why not update in faster intervals?

20. Since data continually flows to ERIC from the member state of Arizona, in the event a voter happens to die immediately following the day of said transfer, does this then equate to the possibility of a dead voter, confirmed dead, staying active on the State of Arizona voter rolls at least 425 days from the date of discovery or date of report to the State?

21. If the State of Arizona does not in fact take ERIC dead voters accumulated data, could it be possible that the State of Arizona has dead voters inside their voter rolls?

22. If the State of Arizona was to ignore two (2) 425 reporting cycle updates from ERIC and was to not update their voter rolls from said ERIC compiled data, would this then reelect the very real possibility of a dead voter not being detected for 2.34 years?

11

23. Why would a State such as Arizona not accept your dead voter data set information as part of their regular maintenance program?

24. How many Voters, since membership of the State of Arizona, has ERIC identified for the State of Arizona?
      i.    Please provide Total Number By Year
     ii.    Please provide Total Number By Party Affiliation

25. How does ERIC "activate" a Voter for a member state?

      i.    Does ERIC actually register them with the state?
     ii.    Does ERIC have access to the state registration system and can insert voters into the state voter registrations system?
            a.  If NOT active insertion by ERIC, what are the procedures, methods, and steps for getting said new voter information into the State Voter Registration Database?

26. When ERIC identifies a new voter for activation within the State of Arizona's Voter Registration System, does ERIC or its assigns conduct any or all of the following:

      i.    Confirm physical address for the new voter?
            a.  If YES, how does the ERIC system confirm such?
     ii.    Confirm a valid Driver's License or proper State Issued Identification for the new voter?
            a.  If YES, how does the ERIC system confirm such?
     iii.   Confirm the truthful and full date of birth for the new voter?
            a.  If YES, how does the ERIC system confirm such?
     iv.   Confirm a valid and full Social Security Number for the new voter?
            a.  If YES, how does the ERIC system confirm such?
     v.    If the State provided voter roll database has voters on the rolls which are not legal citizens, but for some reason have gone inactive as a voter, how does ERIC handle this situation and avoid unintentionally registering a new voter who may actually be a non-citizen?

27. If ERIC is obtaining motor vehicle division records, which may or may not mean the person is already a voter, how does ERIC then convert

12

them to a new voter for the State of Arizona, if in fact ERIC does not check citizenship?

    i.  Thus, since ERIC may not confirm actual citizenship of an individual while it is taking delivery of motor vehicle division records (which does not mean the person is registered to vote or legal to vote), how does ERIC insure such instances of the improper onboarding of non-qualified persons or illegal voters into the State of Arizona's Voter Registration Records?

    ii.  Can ERIC assure State, Legislative Officials, Lawmakers, Investigators or Auditors of the following:

        a.  ERIC only recommends, signs up, identifies, onboards or registers ONLY legal US citizens to become registered voters in the State of Arizona?

        b.  ERIC only recommends, signs up, identifies, onboards or registers ONLY legal voting age US citizens to become registered voters in the State of Arizona?

        c.  ERIC only recommends, signs up, identifies, onboards or registers ONLY legal voters who ARE NOT UTILIZING A FAKE ID OR AN ILLEGAL ASSUMED INDENTITY in order to become a US registered voter in the State of Arizona?

        d.  To what end (and means) does ERIC take all the assurance and compliance steps with such an extremely minimal staff to handle such larger records?

        e.  To what end (and means) does ERIC take all the assurance and compliance steps to assure it does not recommend, sign up, identify, onboard or register a convicted felon who is in the motor registration records (or existing voter rolls of the State) in order to become a registered valid voter in the State of Arizona?

28. What is the purpose of ERIC needing and requiring the following information from member states, and, how does it help with assuring bad voter files or even new qualified voters are identified by the ERIC services? ERIC requires submission from each state of totals of the following:

    i.  Total provisional ballots counted
    ii.  Total of those uncounted
    iii.  Total voter registrations changed or updated on the day of voting
    iv.  Total paper ballots were cast
    v.  Total electronic votes tabulated

13

<div style="margin-left:2em">

vi. Names of all individuals who participate in the act of registering voters
    a. How many of these individuals' names and information have been provided to ERIC?

vii. Information of individuals who help in the voting registration or voting location process, specifically:
    a. public library staff
        i. How many of these individuals' names and information have been provided to ERIC?
    b. DHS
        i. How many of these individuals' names and information have been provided to ERIC?
    c. Depts. of Health and Public Safety
        i. How many of these individuals' names and information have been provided to ERIC?
    d. Volunteer organizations and/or workers
        i. How many of these individuals' names and information have been provided to ERIC?

</div>

29. How does the above Q28 i-vii help find bad voter records and activate inactive voters? Please explain in detail.

30. Since these items noted in Q28 i-vii are more akin to data harvesting and identifying individuals active in elections, which are normally kept private, protected and confidential, what is happening to this data?

<div style="margin-left:2em">

i. Where is this data being stored?
ii. What systems is this data being interfaced with?
iii. Do all of the volunteers and election supports know they are being identified by the state in disconnected 3rd party databases, when most of these lists are kept confidential and many subject to non-disclose agreements?
iv. How does ERIC having this data not allow the compromise of people, officials and the like who actively work elections in the State of Arizona?
v. Did ERIC or the State of Arizona receive a release of such confidential information from the individuals it has released information about?
vi. Did each State Official which ERIC has listed as participants, members, officials, or participants grant the unconditional release of such personal and private information?
vii. Did those officials allow the participants the opportunity to dis-enroll from this list building and data analytics function?
viii. How does this feature in ERIC, its bylaws and agreements reconcile with current privacy laws and the Privacy Act?
ix. Do the individuals who have been profiled and inserted into the ERIC database by the State of Arizona have a way to immediately remove their information, and the said

</div>

14

resulting information collected about and from them, from the ERIC database in totality?

x.   Does ERIC even have the ability to eliminate this highly private information from its database and artificial intelligence programs, including all resulting information collected as the result of the inclusion of such hidden data, the information which has been shared on individuals?

xi.   If the Supreme Court has interpreted the United States Constitution as providing individuals with a right to privacy and this right generally guards only against government intrusions, how is this disclosure of information (compiled by ERIC since 2012) not a violation of privacy and thus a total invasion of privacy enacted by the joint efforts of ERIC and the State of Arizona?

xii.   How is the ERIC data prevented from rolling into other third part databases?

     a.   Is this or has this occurred?

     b.   Is ERIC or any of its members, officials, or assigns profiting or generating any revenue (no matter how insignificant) off this information provided by the State of Arizona?

**15**

# Exhibit D



Search

Primary and General Election
Absentee, Early and Questioned Ballot Statistics

## November 3, 2020 Election

Last Updated - 12/04/2020

| BALLOT TYPE | NUMBER ISSUED | NUMBER VOTED AND RETURNED |
|---|---|---|
| Absentee In-Person | 27,686 | 27,686 |
| By-Mail Delivery | 119,155 | 98,816 |
| Online Delivery | 16,466 | 12,026 |
| Fax Delivery | 88 | 78 |
| Special Needs | 1,847 | 1,847 |
| Federal Write-In Absentee | 155 | 131 |
| Early Vote In-Person | 53,229 | 53,229 |
| Questioned | 11,784 | 11,784 |
| Total | 230,410 | 205,597 |

- November 3, 2020 Absentee, Early and Questioned Ballot Statistics

Exhibit D

# PUBLIC INTEREST
### —— LEGAL FOUNDATION ——

## Nearly 15 Million Mail Ballots Went Unaccounted for in 2020 Election

### *43 Million over Past Decade*

**AUGUST 2021** -- In the face of a pandemic, states from across the nation hastily pushed traditionally in-person voters to mail ballots while, at the same time, trying to learn how to even administer such a scenario. Experts at PILF warned that the lost ballot problem would worsen in 2020 compared to previous years. In total, elections in 2012, 2014, 2016, 2018, and 2020 saw more than 43.1 million unaccounted for mail ballots.

**2016 Election**
-41.6 million ballots sent
-568,412 undeliverable
-318,716 rejected
-5,951,992 "unknown"

**2020 Election**
-90.6 million ballots sent
-1.1 million undeliverable
-560,814 rejected
-14.7 million "unknown"

| 2020 Election – "Unknown" Ballots | |
|---|---|
| Location | Total |
| Los Angeles County, CA | 1,491,459 |
| Clark County, NV | 724,708 |
| Orange County, CA | 482,940 |
| Riverside County, CA | 454,911 |
| San Diego County, CA | 317,614 |
| San Bernadino County, CA | 274,937 |
| Santa Clara County, CA | 251,840 |
| Essex County, NJ | 248,290 |
| Sacramento County, CA | 241,367 |
| Maricopa County, AZ | 229,123 |

| 2020 Election – Undeliverable Ballots | |
|---|---|
| Location | Total |
| Maricopa County, AZ | 110,092 |
| Clark County, NV | 93,279 |
| Orange County, CA | 46,795 |
| District of Columbia | 45,072 |
| Santa Clara County, CA | 41,874 |
| San Diego County, CA | 34,765 |
| Alameda County, CA | 34,243 |
| San Bernadino County, CA | 18,459 |
| Riverside County, CA | 18,140 |
| Denver County, CO | 17,048 |

| 2020 Election – Rejected Ballots | |
|---|---|
| Location | Total |
| Kings County, NY | 22,423 |
| Los Angeles County, CA | 21,761 |
| Lake County, IL | 16,259 |
| Orange County, NY | 13,676 |
| King County, WA | 10,982 |
| Bernalillo County, NM | 10,535 |
| Bucks County, PA | 9,493 |
| San Bernadino County, CA | 7,414 |
| San Diego County, CA | 7,156 |
| Middlesex County, NJ | 6,646 |

32 E. Washington Street, Suite 1675, Indianapolis, Indiana 46204
Telephone: 317.203.5599  Fax: 888.815.5641  PublicInterestLegal.org

## Just What Does 'Unknown' Mean?

The U.S. Election Assistance Commission asks local officials how many ballots were not returned as voted, were undeliverable, or were otherwise "unable to be tracked." The USPS Inspector General most recently reported that only 13 percent of mail ballots in the 2018 General Election used the official tracking system. This means there is a wide variety of things that can happen to a ballot in the "unknown" column. A ballot can be put in the wrong mailbox and land in an unfriendly neighbor's trash. It can be thrown out with your unpaid bills. It can be left outside for the wind to carry the last mile (like seen in Nevada in 2020). Election officials simply do not know what happened. Unknown ballots are the greatest blind spot in the American electoral system.

## Some Stakes Within These Figures

In some places, it can be difficult to understand how large these numbers really are. Consider the undeliverable ballots. President Joe Biden carried Arizona by 10,457 votes, yet Maricopa County reportedly sent ballots to 110,092 outdated or wrong addresses. The same scenario roughly happened in Nevada, where Biden carried with 33,596 votes, yet Clark County bounced 93,279 ballots. The lesson is clear: increased reliance on mass mail voting must correlate with aggressive voter registration list maintenance.

## PILF President J. Christian Adams

*"These figures detail how the 2020 push to mail voting needs to be a one-year experiment. Bills like H.R. 1/S.1 risk inflating these numbers even further, pushing our election system toward error, disenfranchisement and ultimately widespread doubt about election outcomes. Some of the counties with the least experience in administering mail voting rejected the most ballots nationwide. If continued, 2020-style chaos will become the norm."*

### Sources & Notes

*U.S. Election Assistance Commission; Election Administration and Voting Surveys for 2012, 2014, 2016, 2018, and 2020*

*USPS Inspector General; Processing Readiness of Election and Political Mail During the 2020 General Elections (August 31, 2020)·*

*Certified 2020 General Election Results for Arizona, Nevada via CNN (2021)*

*Las Vegas Review Journal; Primary underway, but argument over mail election continues (May 19, 2020)*

*The EAC data is not without its challenges. First, the EAC has a history making subtle edits to its data well after publication and without conspicuous editorial notes or changelogs. The version relied upon for this research brief, "2020_EAVS_for_Public_Release[1]," shows in its file metadata to have been created on August 16, 2021. Second, after publication, some voter registration jurisdictions have made changes to the EAC data by changing their responses to the federal survey that were hardly obvious to regular observers (see Judicial Watch v. Pennsylvania, No. 1:20-CV-708, 2021 U.S. Dist. LEXIS 42496, at \*13-15 (M.D. Pa. Mar. 8, 2021)). Finally, national totals reflected in this brief are subject to change with the EAC. As of publication, more than 680 jurisdictions have not responded to the survey question related to undeliverable ballots; 400 jurisdictions have not provided "status unknown," data, and 120 did not provide ballot-rejection numbers.*

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding (MOU) is entered between the United States of America, through the Civil Rights Division of the U.S. Department of Justice, and the State of Alaska (the State), through the Office of the Lieutenant Governor and the Department of Administration.

### I. Statement of the Parties

The United States of America and the State of Alaska (the Parties) hereby recognize the following:

1. By letter dated November 3, 2021, the United States notified the State of Alaska that the Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice had authorized litigation against the State and appropriate State officials to enforce Section 5 of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20504.

2. The Assistant Attorney General for the Civil Rights Division had authorized litigation following an investigation in which the United States gathered evidence that established the State's noncompliance with Section 5 of the NVRA.

3. The United States and the State of Alaska share the goal of ensuring that Alaska citizens enjoy convenient opportunities to register to vote and to update voter registration information.

4. The United States and the State of Alaska share the goal of facilitating the maintenance of up-to-date voter registration information.

5. The United States and the State of Alaska have negotiated in good faith and hereby agree to this MOU as an appropriate means to further their shared goals.

### II. The National Voter Registration Act of 1993

6. The NVRA, 52 U.S.C. §§ 20501-11, includes certain requirements with respect to voter registration procedures for elections for federal office by states covered by the NVRA. The State of Alaska is covered by the NVRA and is therefore obliged to ensure compliance with the NVRA's requirements. *Id.* §§ 20502(4), 20503.

7. Section 5(a) of the NVRA requires that each Alaska "motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law . . . serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application." *Id.* § 20504(a)(1).

8. For NVRA purposes, a "motor vehicle driver's license" includes "any personal identification document" issued by the Alaska Department of Administration. *Id.* § 20502(3).

9. The Alaska Department of Administration issues driver's licenses, Alaska Stat. Ann. § 28.15.111, and identification cards, *id.* § 18.65.310.

10. In Alaska, a "driver's license" is any "license, provisional license, or permit to drive a motor vehicle, or the privilege to drive or to obtain a license to drive a motor vehicle, under the laws of [Alaska] whether or not a person holds a valid license issued in [Alaska] or another jurisdiction." *Id.* § 28.90.990(a)(10).

11. Section 5(c) of the NVRA requires the voter registration portion of an application for a motor vehicle driver's license to state each eligibility requirement for registration, including citizenship; contain an attestation that the applicant meets each such requirement; and require the signature of the applicant under penalty of perjury. 52 U.S.C. § 20504(c)(2)(C).

12. The voter registration portion of the application must also inform voters of the penalties for the submission of a false voter registration application; that a decision not to register will remain confidential and will be used only for registration purposes; and that if the applicant registers to vote, the office at which the applicant submitted a voter registration application will remain confidential and will be used only for registration purposes. *Id.* § 20504(c)(2)(D).

13. Section 5(d) of the NVRA requires that "[a]ny change of address form submitted in accordance with State law for purposes" of a motor vehicle driver's license must also "serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes." *Id.* § 20504(d).

## III. Terms of Agreement

NOW, THEREFORE, for full and adequate consideration given and received, the United States, through the Civil Rights Division of the U.S. Department of Justice, and the State of Alaska, through the Office of the Lieutenant Governor and the Department of Administration, agree as follows:

### A. Motor Vehicle Driver's License Applications

14. Within 60 days of the effective date of this MOU, the State will develop and implement uniform forms, policies, and procedures to ensure that each motor vehicle driver's license application (including any renewal application) submitted to the Alaska Department of Administration, Division of Motor Vehicles (DMV) both (1) serves as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application, as required by Section 5(a) of the NVRA, 52 U.S.C. § 20504(a), and (2) meets the technical requirements of Section 5(c) of the NVRA, *id.* § 20504(c).

15. Within 60 days of the effective date of this MOU, the State will ensure that any application form for a motor vehicle driver's license that does not comply with NVRA requirements will no longer be available at DMV offices or on State websites.

16.     Within 60 days of the effective date of this MOU, the State will remove any references to applications for a motor vehicle driver's license that are not NVRA-compliant from all DMV materials—including forms, applications, and manuals—and from all State websites.

17.     Once the State has updated its motor vehicle driver's license application to comply with Sections 5(a) and 5(c) of the NVRA, *see* Paragraph 14, the State will ensure that any applicant who submits a prior version of a motor vehicle driver's license application form that is not NVRA-compliant is sent an application to register to vote.

18.     Within 60 days of the effective date of this MOU, the State will publicize the voter registration opportunities afforded by the NVRA to DMV clients, including the opportunity to register to vote as part of an application for a motor vehicle driver's license and the opportunity to update voter registration records when submitting a change of address for motor vehicle driver's license purposes.

19.     The State may update or modify portions of application forms for a motor vehicle driver's license that do not concern voter registration with respect to elections for Federal office without implicating this MOU.

**B.     Notifications of Change of Address**

20.     The State has informed the United States that Alaska will no longer accept notifications of change of address by paper, whether on a State-provided form or through informal letter, for purposes of a motor vehicle driver's license. Rather, the State has determined that it will accept such notifications through its online system only, which serves as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes.

21.     The State has also informed the United States that, when needed, Alaska will assist individuals in completing an online notification of a change of address, including by accepting requisite information by phone and completing the online notification on behalf of the submitting individual.

22.     In the event that an individual submits a paper notification of change address for purposes of a motor vehicle driver's license, the State shall ensure that the individual who submitted the paper notification is directed to the State's online notification of change of address system, and, when needed, is provided the assistance referred to in Paragraph 21.

23.     Within 30 days of the effective date of this MOU, the State will remove from all DMV materials and from all State websites any references to submitting notifications of change of address for purposes of a motor vehicle driver's license by paper.

**C.     DMV NVRA Coordinator**

24.     Within 30 days of the effective date of this MOU, the State will appoint a DMV NVRA Coordinator for the State of Alaska (DMV NVRA Coordinator).

Page 3 of 8

25. The DMV NVRA Coordinator will:

   a. Within 30 days of the effective date of this MOU, attend training provided by the Lieutenant Governor that explains NVRA requirements for motor vehicle driver's license applications, notifications of change of address for purposes of a motor vehicle driver's license, and this MOU;

   b. Oversee the training of Training Specialists and the training offered to NVRA Site Coordinators, *see* Paragraphs 26, 28(a);

   c. In the event that the DMV receives a version of a motor vehicle driver's license application that is not NVRA-compliant, ensure that the applicant who submitted that application is sent a voter registration application;

   d. In the event that the DMV receives a paper notification of change address for purposes of a motor vehicle driver's license, ensure that:

      i. The applicant is directed to the State's NVRA-compliant online notification of change of address system, *see* Paragraph 22, and

      ii. The applicant is notified that assistance in completing the online notification is available, *see* Paragraph 21;

   e. Ensure the production of the biannual reports described in Paragraph 31;

   f. Provide technical assistance to DMV offices as needed; and

   g. Determine whether corrective action plans are needed statewide or at individual DMV offices and direct the implementation of such plan(s), as needed.

**D.    Training Specialists**

26.    Within 30 days of the effective date of this MOU, the State will designate a sufficient number of Training Specialists to provide:

   a. Initial training to all employees and contractors with NVRA responsibilities within 30 days of receiving training from the DMV NVRA Coordinator; and

   b. Training to all new employees and contractors with NVRA responsibilities within 45 days of the new employee's start date.

**E.    NVRA Site Coordinator**

27.    Within 30 days of the effective date of this MOU, the State will appoint an NVRA Site Coordinator for each DMV office.

28.    The NVRA Site Coordinators will:

Page 4 of 8

a. Within 30 days of the effective date of this MOU, attend training provided by a Training Specialist;

b. Maintain (or supervise the maintenance of) their office's voter registration application data and materials; and

c. Collect the information and data necessary for compliance with the NVRA and for compliance with this MOU, including the information and data described in Paragraph 31.

29. Once the State has updated its motor vehicle driver's license application to comply with Sections 5(a) and 5(c) of the NVRA, *see* Paragraph 14, NVRA Site Coordinators must ensure that:

a. Every motor vehicle driver's license application provided by their DMV office complies with the NVRA and

b. Any applicant who submits a motor vehicle driver's license application to their assigned DMV office that does not comply with the NVRA is sent a voter registration application.

30. In the event that their DMV office receives a paper notification of change address for purposes of a motor vehicle driver's license, NVRA Site Coordinators must ensure that:

a. The applicant is directed to the State's online notification of change of address system, *see* Paragraph 20, and

b. If needed, the applicant is provided assistance to complete the online notification, *see* Paragraph 21.

F.  **Reporting and Monitoring**

31. On April 31 and October 31 of each year this MOU is in effect, the State will submit to the United States a report that provides the following information for the six-month period ending March 30 and September 30, respectively:

a. A summary of efforts to comply with this MOU;

b. The number of completed motor vehicle driver's license applications received, on an office-by-office basis;

c. The number of completed voter registration applications received as part of a motor vehicle driver's license application, on an office-by-office basis;

d. The number of notifications of change of address submitted for purposes of a motor vehicle driver's license; and

Page 5 of 8

Exhibit D _____ Page 9 of 12

Appendix I _____ Page 99 of 174
Case 3:23-cv-00006-SLG   Document 1-1   Filed 01/13/23   Page 101 of 176

e. The number of notifications of change of address for voter registration received as part of a notification of change of address submitted for purposes of a motor vehicle driver's license.

## IV. Deadlines

32. Any deadline in this MOU may be extended by the consent of the parties. The United States will not unreasonably withhold consent following a showing of good cause by the State.

33. With respect to any time deadline imposed on the State in this MOU, if the State is unable, despite good faith efforts, to comply with such deadline, the State will notify the United States of such inability prior to the expiration of such deadline and may request a reasonable extension of the deadline.

## V. Enforcement

34. The State of Alaska authorizes the United States to conduct audits without prior notice to the State, to contact DMV employees without prior notice to the State, and to call or visit DMV offices without prior notice to the State.

35. If at any time, the United States obtains information that the State of Alaska is in breach of or is about to breach any of the terms of this MOU, the United States will advise the Alaska Attorney General, the Lieutenant Governor, and the Department of Administration in writing by notice sent by overnight mail and email. The notice will identify the facts that form the basis of the alleged breach. The Alaska Attorney General, the Lieutenant Governor, and the Department of Administration will have five business days following the receipt of such notice to respond in writing to the United States. The Parties will thereafter immediately attempt to resolve any potential issue of noncompliance. If the Parties are unable to agree on a resolution of the issue, the United States may take appropriate action to enforce the terms of this MOU or to immediately terminate the MOU and enforce Section 5 as provided in Section 11 of the NVRA, 52 U.S.C. § 20510.

36. Nothing in this MOU will prevent the United States from taking any actions required to enforce any and all applicable provisions of the NVRA.

37. Any legal proceedings arising in connection with this MOU may be brought only in the United States District for the District of Alaska, and all parties consent to venue in that court.

38. Any legal proceeding to enforce this MOU may seek specific performance of the terms herein.

39. This MOU creates no third-party rights and may not be enforced by any individual, organization, or entity not a party hereto.

Page 6 of 8

## VI. Effective Date

40. This MOU will take effect immediately upon signing by all signatories.

## VII. Termination

41. This MOU will remain in effect for three years from its effective date, unless terminated earlier by the parties.

42. Any legal proceeding to enforce the terms of this MOU brought before the MOU's termination date will toll the termination of the MOU during the pendency of such proceeding.

## VIII. Construction

43. This MOU will be interpreted as if jointly written by all parties, and the rule of construction providing that any ambiguities are to be resolved against the drafting party will not be used in interpreting this MOU.

44. Prior drafts of this MOU may not be used to construe this MOU.

The undersigned agree to entry of this MOU.

**For the United States of America:**

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

*Tharuni Jayaraman*

T. CHRISTIAN HERREN, JR.
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
THARUNI A. JAYARAMAN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Date 6/13/2022

**For the State of Alaska:**

KEVIN MEYER
Lt. Governor
State of Alaska

Date: 6/13/2022

Paula Vrana

PAULA VRANA
Commissioner
Alaska Department of Administration

Date: 05/31/2022

Page 8 of 8

# Exhibit E

# Voter Registration Table 4: Voter List Maintenance – Confirmation Notices

| State | Confirmation Notices Sent | | Result of Confirmation Notice | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Received Confirmation From Voter | | | | Confirmation Returned as Undeliverable | |
| | | | Valid | | Invalid | | | |
| | Total | Active Voters | Total | % | Total | % | Total | % |
| Alabama [1] | – | – | 1,826 | – | 25,755 | – | 3 | – |
| Alaska | 91,667 | 15.4 | 1,108 | 1.2 | – | – | 30,692 | 33.5 |
| American Samoa | 4,741 | 29.0 | 4,741 | 100.0 | 0 | 0.0 | 0 | 0.0 |
| Arizona | 2,480,620 | 58.0 | 75,275 | 3.0 | 422,319 | 17.0 | 328,161 | 13.2 |
| Arkansas | 432,798 | 30.7 | 89,906 | 20.8 | 33,312 | 7.7 | 45,003 | 10.4 |
| California [2] | 6,682,336 | 30.7 | 609,638 | 9.1 | 557,041 | 8.3 | 477,486 | 7.1 |
| Colorado | 705,625 | 18.6 | 13,885 | 2.0 | 14,104 | 2.0 | – | – |
| Connecticut | 178,993 | 7.7 | 55,787 | 31.2 | 92,022 | 51.4 | 25,292 | 14.1 |
| Delaware [3] | 89,271 | 12.6 | – | – | – | – | – | – |
| District of Columbia [4] | 571,983 | 110.3 | 26,308 | 4.6 | 15,582 | 2.7 | 72,114 | 12.6 |
| Florida | 1,295,491 | 8.9 | 121,655 | 9.4 | 142,275 | 11.0 | 219,736 | 17.0 |
| Georgia | 1,060,235 | 14.7 | 72,979 | 6.9 | 4,018 | 0.4 | 186,456 | 17.6 |
| Guam | 5,874 | 10.5 | – | – | – | – | 1,153 | 19.6 |
| Hawaii [5] | 101,013 | 13.3 | 14,576 | 14.4 | 4,271 | 4.2 | – | – |
| Idaho | 36,438 | 3.5 | 2,912 | 8.0 | – | – | 315 | 0.9 |
| Illinois | 5,106,813 | 58.1 | 333,135 | 6.5 | 181,526 | 3.6 | 457,373 | 9.0 |
| Indiana [6] | – | – | – | – | – | – | – | – |
| Iowa [7] | 123,320 | 5.9 | – | – | – | – | – | – |
| Kansas | 227,808 | 12.9 | 9,203 | 4.0 | 43,892 | 19.3 | 16,588 | 7.3 |
| Kentucky [8] | 366,101 | 11.0 | – | – | – | – | – | – |
| Louisiana [9] | 325,975 | 11.0 | – | – | – | – | – | – |
| Maine [10] | 2,147 | 0.2 | 0 | 0.0 | 733 | 34.1 | – | – |
| Maryland [11] | 238,027 | 5.7 | 3,587 | 1.5 | 436 | 0.2 | – | – |
| Massachusetts [12] | 608,691 | 13.6 | – | – | – | – | – | – |
| Michigan | 207,229 | 2.9 | 1,143 | 0.6 | 27,214 | 13.1 | 20,030 | 9.7 |
| Minnesota [13] | – | – | – | – | – | – | – | – |
| Mississippi | 82,826 | 4.2 | – | – | – | – | – | – |
| Missouri [14] | 381,716 | 9.6 | 149,017 | 39.0 | 39,299 | 10.3 | 78,034 | 20.4 |
| Montana | 107,111 | 15.8 | 8,491 | 7.9 | 2,344 | 2.2 | 26,537 | 24.8 |
| Nebraska | 160,117 | 13.7 | 27,030 | 16.9 | 24,931 | 15.6 | 21,046 | 13.1 |
| Nevada [15] | 361,871 | 19.7 | 158,854 | 43.9 | 26,222 | 7.2 | 153,156 | 42.3 |
| New Hampshire [16] | 15,180 | 1.4 | 112 | 0.7 | – | – | 4,834 | 31.8 |
| New Jersey [17] | 311,385 | 5.3 | – | – | – | – | – | – |
| New Mexico [18] | 136,426 | 10.9 | 0 | 0.0 | 3 | 0.0 | 9,348 | 6.9 |

Voter Registration: The NVRA and Beyond | 159
Page 2 of 3

Exhibit E

Appendix I

Page 104 of 174
Case 3:23-cv-00006-SLG   Document 1-1   Filed 01/13/23   Page 106 of 176



# Appendix A: Descriptive Tables

## Voter Registration Table 1: Registration History

| State | Year | CVAP Total | Reported Registrations | Active Registrations | Active Regs (% of CVAP) | Active Regs. (% of Total) | Inactive Registrations | Inactive Regs. (% of Total) |
|---|---|---|---|---|---|---|---|---|
| Alabama | 2020 | 3,731,336 | 3,717,798 | 3,438,213 | 92.1 | 92.5 | 279,585 | 7.5 |
| | 2018 | 3,688,249 | 3,465,352 | 3,164,301 | 85.8 | 91.3 | 301,051 | 8.7 |
| | 2016 | 3,653,381 | 3,333,946 | 3,049,655 | 83.5 | 91.5 | 139,638 | 4.2 |
| Alaska | 2020 | 533,151 | 646,093 | 595,647 | 111.7 | 92.2 | 50,446 | 7.8 |
| | 2018 | 531,653 | 624,467 | 571,851 | 107.6 | 91.6 | 52,616 | 8.4 |
| | 2016 | 525,248 | 587,303 | 528,671 | 100.1 | 90.0 | 58,632 | 10.0 |
| American Samoa [1], [2], [3] | 2020 | – | 16,341 | 16,341 | – | 100.0 | 0 | 0.0 |
| | 2018 | – | 15,527 | 8,462 | – | 54.5 | 7,065 | 45.5 |
| | 2016 | – | – | – | – | – | – | – |
| Arizona | 2020 | 5,137,474 | 4,728,109 | 4,275,729 | 83.2 | 90.4 | 452,380 | 9.6 |
| | 2018 | 4,895,706 | 4,276,991 | 3,715,624 | 75.9 | 86.9 | 561,287 | 13.1 |
| | 2016 | 4,710,448 | 4,080,680 | 3,589,084 | 76.2 | 88.0 | 491,596 | 12.0 |
| Arkansas | 2020 | 2,235,415 | 1,831,414 | 1,408,061 | 63.0 | 76.9 | 423,353 | 23.1 |
| | 2018 | 2,207,894 | 1,786,840 | 1,456,887 | 66.0 | 81.5 | 329,953 | 18.5 |
| | 2016 | 2,185,724 | 1,765,513 | 1,422,393 | 65.1 | 80.6 | 343,120 | 19.4 |
| California [4] | 2020 | 26,032,160 | 26,157,618 | 21,795,838 | 83.7 | 83.3 | 4,345,874 | 16.6 |
| | 2018 | 25,650,455 | 25,103,559 | 19,724,297 | 76.9 | 78.6 | 5,379,262 | 21.4 |
| | 2016 | 25,002,812 | 24,486,638 | 19,495,856 | 77.7 | 79.4 | 5,065,746 | 20.7 |
| Colorado | 2020 | 4,244,210 | 4,211,528 | 3,803,762 | 89.6 | 90.3 | 407,766 | 9.7 |
| | 2018 | 4,057,437 | 3,953,613 | 3,426,499 | 84.4 | 86.7 | 527,114 | 13.3 |
| | 2016 | 3,896,986 | 3,840,303 | 3,336,663 | 85.6 | 86.9 | 503,640 | 13.1 |
| Connecticut | 2020 | 2,819,474 | 2,524,717 | 2,335,860 | 89.2 | 92.5 | 188,857 | 7.5 |
| | 2018 | 2,811,587 | 2,369,335 | 2,193,586 | 84.0 | 92.6 | 175,749 | 7.4 |
| | 2016 | 2,584,884 | 2,331,684 | 2,162,797 | 83.7 | 92.8 | 168,897 | 7.2 |
| Delaware | 2020 | 725,178 | 739,672 | 711,287 | 98.1 | 96.2 | 28,385 | 3.8 |
| | 2018 | 709,999 | 695,014 | 672,632 | 94.7 | 96.8 | 22,382 | 3.2 |
| | 2016 | 697,148 | 675,663 | 642,334 | 92.1 | 95.1 | 33,329 | 4.9 |
| District of Columbia | 2020 | 596,768 | 625,683 | 517,890 | 96.5 | 82.8 | 107,793 | 17.2 |
| | 2018 | 510,514 | 617,046 | 511,633 | 100.2 | 82.9 | 105,413 | 17.1 |
| | 2016 | 504,242 | 493,287 | 493,287 | 97.8 | 100.0 | – | – |
| Florida | 2020 | 15,507,315 | 15,231,808 | 14,517,002 | 93.6 | 95.3 | 701,422 | 4.6 |
| | 2018 | 15,014,950 | 14,126,722 | 13,278,070 | 88.4 | 94.0 | 848,652 | 6.0 |
| | 2016 | 14,441,877 | 13,505,571 | 12,853,866 | 89.0 | 95.2 | 651,705 | 4.8 |

# Exhibit F

## APPENDIX C

**Willful Blindness: Feds Ignore Illegal Alien ID Theft Plaguing Americans as U.S. Coffers Fill**

Real Clear Investigations: By Mark Hemingway and Ben Weingarten - June 30, 2022

https://www.realclearinvestigations.com/articles/2022/06/29/

willful_blindness_feds_ignore_massive_illegal_alien_id_plaguing_americans_as_us_coffers_fill_839815.html

## [FULL TEXT]

The historic surge of illegal immigrants across America's southern border is fueling a hidden crime spree few in Washington seem willing or able to address: widespread identity theft victimizing unwitting Americans perpetrated by migrants who need U.S. credentials to work.

An extensive review of government reports, think-tank research, news accounts, and interviews with policymakers and scholars suggests the problem involves millions of people – though measuring it with precision is difficult because of the lack of data provided by authorities.

A telling indication of the scope of the criminality is provided by a little-known government accounting book, the Social Security Administration's Earnings Suspense File (ESF). It reflects the earnings of employees whose W-2 wage and tax statements have names and Social Security numbers that do not match official records. The total logged in the file has increased tenfold from $188.9 billion at the dawn of the millennium to $1.9 trillion in 2021.

Officials have historically ascribed a "high proportion" of the file's growth to wages reported by illegal immigrants, and it has swelled alongside their population, which stands at a conservatively estimated 11.5 million today, 7 million of whom are employed. Among those doing so on the books, federal authorities have found that well over 1 million are using Social Security numbers belonging to someone else – i.e. stolen or "shared" with a relative or acquaintance – or numbers that are fabricated.

The data held in the ESF would enable authorities to pursue many of the fraudsters, but the IRS and other agencies responsible for enforcing the law have been reluctant to investigate, and regulations have prevented meaningful information-sharing among them.



**Rep. Pramila Jayapal** ✔️
@RepJayapal · Follow

Replying to @RepJayapal

Another complication of Trump's plans to limit immigration is the effect to our Social Security Earnings Suspense File – money that keeps our Social Security system afloat.

The tax money of undocumented immigrants goes to this file, which held $1.2 trillion at the end of 2012.

2:39 PM · Feb 27, 2018

This identity-related crime is providing a windfall for the U.S. government. A 2017 study from the conservative Federation for American Immigration Reform found that the federal government collects about $22 billion annually in tax receipts from illegal aliens, with the bulk going toward Social Security ($12.6 billion) and Medicare ($5.9 billion) – programs from which noncitizens are ineligible to receive benefits. FAIR estimated that illegal migrants also paid $3.3 billion in federal income tax – a

smaller proportion primarily due to illegal aliens' lower wage levels – and another $1 billion in state income taxes.

In other words, the fraud has the effect of bolstering financially shaky federal programs. In one of the agency's rare direct statements on the issue, Social Security Administration Chief Actuary Stephen Goss told CNN in 2014 that without "undocumented immigrants paying into the system, Social Security would have entered persistent shortfall of tax revenue to cover payouts starting in 2009." Leading progressive Rep. Pramila Jayapal echoed this observation in 2018, arguing that a "complication of [then-president] Trump's plans to limit immigration is the effect to our Social Security Earnings Suspense File – money that keeps our Social Security system afloat," including money provided by "undocumented immigrants."

Given Washington's bipartisan willingness to tolerate illegal immigration – whether driven by the multicultural left or businesses interests seeking cheap labor – authorities have focused on this apparent windfall to the U.S. Treasury. But they have largely ignored the costs. These include the significant strain illegal immigrant households place on public finances, which FAIR and others estimate vastly outweigh their tax contributions, their impacts on crime and the job market – and on the victims of identity theft.

Reports dating back over a decade show that hundreds of thousands of Americans are unknowingly "sharing" their Social Security numbers with illegal immigrants. Such victims may face tax bills for income they didn't earn or depleted benefits. Worse, some may experience the burden of bad credit histories and criminal records inaccurately attributed to them after being issued SSNs that illegal aliens had previously invented and used. The overall impact on American citizens is largely unknown because federal, state, and local governments as well as financial institutions have generally failed to notify them even when fraud is suspected.

The relevant agencies were largely non-responsive to RealClearInvestigation's requests for updated figures on the size, scope, and extent of the fraud. Nor have lawmakers recently given voice to the victims. Congress seems to have last held a hearing spotlighting the defrauded over a decade ago. Related legislation aimed at reducing Social Security number fraud in employment has typically languished, and many lawmakers RCI contacted indicated only a passing knowledge of the issue.

One thing experts do agree on is that the problem is likely to get worse as more illegal immigrants cross the border and seek work.

**Immigration Reform Spurs Fraud**

The growth in illegal immigrant identity fraud, reflected in part by the booming Earnings Suspense File, serves as an ironic instance of regulation becoming the mother of criminal innovation.

In 1986, Congress for the first time made it explicitly unlawful for employers to hire illegal immigrants. The Immigration Reform and Control Act required those seeking employment to fill out I-9 forms attesting to citizenship or work-authorized immigrant status, and provide corroborating documentation and a valid Social Security number.

The law, signed by President Reagan amid great fanfare, was supposed to end the problem of illegal immigration, and as part of the grand bargain nearly 3 million undocumented immigrants, most of them from Mexico, were granted U.S. citizenship. But the law did not slow the pipeline of immigration as it was intended to do, and it would drive many illegal aliens – not only those crossing the border under cover but also those

Appendix C: SSN Fraud - Real Clear Investigations
*Pulitzer Exhibition: Forensic Audit - Maricopa County AZ*

Pg. 2

Exhibit F

Page 3 of 10

Appendix I

Page 108 of 174

Case 3:23-cv-00006-SLG   Document 1-1   Filed 01/13/23   Page 110 of 176

not allowed to work while awaiting court hearings that can take months or even years to take place – to fraud. According to the libertarian CATO Institute, the 1986 law spurred the "creation of a largescale black market for legal documents in the United States. The value of document fraud increased after ICRA because false documents became necessary for illegal immigrants to fill out an I-9 form to work."

Aliens can procure Social Security numbers in several ways: Some simply conjure a nine-digit SSN out of thin air. Others use the numbers of their children who were born in the U.S. Still others steal them directly from individuals, purchase them from dealers for $80 to $200 along with a green card as can be done in Los Angeles, or via the dark web for as little as $4.

In a rare instance of enforcement, in June the Department of Justice announced that a joint operation between the IRS Cyber Crimes Unit and the FBI had seized the "SSNDOB marketplace" – a series of lucrative websites touted on the dark web that sold illegally obtained Social Security numbers of more than 20 million Americans. But "synthetic identity fraud" persists – the most common form of ID theft, where fraudsters create an entirely new identity by stealing the Social Security numbers of children or poor adults with little credit history.

While some illegal immigrants work off the books, the Social Security Administration has previously said that 75% are using fake or stolen numbers. By doing so, they gain access to broader employment opportunities. There is another powerful incentive for paying taxes as well. By dint of their generally low income levels, illegals can receive reimbursements through making use of deductions and exemptions, as well as rebates via refundable credits – leaving many with tax liabilities of zero or even as net recipients of government largesse. Immigration proponents contend that many do so in the hope that paying their taxes through employer withholding will weigh in their favor in a future amnesty, reflecting good behavior.

Their fraud can be detected each year when employers submit W-2s. The Social Security Administration analyzes the W-2s to detect inaccuracies, such as mismatched names to the numbers it has on file.



*W-2 filings flow between Social Security and the IRS. Errant ones end up in the Earnings Suspense File.*

This is where the Earnings Suspense File comes into play. ESF, established in 1937, was long an accounting for wayward tax and Social Security payments – for instance when a newly married woman changed her name but forgot to notify the SSA. Should a legitimate taxpayer find he didn't get tax refunds or Social Security benefits because of a mix-up with his Social Security number, ESF records ideally would help him get what he was owed. Unreconciled filings would remain in the ESF.

For decades relatively little money was recorded in the file. According to the Government Accountability Office, in the three decades between 1950 and 1980 just $33 billion in uncredited earnings were recorded.

Contributions to the ESF exploded after passage of the ICRA in 1986, as a Social Security Administration inspector general report providing a chart showing annual contributions to the fund makes clear:



*The Earnings Suspense File exploded after the Immigration Reform and Control Act of 1986.*

Uncredited earnings rose to $77.3 billion in the 1980s, would double in the 1990s to $188.9 billion, and then grow by a factor of 10 over the next two decades to an accumulated $1.9 trillion today – surging by $409 billion between the years 2012 and 2016 alone, according to documents obtained by the mass migration-skeptical Immigration Reform Law Institute via FOIA request.

A 2015 audit from SSA's IG reports that in a given year as many as one in 25 American workers supplied their employers with false information – "each year, SSA posts to the ESF 3 to 4 percent of the total W-2s and 1.4 to 1.8 percent of the total wages received from employers."

A 2018 Treasury inspector general report documented more than 1.3 million cases of employment-related identity theft from 2011-2016, and 1.2 million cases in which illegal aliens used Social Security numbers that belonged to someone else or were fabricated in 2017 alone. The Social Security Administration projects this number will rise to 2.9 by 2040.

Appendix C: SSN Fraud - Real Clear Investigations
*Pulitzer Exhibition: Forensic Audit - Maricopa County AZ*

Pg. 4

Exhibit F        Page 5 of 10

Appendix I        Page 110 of 174

Case 3:23-cv-00006-SLG    Document 1-1    Filed 01/13/23    Page 112 of 176

Private estimates of Social Security number theft have ranged substantially higher.

A 2020 GAO report on employment-related identity fraud identified more than 2.9 million Social Security numbers with "risk characteristics associated with SSN misuse."

"There's massive amounts of fraud, the SSA knows it's happening, and they know it's your Social Security numbers…being used. These IG reports make it explicitly clear," said Jon Feere, a former Department of Homeland Security and U.S. Immigration and Customs Enforcement official now with the "pro-immigrant, low immigration" Center for Immigration Studies. "And they basically say that they believe that one of the main reasons for this fraud is because of the employment of illegal aliens."

## Known Fraud, Little Enforcement

The existence of the ESF means the Social Security Administration and the IRS, with which it coordinates, are sitting on a database containing a substantial population of fraudsters against American citizens. For the better part of two decades, government watchdogs have encouraged these agencies to put the data to use, but they have been reticent.

A 2005 Social Security Administration IG report stated: "Although SSA continues to coordinate with DHS on immigration issues, it does not routinely share information regarding egregious employers who submit inaccurate SSNs. In our opinion, any serious plan to address SSN misuse and growth of the ESF must allow SSA to share such information with DHS," reads the report.

A 2006 GAO report similarly recommended that the SSA, IRS, and DHS share data to address this problem. However, federal law severely limits the SSA and IRS from sharing information from tax forms, in part on privacy grounds. The ACLU called attempts to coordinate information-sharing between the SSA and immigration enforcement authorities during the Trump administration an "all-out assault on our legal rights and our immigrant communities."

Since SSA lacks enforcement authority, the George W. Bush-led Immigrations and Customs Enforcement agency proposed a rule setting forth potential penalties for employers who did not respond to SSA "no match letters" - notifications sent to employers informing them of employees whose SSNs don't match government records.

The proposed rule kicked off a firestorm of opposition from immigrant advocates. In 2008, U.S. Court of Appeals for the Ninth Circuit reinstated 33 employees who had been fired by their employer after receiving a no match letter. The court ruled a no match letter alone wasn't sufficient to determine whether employees were in violation of the law.

The Obama administration put an end to no match letters altogether. Jason Hopkins, the investigations manager for the IRLI, told RCI that the Obama administration did so in service of its Deferred Action for Childhood Arrivals ("Dreamers") program, which allowed illegal immigrants brought to the U.S. as children exemption from deportation and eligibility for work permits.

"If they went in [and] applied for a DACA application, and they had to actually admit they put in fake social security numbers, they'd be essentially admitting to perjury," Hopkins says. "So that would have scared them off, and Obama wanted them to apply for this program."

In 2019, the Trump administration-led Social Security Administration resumed sending out no match letters, delivering 1.6 million notices across 2019 and 2020. The Biden administration again discontinued the practice.

The SSA did not respond to RCI's multiple attempts to contact it regarding related policies.

The IRS has enforcement powers the SSA lacks, but has historically disavowed responsibility for dealing with illegal alien ID theft. In 2016 then-IRS Commissioner John Koskinen, who faced impeachment hearings for defying congressional subpoenas and the destruction of evidence, told Congress, "We have Social Security and immigration authorities and others who enforce that part of the law, and if we start looking behind the system and doing their job for them, we're going to discourage a lot of people from paying the taxes they owe."

Consistent with this view, a 2020 GAO report on employment-related identity fraud found that the IRS was not tracking numerous forms of employment-related identity fraud.

The IRS' Internal Revenue Manual, which governs employees' policies and practices, refers to those engaged in ID fraud as "borrowers," defending this language as neutral, given that some may be "borrowing" an SSN from another family member to work, rather than engaging in "actual identity theft."

When CNS News asked the IRS in 2018 how many taxpayer accounts it had referred for criminal prosecution, of the 1.3 million Treasury's inspector general had flagged for identity fraud, the agency said "We do not have this information." Similarly, the IG report recommended that the IRS notify the 458,658 victims of ID theft identified in 2017 – and the IRS does not appear to have notified anyone.

When RCI asked the IRS about its policies for handling ID theft, the agency did not confirm it had done anything in response to the IG's findings or identity fraud specifically related to illegal immigration. A spokesman said that "in recent years, we've referred people" – that is, from the general U.S. population – "for prosecution all the time, and where appropriate, we work with other law-enforcement agencies."

The IRS's guide to employment-related identity theft highlights notices it might send to taxpayers indicating potential fraud, but it is not clear how many such letters it sends out, and the burden overwhelmingly falls on the victims to be vigilant and take steps to clear their names.

Meanwhile, DHS Secretary Alejandro Mayorkas has curtailed worksite enforcement. Between halting no match letters and DHS' leniency, Spencer Raley, a researcher with FAIR, told RCI, "From a strictly immigration-enforcement standpoint, nothing is being done to combat the issue of illegal aliens committing document fraud in order to obtain employment."

RCI asked a series of questions of ICE, which leads criminal investigations into both document fraud and worksite enforcement, on the nature and extent of its targeting of those engaging in ID theft/fraud in employment, and whether and to what end it coordinated with other agencies on identifying such individuals for investigation. As of the time of publication, it had not responded to the questions.

Law enforcement agencies have periodically made illegal alien ID fraud busts in recent years, but not at meaningful levels relative to the previously reported number of fraudsters.

Given that Medicare is a beneficiary of the fraud, RCI posed a series of questions to the Centers for Medicare and Medicaid Services pertaining to ESF, and whether it was aware of, or did anything to contact those whose SSNs might have been fraudulently used associated with Medicare contributions. A CMS spokesperson referred RCI to the Social Security Administration.

RCI posed similar questions to tax authorities in both California and Texas – states dominated by opposing political parties but each with substantial illegal alien populations – to ascertain whether they, like the federal government, were tracking taxes paid by those potentially using fraudulent IDs, including illegal aliens, and doing anything to pursue them.

California's Franchise Tax Board told RCI that it does not have a state Earnings Suspense File, nor does it track how much tax revenue annually is attributable to individuals misrepresenting themselves on filings. It did note, "If we suspect identity theft on an individual tax return, we send a notice to the taxpayer to let them know they may be a victim and how to verify the authenticity of the tax return on file." With respect to enforcement, the board indicated "Fraudulent claims and suspected ID theft cases may be sent to" its Criminal Investigations Bureau, which partners with other state law enforcement authorities. The board emphasized that California further partners with "state, city, federal and industry partners" to "protect the entire tax ecosystem," with a focus on "widespread fraudulent schemes and threat groups," rather than those filing and paying taxes.

As of the time of publication, Texas had not responded to RCI's inquiries.

Banks and credit agencies also have their own extensive "sub-files" for people who share the same Social Security number, but privacy laws make it impossible to get information on someone who has stolen one's SSN from a third party, even though the behavior of the person stealing one's number may end up affecting one's ability to get government benefits or credit.

Credit rating agencies Equifax, Experian, and Transunion did not respond to RCI's queries around illegal alien identity fraud.

**What Victims Face**

Marcus Calvillo, a father of six from Grand Prairie, Texas, experienced one of the more harrowing episodes of identity fraud on record, at least in the eyes of the prosecutor who helped bring him justice. Calvillo's life was upended after an illegal immigrant named Fernando Neave-Ceniceros was first arrested on drug trafficking charges in Kansas in 1993, then a slew of other ones, including a sex crime involving a minor, and his twice failing to register as a sex offender.

The criminal activity was recorded under Calvillo's stolen identity – Neave-Ceniceros' fingerprints were linked to Calvillo's name in national criminal databases – making it difficult for the innocent Calvillo to pass the cursory background checks required to hold a job and support his family.

At one point, Calvillo was working as a cable installer when he was abruptly fired. When asked why, he told the Associated Press he was only told, "You know what you did." Calvillo also had disputes with the IRS over taxes on wages that had been paid to Neave-Ceniceros but recorded under his name.

After years of struggling to get help – a struggle similarly encountered by other victims – Calvillo contacted Assistant U.S. Attorney Brent Anderson, who had been pursuing another identity theft case, who helped him

get justice. In 2016, Neave-Ceniceros was convicted on a series of charges including aggravated identity theft and misuse of a Social Security number. "I don't know of a case where the theft of an identity had a more devastating impact than this one," Anderson told the Associated Press.

Despite wreaking havoc on Calvillo's life, Neave-Ceniceros was only sentenced to one year and a day in prison for his crimes.

Horror stories such as Calvillo's still abound. "I've been fired from jobs and have been accused of crimes I didn't commit because my identity was stolen," identity theft victim Adrian Gonzalez told the Fort Worth Star-Telegram last year. "I don't know what to do anymore, I think I might need to change my name."

Linda Trevino, a Chicago suburb resident, was another victim, one of the hundreds of thousands NBC News cited in a report from over a decade ago. She had been denied a job at a local Target because someone using her SSN also worked there. Her number, in fact, had been used to obtain employment at 37 other employers, leaving her haunted by the IRS with letters asking her to pay others' taxes, and facing creditors.

Children are victims of fraud too, and in fact may be prime targets given the clean records their IDs provide for thieves, and that conduct engaged in in their names may go undetected for years. Former California congressman Elton Gallegly wrote in The Hill in 2012 of a number of child victims of illegal immigrant fraud, including among them:

*A 3-year-old issued an SSN already in use for years by a twice-arrested illegal alien, impacting the child's credit, medical, and work history.*
*A 9-year-old denied Medicaid due to wages reported on his SSN.*
*A 13-year-old denied as a dependent on her family's return for supposedly making too much money.*

Immigration advocates downplay the criminality involved. "Most workers are buying documents they believe to be false," a representative of the National Immigration Law Center told the Los Angeles Times. "There isn't really any intention of stealing someone's identity." But even when immigration-related identity theft lacks specific criminal intent, the confusion that ID theft creates when dealing with tax bills, receiving government benefits, facing ruined credit, and other problems can upend a person's life.

Citizens who discover someone else is using their Social Security number will quickly learn there's little they can do about it. According to the Social Security Administration, proof that one's SSN has been stolen and is being used by someone else isn't sufficient reason to change one's Social Security number. One must prove significant harm as a result, and the process is onerous – in 2014 the agency only permitted a total of 250 people to change their Social Security number. The Federal Trade Commission details the numerous steps those who believe they might have been defrauded should take to get their lives back.

The problem is so extensive that Mike Chapple, a professor of information technology at the University of Notre Dame's Mendoza College of Business, told Forbes, "It's totally reasonable to assume that your Social Security number has been compromised at least once, if not many times."

## Little Legislative Relief

One of the seminal victories for proponents of ID integrity in the workplace was the passage of the Illegal Immigration Reform and Immigrant Responsibility Act in 1996, which launched the E-Verify system.

That its author, Rep. Ken Calvert, another California Republican, was still struggling 15 years later to move legislation making the program mandatory, illustrates the uphill battle the limited number of immigration hawks in Washington face.

The DHS-run program, which compares employment eligibility information from I-9 forms to government records, remains required solely of federal contractors. Only a small minority of states have mandated its use by employers. Republican senators Mitt Romney and Tom Cotton tried to pass a federal law that would simultaneously mandate E-Verify and raise the federal minimum wage to $10 an hour, but with the Senate controlled by Democrats, that legislation died.

On the House side, Georgia Republican Buddy Carter has sought to pass legislation multiple times that would require the IRS to produce a report on whether it could use proprietary information to identify illegal aliens fraudulently working in the U.S., to no avail.

At the state level, even Republican red Texas, mired in problems pertaining to illegal immigration, has had difficulty finding the political will to police the workplace. "At least 30 bills mandating E-Verify have been introduced in Texas in the past decade," the Fort Worth Star-Telegram reported last year. "Only one has passed, and none addressed undocumented workers, employers or temporary employment agencies using fraudulently obtained identities."

Until recently, it wasn't clear whether states even had the authority to prosecute identity theft by illegal immigrants. In March of 2020, the Supreme Court ruled in a 5-4 decision that at least in some circumstances, they do, overturning a Kansas Supreme Court ruling that had voided the convictions of three illegal immigrants under the state's identity theft law who had used stolen SSNs to obtain jobs.

The rapidly changing political landscape may be the only thing that could impact the broader trajectory of illegal immigration from which the fraud springs. The populist turn of the post-Donald Trump Republican Party is appealing to working class voters with a strong interest curbing illegal immigration to put upward pressure on wages.

Recent elections also show Hispanics voting for Republicans in significantly higher numbers, in part because of the Democrats' more liberal border policies.

In the meantime, the illegal immigrant population continues to swell. The Biden administration has released over one million illegal immigrants into the U.S., in addition to the more than 700,000 "got-aways" who evaded apprehension, and over 190,000 unaccompanied minors released into the interior – for a total of nearly two million people. "To put it bluntly, the Biden administration, and other Democratic administrations, they just don't care," says Jason Hopkins.

Appendix C: SSN Fraud - Real Clear Investigations
*Pulitzer Exhibition: Forensic Audit - Maricopa County AZ*

**Pg. 9**

Exhibit F

Page 10 of 10

Appendix I

Page 115 of 174
Case 3:23-cv-00006-SLG    Document 1-1    Filed 01/13/23    Page 117 of 176

# Exhibit G

  

Alaska

August 31, 2020

Lieutenant Governor Kevin Meyer
Director Gail Fenumiai
Alaska Division of Elections
P.O. Box 110017
Juneau, AK 99811
*by email only to:  kevin.meyer@alaska.gov*
*gail.fenumiai@alaska.gov*

Re:    Let every Alaskan vote: waive the absentee witness requirement

Dear Lieutenant Governor Meyer and Director Fenumiai:

There is no job more paramount in our democracy than the job of voter. In November,
Alaskans will elect our President, our U.S. Senator and U.S. Representative, and 51 state
legislators, and we'll decide two ballot measures. Turnout for August's primary reflects this
year's importance: over 133,000 Alaskans voted—more than in the 2018 or 2016
primaries—a third of whom voted by mail, online, or by fax.[1] November's significance and
August's numbers foretell similarly high turnout in the general election.

For August's voters, voting by mail made sense because, as the Lt. Governor's chief of staff
Josh Applebee testified, in this global COVID-19 pandemic, "voters may therefore wish to
avoid going to the polls, standing in close proximity, and using touch screens or handling
ballots."[2]

Yet, the Division of Elections' enforcement of Alaska Statutes 15.20.066(b)(2) and
15.20.081(d), which require Alaskans who vote by mail or electronic transmission to have

---

[1] Alaska Division of Elections, *Primary, General and Statewide Special Election Results,*
https://www.elections.alaska.gov/doc/info/ElectionResults.php.

[2] Declaration of Josh Applebee, docket no. 25 at ¶ 7, Disability Law Center of Alaska v. Meyer, No.
3:20-cv-00173-JMK (D. Alaska Aug. 8, 2020).

witnesses sign their ballots, disenfranchises many voters. So we write to ask you not to enforce this requirement this fall: let every qualified voter freely vote during this pandemic.

In Alaska, every "qualified voter may vote an absentee ballot for any reason."[3] Alaskans who are in "high-risk group[s] who must be particularly careful to avoid exposure to COVID-19,"[4] including those whom you have recognized as "people 65 and older" and "with certain underlying medical conditions,"[5] may wish to vote absentee so as to, in Mr. Applebee's words, "avoid going to the polls, standing in close proximity, and using touch screens or handling ballots."[6]

Voters who are concerned about getting COVID-19 should be able to easily cast their absentee ballots: that's why you "reach[ed] out to encourage [the] high-risk group" of 65 and older voters "to vote absentee," because it "was a reasonable measure that comported with the public health information available at the time."[7] And as you said, "The more people who vote absentee the easier it will be for those who go to the polls to maintain social distance and limit their potential exposure to COVID-19."[8] And we appreciate your promise that "[t]he Division is doing everything it can to avoid . . . forcing many voters . . . to choose between going to potentially crowded polling places or being disenfranchised."[9]

Enforcing the witness requirement, however, forces this very choice on voters. For many Alaskans who, for example live alone or who are single parents with children,[10] getting a witness and maintaining safe social distancing isn't feasible.[11] But, without a witness, their votes will be rejected and uncounted. You recognized that Alaska should not force voters

---

[3] Alaska Stat. § 15.20.010.

[4] Defs.' Opposition to Motion for Preliminary Injunction, docket no. 23 at 8, *Disability Law Center of Alaska v. Meyer*, No. 3:20-cv-00173-JMK (D. Alaska Aug. 3, 2020).

[5] *Id.*

[6] Applebee Decl. at ¶ 7.

[7] Defs.' Opposition to Motion for Preliminary Injunction at 19.

[8] *Id.* at 21.

[9] *Id.* at 28.

[10] Absentee voters' witnesses must be at least 18. Alaska Stat. §§ 15.20.066(b)(2)(C) & 15.20.061(d).

[11] Alaska's Chief Medical Officer Dr. Anne Zink testified, "The most effective ways to minimize the spread of the disease continue to be social distancing, frequent handwashing or sanitizing, and wearing adequate face coverings that cover the nose and mouth." Declaration of Anne Zink, docket no. 23 at ¶ 7, *Disability Law Center of Alaska v. Meyer*, No. 3:20-cv-00173-JMK (D. Alaska Aug. 3, 2020).

Lt. Governor Meyer and Director Fenumiai
*Let every Alaskan vote: waive the absentee witness requirement*
August 31, 2020
Page 3 of 4

into the Sophie's Choice of a fatal virus or democratic disenfranchisement: please don't enforce the witness requirement and make Alaskans choose between their health or their vote.

Alaskans' right to vote is fundamental, guaranteed by the United States and Alaska Constitutions,[12] and the health consequences of COVID-19 are dire: 1 out of 6 people become seriously ill and require hospitalization,[13] and while "[o]ur understanding of this virus is constantly evolving,"[14] we know that of the almost 6 million Americans it has infected, it has killed more than 182,000.[15]

In upholding Alaskans' fundamental right to elect our public servants, and "to avoid . . . forcing many voters . . . to choose between going to potentially crowded polling places or being disenfranchised,"[16] the Division of Elections should recognize that enforcing the witness requirement now is unwise and poor policy. Its harm of disenfranching Alaskans is not offset by any good: instances of voter fraud are so incredibly rare that the witness requirement cannot serve a compelling purpose, especially since there is no way to confirm the identity of a witness who signs another's ballot.

COVID-19 is serious and so too is the right to vote, free from unnecessary ballot barriers. Alaska should continue its "long history of expanding voting access and facilitating voters' exercise of their right to vote,"[17] by not enforcing the absentee witness requirement now, in this global pandemic.

By Friday, September 4, we hope to hear that you're putting the safety of our democracy and the safety of Alaska first, and will make this commitment. Please contact Stephen Koteff, the ACLU of Alaska's legal director, at skoteff@acluak.org.

Thank you.

---

[12] U.S. Const. amend. I, XIV, XV, XIX, and XXVI; Alaska Const. art. V.

[13] World Health Organization, *Q&A on coronaviruses: What are the symptoms of COVID-19*, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-dstail/q-a-coronaviruses.

[14] Zink Decl. at ¶ 2.

[15] Centers for Disease Control and Prevention, *CDC COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker.

[16] Defs.' Opposition to Motion for Preliminary Injunction at 25.

[17] *Id.* at 3.

Sincerely,

/s/
Joshua A. Decker
Executive Director
American Civil Liberties Union of Alaska Foundation

/s/
Natalie Landreth
Senior Staff Attorney
Native American Rights Fund

/s/
Kristen Clarke
President and Executive Director
Lawyers' Committee for Civil Rights Under Law



Lieutenant Governor Kevin Meyer
**STATE OF ALASKA**

September 4, 2020

Stephen Koteff, Legal Director ACLU of Alaska
1057 W Fireweed Ln Ste 207
Anchorage, AK 99503
*Via Email Only*

Dear Mr. Koteff,

Thank you for your letter of August 31 concerning the upcoming statewide elections. My office has been working diligently with the Division of Elections and our Department of Law to evaluate our options for the upcoming general election.

I am sure you would agree that election integrity begins with following the law. If an election is not conducted legally by following the statutes duly passed by the legislature, there can be no basis to believe in the election's integrity. Making exceptions to the statutes, even on a piecemeal basis, would erode the foundation upon which Alaskans have built their faith in the election process.

The Office of Lt. Governor lacks the power to unilaterally waive the statutory witness requirement. The witness requirement is central to the absentee ballot statutory scheme and is not a mere procedural requirement. AS 15.20.081(d) sets forth the witness requirement, and AS 15.20.203(b)(2) mandates that an absentee ballot be rejected and not counted if it is not properly witnessed.

If my office were to ignore this clear statutory language and count ballots that were not properly witnessed, those absentee ballots could later be invalidated in a court challenge. It would be irresponsible for me to tell voters not to follow the witness requirement and risk their votes not counting.

Like you, I care deeply about every Alaskan's safety during this pandemic, and we have learned a lot over these past several months about how to best prevent spreading the virus. Just like going to the grocery store or receiving deliveries at your home, maintaining a social distance of six feet and wearing masks goes a long way and both of these can be accomplished for witnessing a ballot. Witnessing could also take place through a window if necessary. Although not ideal, we are all having to change the way we do things, and I would encourage voters to think creatively about how to fulfill this requirement in a safe manner.

Sincerely,

Kevin Meyer

Kevin Meyer
Lieutenant Governor

Juneau Office: Post Office Box 110015 • Juneau, Alaska 99811 •907-465-3520 voice •907-465-5400 fax
Anchorage Office 550 West 7th Avenue, Suite 1700 • Anchorage, Alaska 99501 • 907-269-7450 voice • 907-269-0263 fax
lt.governor@alaska.gov • www.ltgov.alaska.gov

# Exhibit H

anc.law.ecf@alaska.gov

## IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
## THIRD JUDICIAL DISTRICT AT ANCHORAGE

ARCTIC VILLAGE COUNCIL, )
LEAGUE OF WOMEN VOTERS OF )
ALASKA, ELIZABETH L. JONES, and )
BARBARA CLARK, )
                    )
        Plaintiffs, )
                    )
    v. )
                    )
KEVIN MEYER, in his official capacity )    Case No.: 3AN-20-07858 CI
as the Lieutenant Governor of the State of )
Alaska; GAIL FENUMIAI, in her official )
capacity as the Director of the Alaska )
Division of Elections; and ALASKA )
DIVISION OF ELECTIONS, )
                    )
        Defendants. )
                    )

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

## STATE'S NOTICE OF FILING PROPOSED
## PRELIMININARY INJUNCTION ORDER

The State hereby files a proposed preliminary injunction order as directed by this

Court's October 5, 2020 order granting the plaintiffs' motion for a preliminary

injunction. The terms of the order were negotiated with the plaintiffs today; and the

State believes that the only remaining dispute relates to its motion for a stay of the order

pending appeal. The State proposes that the Court stay the effective date of the order

pending the outcome of its petition for review to the Alaska Supreme Court. That

proposal is reflected in the last sentence which reads: "This order will go into effect

only in the event of a ruling from the Alaska Supreme Court upholding the preliminary

injunction."

DATED October 6, 2020.

CLYDE "ED" SNIFFEN, JR.
ACTING ATTORNEY GENERAL

By: _M.A. _____

Lael Harrison
Alaska Bar No. 0811093
Margaret Paton Walsh
Alaska Bar No. 0411074
Assistant Attorneys General

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

*Arctic Village Council, et al. v. Kevin Meyer, et al.*
State's Notice of Filing Proposed Prelim. Injunction Order

Case No. 3AN-20-07858 CI
Page 2 of 2

# IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
## THIRD JUDICIAL DISTRICT AT ANCHORAGE

ARCTIC VILLAGE COUNCIL,  )
LEAGUE OF WOMEN VOTERS OF  )
ALASKA, ELIZABETH L. JONES, and  )
BARBARA CLARK,  )
                  )
       Plaintiffs,  )
                  )
       v.  )
                  )
KEVIN MEYER, in his official capacity  )   Case No.: 3AN-20-07858 CI
as the Lieutenant Governor of the State of  )
Alaska; GAIL FENUMIAI, in her official  )
capacity as the Director of the Alaska  )
Division of Elections; and ALASKA  )
DIVISION OF ELECTIONS,  )
                  )
       Defendants.  )
                  )

## [PROPOSED] PRELIMINARY INJUNCTION ORDER

On October 5, 2020, the Court granted Plaintiffs Arctic Village Council's, League of Women Voters of Alaska's, Elizabeth L. Jones's, and Barbara Clark's Motion for Preliminary Injunction and requested the parties submit a proposed order, or if agreement could not be reached separate proposed orders, detailing how Defendants Kevin Meyer, Gail Fenumiai, and Alaska Division of Elections must implement the Court's order. The Court agrees with the proposed order submitted by Defendants Lieutenant Governor Kevin Meyer, Director of the Division of Elections Gail Fenumiai, and the Division of Elections. Accordingly, finding good cause,

**IT IS HEREBY ORDERED** that the "Witness Requirement" for Absentee Ballots, as required by AS § 15.20.066(b), AS § 15.20.081(d), 6 AAC 25.550, and

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

6 AAC 25.680 is hereby vacated as an unconstitutional burden on the right to vote in the 2020 General Election during the COVID-19 pandemic.

**IT IS FURTHER ORDERED:**

(1)    Defendant Alaska Division of Elections ("the Division") must count all returned absentee ballots for the 2020 General Election without witness signatures, provided that they satisfy all other requirements.

(2)    The Division must send all voters to whom it sent absentee ballots a separate mailing as soon as practicable explaining that they do not need to have their ballots witnessed given the COVID-19 pandemic;

(3)    As soon as practicable, the Division will send out an email to the list the Division has from the Permanent Fund Dividend Division that includes voters who applied for a PFD this year explaining that they do not need to have their ballots witnessed for the 2020 general election.;

(4)    Defendants must train all persons who count absentee ballots on the absentee ballot counting boards to count those ballots without witness signatures, provided that they satisfy all other requirements.

(5)    The Division must post on its social media accounts, including but not limited to Facebook, www.facebook.com/akelections, and Twitter, www.twitter.com/ak_elections, notifications that the Witness Requirement is not in effect for the 2020 General Election and that voters do not need to have their absentee ballots witnessed. The first social media notifications will be posted shortly after this final order is issued and then on a weekly basis through the day of the election.

*Arctic Village Council, et al. v. Kevin Meyer, et al.*
[Proposed] Prelim. Injunction Order

Case No. 3AN-20-07858 CI
Page 2 of 6

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

(6)     Defendant Kevin Meyer must post on his official social media accounts, including, but not limited to, Facebook, https://www.facebook.com/LtGovMeyer/, and Twitter, https://twitter.com/ltgovmeyer, notifications that the Witness Requirement is not in effect for the 2020 General Election and that voters do not need to have their absentee ballots witnessed. Defendant Meyer may fulfill this requirement by immediately re-posting, sharing, and retweeting posts from the Division on its own social media accounts within a reasonable amount of time.

(7)     The text of the above posts should read, "Recently, a court decided that voters do not need to have their by mail ballot witnessed. This is only for the November 2020 general election. Voters must still sign and provide an identifier on the back of the envelope. It is recommended for voters to date their signature."

(8)     The Division must issue a press release announcing that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed.

(9)     The Division must make the following modifications to its website:

(i)     On its "Press Releases and Public Service Announcements" page, https://www.elections.alaska.gov/Core/pressreleasesandpublicserviceannouncements.php, the Division must post an announcement that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed.

(ii)     On its "Public Notice" page, https://www.elections.alaska.gov/Core/publicnotice.php, the Division must create a new

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

*Arctic Village Council, et al. v. Kevin Meyer, et al.*
[Proposed] Prelim. Injunction Order

Case No. 3AN-20-07858 CI
Page 3 of 6

heading and post an announcement that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed.

    (iii)    On its homepage, https://www.elections.alaska.gov/, the Division must post under "News" the press release that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed.

    (iv)    On its "Early and Absentee Voting Options" page, https://elections.alaska.gov/Core/AKVoteEarly.php, the Division must: (A) post under "Absentee Voting By-Mail FAQ" a new FAQ to the effect of: "Do I need a witness signature for my absentee ballot?" "No. Recently, a court decided that voters do not need to have their by mail ballot witnessed. This is only for the November 2020 general election. Voters must still sign and provide an identifier on the back of the enevelope. It is recommended for voters to date their signature. This applies to by-mail, by-fax, and online absentee ballots. Un-witnessed ballots will still be counted. If you do have your ballot witnessed, your vote will still count."; (B) remove the FAQ entitled "What does reasonably accessible mean regarding witnessing?"; and (C) modify the answer for "If I have a Power of Attorney (POA) can I sign the ballot envelope for the voter?" to indicate that the Witness Requirement is not required for the 2020 General Election.

    (v)    On its "By-Mail Ballot Delivery" page, https://www.elections.alaska.gov/Core/votingbymail.php, the Division must: (A) include a notification that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed; and (B) under "How to

*Arctic Village Council, et al. v. Kevin Meyer, et al.*
[Proposed] Prelim. Injunction Order

Case No. 3AN-20-07858 CI
Page 4 of 6

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

Vote your By-Mail Ballot," modify the instructions to state that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed.

(vi)     On its "By-Fax Ballot Delivery" page, https://www.elections.alaska.gov/Core/votingbyfax.php, the Division must: (A) include a notification that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed; and (B) under "How to Vote your By-Mail Ballot," modify the instructions to state that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed.

(vii)    On its "Online Ballot Delivery" page, https://www.elections.alaska.gov/Core/votingbyonline.php, the Division must: (A) include a notification that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed; and (B) under "How to Vote your By-Mail Ballot," modify the instructions to state that the Witness Requirement is suspended for the 2020 General Election and voters do not need to have their absentee ballots witnessed.

(10)    The Division previously purchased television ad space for the 2020 general election, but the Division may not be able to change or add to the ads at this late date. If the Division determines it is possible, the Division will include information on the elimination of the ballot witnessing requirement in some of its ads.

(11)    The Division must create a short Public Service Announcement ("PSA")

*Arctic Village Council, et al. v. Kevin Meyer, et al.*
[Proposed] Prelim. Injunction Order

Case No. 3AN-20-07858 CI
Page 5 of 6

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

explaining that the Witness Requirement is suspended for the 2020 General Election and that voters do not need to have their absentee ballots witnessed. The Division will distribute the PSA to Alaska radio stations, but the Division has no control over whether the radio stations play the PSA.

(12)     The Division will contact community get-out-vote organizations, tribal organization, Native Corporations, and political parties for which the Division already has an email or mailing address and encourage them to notify voters of the elimination of the witness requirement.

(12)     The Division must share the text of the above-mentioned PSA with every bilingual outreach worker and ask that they announce it on local radio in the villages.

This Order will go into effect in the event that the Alaska Supreme Court upholds the preliminary injunction.

DATED this _____ day of October, 2020 at Anchorage, Alaska.


_____
Hon. Dani Crosby
Superior Court Judge

DEPARTMENT OF LAW
OFFICE OF THE ATTORNEY GENERAL
ANCHORAGE BRANCH
1031 W. FOURTH AVENUE, SUITE 200
ANCHORAGE, ALASKA 99501
PHONE: (907) 269-5100

*Arctic Village Council, et al. v. Kevin Meyer, et al.*
[Proposed] Prelim. Injunction Order

Case No. 3AN-20-07858 CI
Page 6 of 6

Addendum to Citizen Complaint of September 1, 2022

316. Plaintiffs, Oels, Johnson, Bickford, de Schweinitz, and Thurman (hereinafter "CCSA") hereby supplement the original complaint and request for litigation documents as the Defendants have not yet responded to our request for an administrative hearing officer.

317. CCSA submit that the Defendants cannot be confused as to the Complaint objectives as all four agencies were notified of our concerns regarding the actions of state officials in the *Arctic Village v. Meyer* case, in our filing to intervene in the *Kohlhaas v. Meyer* case and may have even been aware of our correspondences with our legislators regarding election anomalies and advocacy for repairs to the Alaskan election process.

318. According to the State of Alaska, Department of Law Hearing Officer's Manual, (Exhibit I, p. 2) upon receipt of a complaint a hearing officer is assigned and sets a Prehearing Conference. See Hearing Officer's Manual, 5th Edition (Aug 2002), page v (Exhibit I, p.3).

319. Oels, Johnson, Bickford, de Schweinitz, and Thurman, have not received notification of a Prehearing Conference.

320. The first response CCSA received was mailed to one individual from the Director of Elections, Gail Fenumiai, dated September 19, 2022 (mailed on September 20) asserting the restrictions at issue in paragraph 12, page 3, of the September 1, 2022, complaint (Exhibit J).

321. Gail Fenumiai is an identified Defendant in the September 1, 2022, Complaint.

322. Defendant Fenumiai's letter acknowledges that "the Office of the Governor, the Office of the Lieutenant Governor, the Division of Elections, and the Department of Law received the document" but "does not clearly allege violations or request records" and therefore "the Agencies are unable to respond." (Exhibit J, p. 2).

323. The Complaint on page 1, leaves space for a Hearing Officer Case number, requests litigation documents under AS 40.25.122 (paragraph 1(f)) (which requires the oversight of an officer not a "records request"), and plainly identifies violations of law, both State and Federal, in the administration of Alaskan elections.

324. According to the State of Alaska, Department of Law Hearing Officer's Manual, page 13, fn. 39, Ex Parte Communications is prohibited to allow "all parties to a proceeding [to] have an opportunity to rebut any facts considered by the decision-maker and that all facts . . . are on the record." The provision to all parties as an exhibit is CCSA's only response to the Director's inappropriate correspondence.

325. As of September 28, 2022, the other Complainants, Thomas W. Oels, David H. Johnson, William C. de Schweinitz, and Loy A. Thurman, had not received the same correspondence.

326. Director Fenumiai's letter does not provide any indication that the other agencies were provided a copy of the correspondence (Exhibit J, p. 3).

327. CCSA's complaint contained request for records in association with the alleged violations as the online documentation of the statutes and regulations for elections referenced federal

regulations that harken back to the 1960, to establish the exact date and process the federal compliance requirements were encoded into Alaskan statutes, from the agencies that conduct the process to amend our law.

328. CCSA's Complaint for election records to conduct a full forensic audit of the 2020 General Election is well within the two-year time limit for civil action against the state and well within the six-year period for criminal action against Defendants.

329. CCSA's concerns are that the allegations regarding the failure to amend Alaskan Statutes are many administrations in the past, and those failures (violations) need to be resolved to uphold our duty and responsibility to the Republic, as those failures (violations) affect future elections.

**The June 11, 2022, Special Primary Election and the August 16, 2022, Special General Election for U.S. House of Representatives**

330. All foregoing Paragraphs are incorporated as if set forth fully herein.

331. No state statute authorizes the Defendants non-compliant conduct that compromised the 2020 General Election, suspected to have compromised the 2018 General Election (and other past elections), and has now compromised the policies, practices, and procedures of the 2022 Special Elections, both the June 11 and the August 16 elections (Exhibit K).

332. CCSA's request to conduct a full forensic audit on both elections should not be construed as a challenge to the determination of a candidate, but to the election process, and a determination as to whether the Ranked Choice Method meets both the state and federal election law standards.

333. CCSA request access to the election records of both identified elections to conduct a full forensic audit, incorporating the designation of "in the Public's Interest" and the waiver of all costs and fees associated with the full forensic audit.

334. CCSA will await the assignment of an administrative hearing officer to not confuse the state officials further, but this addendum provides notification of CCSA's request.

335. CCSA, upon knowledge and belief, understand that a full forensic audit begins with a Constitutional review of the appropriate statutes and regulations that determine the policies, procedures, and practices of an election – hence our request for statutory authority to begin the process of an examination and, by doing so, highlight the errors and omissions of the law that need to be resolved.

336. CCSA, upon knowledge and belief, understand that an administrative hearing officer versed in the Administrative Procedures Act, has no authority to opine on a statute, but can assist in the determination of whether or not the statute or the authority it provides even exists and when the statute and regulations became law.

337. CCSA has no association with any other ongoing litigation, but without repeating CCSA's objection to the outsourcing of Alaska's voter registration management to ERIC (that aligns with the State's opponent), we request the Public Interest Legal Foundation (PILF v. Meyer) be

provided access to the final full forensic audit databases and any and all resulting reports in order to complete their academic assessment.

338. CCSA, upon knowledge and belief, that the Division of Elections is listed as a member on their website and purported to be "parties" to a Memorandum of Agreement between MS-ISAC and the EI-ISAC and the Division of Elections, CCSA requests documentation of the Alaskan MOA and any other third-party agreements having to do with elections or election cyber-security (See example of another county agreement, Exhibit L, p. 2).

339. The requested Memorandum of Agreement (above) will supplement the Violation of the SVR List 52 USC 21083(a)(3) "Adequate Technological Security Measures" found on page 26 of the September 1 Complaint, paragraphs 207 thru 211).

340. In addition to 52 USC 21083(a)(3), Executive Order 13848, dated September 12, 2018, and *Notice on the Continuation of the National Emergency with Respect to Foreign Interference In or Undermining Public Confidence in United States Elections*, dated September 7, 2022, both attached as Exhibit M, declare a national emergency "constituted by the threat of foreign interference in or undermining public confidence in United States elections." (Exhibit M, p. 2).

341. The Cause of Action as presented by paragraphs 280 through 315 (Complaint pages 33-36) do not need to be supplemented at this time.

342. The Prayer for Relief as presented on pages 36 and 37 must be supplemented to include the requested election records and full forensic audit of the 2022 Special Primary Election.

343. To facilitate communication and scheduling, CCSA has designated Thomas W. Oels as our point of contact, and his information is provided in the following affidavit.


*9-28-2022*
_____
Dated

Citizen Complainants of the State of Alaska

See Notarized Affidavits of Complainants (attached)

Affidavit of Complainant _Thomas W. Oels_

I, Citizen Complainant _Thomas W. Oels_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records is an addendum to the September 1, 2022, Complaint & Request for Records.

I voted in both the June 11, 2022 Special Primary Election and the August 16, 2022 Special General Election for U.S. Representative, and I am concerned the elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2022 Special Primary and Special General Election in Alaska.

I currently reside at: 2841 W. Discovery LP WASilla, Alaska 99687

My mailing address is:
PO. Box 873562 WASilla AK. 99687
My email is: blackpnteonline.net My phone number is: 907-232-6782

Sept 28, 2022
Date

Signature of Person Making this Affidavit

_Thomas W. Oels_
Printed Name

Subscribed and sworn to or affirmed before me at _Wasilla_, Alaska 9/28/22.

(SEAL)

Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires 12/2/2025.

[Notary seal: OLIVIA FARRELL, NOTARY PUBLIC, STATE OF ALASKA, My Commission Expires December 2, 2025]

Affidavit of Complainant _David H. Johnson_

I, Citizen Complainant _David H Johnson_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records is an addendum to the September 1, 2022, Complaint & Request for Records.

I voted in both the June 11, 2022 Special Primary Election and the August 16, 2022 Special General Election for U.S. Representative, and I am concerned the elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2022 Special Primary and Special General Election in Alaska.

I currently reside at: _6360 East Homebuilt Circle_
_Wasilla_, Alaska _99654_.

My mailing address is:
_P.O. Box 870966  Wasilla  AK 99687_

My email is: _dhjohnson113@gmail.com_ My phone number is: _907 232 6867_

_09/28/2022_
Date

_D H Johnson_ (signature)
Signature of Person Making this Affidavit

_David H Johnson_
Printed Name

Subscribed and sworn to or affirmed before me at _Wasilla_, Alaska _9/28/22_.

(SEAL)

_Tabita Por_
Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _12/2/2025_.

**Affidavit of Complainant** _William C. de Schweinitz_

I, Citizen Complainant _William C deSchweinitz_ the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records is an addendum to the September 1, 2022, Complaint & Request for Records.

I voted in both the June 11, 2022 Special Primary Election and the August 16, 2022 Special General Election for U.S. Representative, and I am concerned the elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2022 Special Primary and Special General Election in Alaska.

I currently reside at: _3260 South Circle_ _Anchorage_, Alaska _99507_

My mailing address is: _1530 Gambell St. Anchorage, Alaska 99501_

My email is: _William.Z@AK.net_ My phone number is: _907 884 7001_

_Sept 28, 2022_
Date

_William de Schweinitz_
Signature of Person Making this Affidavit

_William de Schweinitz_
Printed Name

Subscribed and sworn to or affirmed before me at _Anchorage_, Alaska _____.

(SEAL)

_____
Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _March 30, 2025_

**Affidavit of Complainant** *Pamela L. Bickford*

I, Citizen Complainant *Pam Bickford*, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records is an addendum to the September 1, 2022, Complaint & Request for Records.

I voted in both the June 11, 2022 Special Primary Election and the August 16, 2022 Special General Election for U.S. Representative, and I am concerned the elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2022 Special Primary and Special General Election in Alaska.

I currently reside at: *16840 Tide View Drive*
*Anchorage*, Alaska *99516*

My mailing address is:
*same*

My email is: *pam.bickford@yahoo.com* My phone number is: *(907) 223-8829*

*9-28-2022*                    *Pamela L. Bickford*
Date                              Signature of Person Making this Affidavit

                                  *Pamela L. Bickford*
                                  Printed Name

Subscribed and sworn to or affirmed before me at *Anchorage*, Alaska *9/28/2022*.

(SEAL)                            *Scott Miley*

> SCOTT MILEY
> Notary Public
> State of Alaska
> My Commission Expires Jun 28, 2026

Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires *June 28th 2026*.

Affidavit of Complainant _Loy A. Thurman_

I, Citizen Complainant _Loy A. Thurman_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records is an addendum to the September 1, 2022, Complaint & Request for Records.

I voted in both the June 11, 2022 Special Primary Election and the August 16, 2022 Special General Election for U.S. Representative, and I am concerned the elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2022 Special Primary and Special General Election in Alaska.

I currently reside at: _14166 W. Knights Dr._
_Wils. 11+_, Alaska _99654_.

My mailing address is:
_P.O. Box 520011 Big Lake, AK 99652_

My email is: _Loythurman@outlook.com_  My phone number is: _(907) 775-8899_

_Sept 28, 2022_                    _Loy Thur..._
Date                                             Signature of Person Making this Affidavit

_Loy A. Thurman_
Printed Name

Subscribed and sworn to or affirmed before me at _Wasilla_, Alaska _9/28/22_.

(SEAL)

Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _12/2/2025_.

# Exhibit I



**APA HEARING PROCESS**

v

# HEARING

# OFFICER'S

# MANUAL



**FIFTH EDITION**                    **AUGUST 2002**

## STATE OF ALASKA

## DEPARTMENT OF LAW

# Exhibit J

Case 3:23-cv-00006-SLG   Document 1-1   Filed 01/13/23   Page 144 of 176

Director's Office
240 Main Street, Suite 300
P.O. Box 110017
Juneau, Alaska 99811-0017
Phone: 907-465-4611 Fax: 907-465-3203
elections@alaska.gov



Elections Offices ↔
Ancorage/Penney 907-276-0700
Anchorage 907-522-8683
Fairbanks 907-451-2835
Juneau 907-465-3021
Nome 907-443-5285
Mat-Su 907-373-8952

## STATE OF ALASKA
### Division of Elections
### Office of the Lieutenant Governor

September 19, 2022

Dear Complainants,

On September 2, 2022, the Office of the Governor, the Office of the Lieutenant Governor, the Division of Elections, and the Department of Law (Agencies) received the document you titled "Complaint for Declaratory and Injunctive Relief Requesting Litigation Disclosure in the 'Public's Interest' of Administrative Records and Waiver of All Costs and Fees to Conduct a Full Forensic Audit of 2020 Election Records." Your submission is styled after a civil complaint and appears to be either an attempt to file a Help America Vote Act (HAVA) complaint or a request for records under the Alaska Public Records Act (APRA). Because your submission is 130 pages long and does not clearly allege violations or request records, the Agencies are unable to respond.

### Help America Vote Act

To the extent you intended to file a HAVA complaint, your submission does not comply with 6 AAC 25.400–.490. The HAVA complaint process allows people to allege a violation of 52 U.S.C. §§ 21081–21085 that has occurred, is occurring, or is about to occur. A complaint "must set out a clear and concise description of the claimed violation that is sufficiently detailed" to provide notice of the violation. 6 AAC 25.420(b). Your submission does not meet this standard.

If you wish to file a HAVA complaint, you may use the form on the Division of Elections' website.[1] Before doing so, you should review the jurisdictional time limitations in 6 AAC 25.430. You must file a complaint within 60 days of the actions or events that form the basis of the complaint, or within 60 days of the date you knew or reasonably should have known about those actions or events. 6 AAC 25.430(b). You must also file a complaint within 90 days of certification of the federal election at issue. 6 AAC 25.430(d)(4). It is too late to allege a HAVA violation as to the 2020 general election.

### Alaska Public Records Act

To the extent you want the Agencies to treat your submission as a request for records under the APRA, the Agencies cannot recognize your request. This is because the Agencies do not know which specific records you seek from which agency. It is not reasonable to burden the Agencies with the task of sifting through the 315 paragraphs in your 37-page, single-spaced submission to identify each of the records you want.

Accordingly, if you want to make a request for records under the APRA, please submit a separate request to each agency whose records you want. In that request, only identify—in as much detail as possible—the specific records you want from the agency. Do not mingle requests for records

Exhibit [1] J  https://www.elections.alaska.gov/doc/forms/A01.pdf.  Page 2 of 4

from one agency with requests for records from another agency. Do not mingle requests for records with, among other things, legal and factual assertions and claims for relief. Finally, please note that the APRA applies to records that already exist; the Act does not require agencies to answer questions or to summarize records.

Sincerely,

Gail Fenumiai, Director

617

US POSTAGE & FEES PAID

$ 000.57⁰

ZIP 99801
02 4W
5000368521

SEP 20 2022

First Class Mail
ComBasPrice

DIVISION OF ELECTIONS
DIRECTOR'S OFFICE
P.O. BOX 110017
JUNEAU, AK 99811-0017

**RETURN SERVICE REQUESTED**

CCSA
16840 Tide View Drive
Anchorage, AK 99516

99516346031 C022

E-20 (REV 05/10)

Page 4 of 4

# Exhibit K

# State of Alaska
## 2022 SPECIAL GENERAL ELECTION
## RCV Tabulation
## August 16, 2022
## UNOFFICIAL RESULTS

## U.S. Representative (Special General)

**Unofficial results**

Number of positions to elect is 1.

| | |
|---|---|
| Tabulation status: | All Positions Filled |
| Tabulation time: | 8/31/2022 3:58:05 PM |

### Tabulation Options

| | |
|---|---|
| RCV method | IRV |
| Exclude unresolved write-ins | True |
| Declare winners by threshold | False |
| Uses precincts | True |
| Previous rounds evaluation method | None |
| Elimination type | Single |
| Fixed precision decimals | 0 |
| Perform elimination transfer in last round | True |
| Skip overvoted rankings | False |
| Votes to include in threshold calculation | Continuing ballots per round |
| Use first round suspension | False |
| Handling skip rankings | Exhausted on Two or More Ranks Skipped |

Ties are resolved in accordance with election law.

# State of Alaska

## Round 1

| Candidate | Votes | Percentage |
|---|---|---|
| Begich, Nick | 53,756 | 28.52% |
| Palin, Sarah | 58,945 | 31.28% |
| Peltola, Mary S. | 75,761 | 40.20% |
| **Continuing Ballots Total** | **188,462** | |
| Blanks | 3,401 | |
| Exhausted | 0 | |
| Overvotes | 295 | |
| Remainder Points | 0 | |
| **Non Transferable Total** | **3,696** | |

Begich, Nick is eliminated because the candidate had the least amount of votes.

Elimination transfer for candidate Begich, Nick.

53756 ballots have been transferred in the following manner:

| Transferred from | Transferred to | Ballots | Votes |
|---|---|---|---|
| Begich, Nick | Palin, Sarah | 27042 | 27,042 |
| Begich, Nick | Peltola, Mary S. | 15445 | 15,445 |
| Begich, Nick | Exhausted | 11222 | 11,222 |
| Begich, Nick | Overvotes | 47 | 47 |

## Round 2

| Candidate | Votes | Percentage |
|---|---|---|
| Begich, Nick | 0 | 0.00% |
| Palin, Sarah | 85,987 | 48.53% |
| ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓▓▓▓▓▓ | ▓▓▓▓▓ |
| **Continuing Ballots Total** | **177,193** | |
| Blanks | 3,401 | |
| Exhausted | 11,222 | |
| Overvotes | 342 | |
| Remainder Points | 0 | |
| **Non Transferable Total** | **14,965** | |

Palin, Sarah is eliminated because the candidate was not elected in the last round.

Peltola, Mary S. is elected because all other candidates have been eliminated.

# Exhibit L

Case 3:23-cv-00006-SLG Document 1-1 Filed 01/13/23 Page 151 of 176

**MEMORANDUM OF AGREEMENT**
**BETWEEN THE CENTER FOR INTERNET SECURITY**
**AND**
Board of Elections
**FOR**
**Endpoint Detection & Response (EDR) Services**
**(Federally Funded Services)**

This MEMORANDUM OF AGREEMENT ("Agreement") by and between the Center for Internet Security, Inc. ("CIS"), operating in its capacity as the Multi-State Information Sharing and Analysis Center (MS-ISAC) and the Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC), located at 31 Tech Valley Drive, East Greenbush, NY 12061-4134, and _____ Board of Elections (Entity) with its principal place of business at: _____
for EDR Services, as defined herein below (CIS and Entity collectively referred to as the "Parties").

- In its role as the MS-ISAC and the EI-ISAC, CIS has been recognized by the United States Department of Homeland Security (DHS) as a key Cyber Security resource for all fifty states, local governments, United States territories, and tribal nations (SLTT) and state and local elections entities; and

- CIS operates a twenty-four hours a day, seven days per week (24/7) Security Operations Center (SOC); and

- CIS has entered into an agreement with the federal government to provide EDR Services to certain SLTT entities.

In consideration of the mutual covenants contained herein, the Parties do hereby agree as follows:

I.   Purpose

   The purpose of this agreement is to set forth the mutual understanding between Entity and CIS with respect to the provision of EDR Services to Entity.

II.   Definitions

   A. **Security Operation Center (SOC)** – 24 X 7 X 365 watch and warning center that provides cybersecurity infrastructure monitoring, dissemination of cyber threat warnings and vulnerability identification and mitigation recommendations.

   B. **EDR Services:** EDR Services is comprised of the following:

   1. Deployment and maintenance of an EDR software agent on Entity's identified endpoint devices, which will (a) block malicious activity at a device level if agreed to by the Entity; (b) remotely isolate compromised systems after coordination with the Entity; (c) identify threats on premise, in the cloud, or on remote systems; (d) inspect network traffic in a decrypted state on the endpoint for the limited purpose of identifying malicious activity; and (e) identify and remediate malware infections.

# Exhibit M

Case 3:23-cv-00006-SLG   Document 1-1   Filed 01/13/23   Page 153 of 176


This document is scheduled to be published in the
Federal Register on 09/09/2022 and available online at
federalregister.gov/d/2022-19701, and on govinfo.gov

NOTICE

- - - - - - -

## CONTINUATION OF THE NATIONAL EMERGENCY WITH RESPECT TO FOREIGN INTERFERENCE IN OR UNDERMINING PUBLIC CONFIDENCE IN UNITED STATES ELECTIONS

On September 12, 2018, by Executive Order 13848, the
President declared a national emergency pursuant to the
International Emergency Economic Powers Act (50 U.S.C. 1701
*et seq.*) to deal with the unusual and extraordinary threat to
the national security and foreign policy of the United States
constituted by the threat of foreign interference in or
undermining public confidence in United States elections.

Although there has been no evidence of a foreign power
altering the outcomes or vote tabulation in any United States
election, foreign powers have historically sought to exploit
America's free and open political system. In recent years,
the proliferation of digital devices and internet-based
communications has created significant vulnerabilities and
magnified the scope and intensity of the threat of foreign
interference. The ability of persons located, in whole or in
substantial part, outside the United States to interfere in
or undermine public confidence in United States elections,
including through the unauthorized accessing of election

and campaign infrastructure or the covert distribution of
propaganda and disinformation, continues to pose an unusual and
extraordinary threat to the national security and foreign policy
of the United States. For this reason, the national emergency
declared on September 12, 2018, must continue in effect
beyond September 12, 2022. Therefore, in accordance with
section 202(d) of the National Emergencies Act (50 U.S.C.
1622(d)), I am continuing for 1 year the national emergency
declared in Executive Order 13848 with respect to the threat
of foreign interference in or undermining public confidence in
United States elections.

   This notice shall be published in the *Federal Register* and
transmitted to the Congress.


THE WHITE HOUSE,

   September 7, 2022.

[FR Doc. 2022-19701 Filed: 9/8/2022 11:15 am; Publication Date: 9/9/2022]

# Notice on the Continuation of the National Emergency with Respect to Foreign Interference In or Undermining Public Confidence in United States Elections

SEPTEMBER 07, 2022· PRESIDENTIAL ACTIONS

On September 12, 2018, by Executive Order 13848, the President declared a national emergency pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) to deal with the unusual and extraordinary threat to the national security and foreign policy of the United States constituted by the threat of foreign interference in or undermining public confidence in United States elections.

Although there has been no evidence of a foreign power altering the outcomes or vote tabulation in any United States election, foreign powers have historically sought to exploit America's free and open political system. In recent years, the proliferation of digital devices and internet-based communications has created significant vulnerabilities and magnified the scope and intensity of the threat of foreign interference. The ability of persons located, in whole or in substantial part, outside the United States to interfere in or undermine public confidence in United States elections, including through the unauthorized accessing of election and campaign infrastructure or the covert distribution of propaganda and disinformation, continues to pose an unusual and extraordinary threat to the national security and foreign policy of the United States. For this reason, the national emergency declared on September 12, 2018, must continue in effect beyond September 12, 2022. Therefore, in accordance with section 202(d) of the National Emergencies Act (50 U.S.C. 1622(d)), I am continuing for 1 year the national emergency declared in Executive Order 13848 with respect to the threat of foreign interference in or undermining public confidence in United States elections.

This notice shall be published in the Federal Register and transmitted to the Congress.

JOSEPH R. BIDEN JR.

THE WHITE HOUSE,
September 7, 2022

CERTIFICATE OF SERVICE

I certify that on _Sept 28, 2022_ mailed (USPS) a copy of this Addendum document to the state officials listed below at the following addresses:

Governor Michael J. Dunleavy
State of Alaska
P.O. Box 110001
Juneau, Alaska 99811-0001

Lieutenant Governor Kevin Meyer
P.O. Box 110015
Juneau, Alaska 99811-0015

Attorney General Treg Taylor
P.O. Box 110300
Juneau, Alaska 99811

Director of Elections Gail Fenumiai
P.O. Box 110017
Juneau, Alaska 99811-0017

CERTIFICATE OF SERVICE

_Pamela L. Bickford_
Pamela L. Bickford, Pro Se Clerk

_9-28-2022_
Dated

**Second Addendum to Citizen Complaint of September 1, 2022**

344. Plaintiffs, Oels, Johnson, Bickford, de Schweinitz, and Thurman (hereinafter "CCSA") hereby supplement the original complaint and request for litigation documents as the Defendants, Dunleavy, Meyer, Taylor, and Fenumiai, have not yet responded to our request for an administrative hearing, as provided by 52 USC 21112, nor have we received notice of a pre-hearing conference as outlined by the State of Alaska, Department of Law Hearing Officer's Manual, (Exhibit I, p. 2) that provides upon receipt of a complaint a hearing officer is assigned and sets a Prehearing Conference. See Hearing Officer's Manual, 5th Edition (Aug 2002), page v (Exhibit I, p.3). The issues raised by the Director of Elections in her "ex parte communication" CCSA believe are inappropriate and will be addressed at the pre-hearing conference.

345. On October 17, 2022, Defendant, Director of the Division of Elections, Gail Fenumiai sent correspondence, to CCSA spokesperson Thomas Oels rejecting the filing of the Sept. 1, 2022, Complaint for various reasons, all of which were to be addressed within the administrative procedures. See Citizen Complaint, page 2, paragraphs 2, 3, 4 and 5; page 3, paragraph 12; and page 16, paragraph 123. (See Exhibit N).

346. Despite prior notification of potential "ex parte communications" and CCSA refusal to engage in ex parte controversy with the Director of Elections, the other Defendants have not responded to the complaint.

347. Director Fenumiai erroneously asserts her authority to restrict the complaint to the "scope and strict pleading requirements" of HAVA. Exhibit N, page 2. See 52 USC 2112 for the HAVA requirements, as the purpose of the complaint procedures is to alert the election officials to concerns in order to correct or repair the election policies, practices, and procedures.

348. Director Fenumiai acknowledges that the Sept. 1, 2022 complaint does provide references to 52 USC 21081-21085, but rejects the complaint due to her determination that the complaint is non-compliant with the regulation 6 AAC 25.400-.490, and "comingles references to 52 U.S.C. §§ 21081-21085 with various other legal authorities, including the APRA and the Administrative Procedures Act (APA) to such an extent that it is difficult to discern which portions of 52 U.S.C. §§ 21081-21085 the Complaint asserts are being violated." See Exhibit N, page 3.

349. CCSA requests that a hearing officer be assigned to this case. The assigned Hearing officer then determines which election related issues are inappropriate to his jurisdictional authority, which election related issues are not covered by HAVA, what election related issues are reserved for appeal, and how the case will proceed.

350. CCSA assert that the Alaska State Constitution, Article 1, Sec. 6, provides "The right of the people peacefully to assemble, and to petition the government shall never be abridged." And, the Constitution of the United States, Amendment 1, the Bill of Rights, provides "petition the Government for a redress of grievances", such redress of grievances would provide for any claim the Director of Elections deems inappropriate for the federal provision for complaint resolution.

351. CCSA request that the Administrative Hearing Officer rely on the plain reading of the 52 USC 21112 (a)(2) requirements for State-based administrative complaint procedures to remedy grievances:

> (D) The State may consolidate complaint filed under subparagraph (B).

> (E) At the request of the complainant, there shall be a hearing on the record.

> (F) If, under the procedures, the State determines that there is a violation of any provision of subchapter III, the State shall provide the appropriate remedy.

> (G) If, under the procedures, the State determines that there is no violation, the State shall dismiss the complaint and publish the results of the procedures.

> (H) The State shall make a final determination with respect to a complaint prior to the expiration of the 90-day period which begins on the date the complaint is filed, unless the complainant consents to a longer period for making such a determination.

> (I) If the State fails to meet the deadline applicable under subparagraph (H), the complaint shall be resolved within 60 days under alternative dispute resolution procedures established for purposes of this section. The record and other materials from any proceedings conducted under the complaint procedures established under this section shall be made available for use under the alternative dispute resolution procedures.

352. CCSA have appended both correspondences initiated by Director Fenumiai as exhibits to these proceedings as a matter of record but consider both letters to be fraught with errors and omissions and both documents considered an unreliable summary of the controversy to date.

353. CCSA asserts that Director Fenumiai has exceeded her authority in determining the complaint insufficient to be heard and object to the October 17, 2022 dismissal of the complaint, as her action is in conflict with the State-based administrative complaint procedures, and her action is in violation of both constitutions providing for citizens to redress a grievance.

354. CCSA, upon knowledge and belief, anticipating the other threshold issue of "standing" that may be raised, State Supreme Court Decisions in other jurisdictions are persuasive authority. CCSA provides notification of the October 25, 2022, decision of the Supreme Court of Georgia in *Sons of Confederate Veterans et al. (S22G0039) v. Henry County Board of Commissioners and Sons of Confederate Veterans et al. (S22G0045) v. Newton County Board of Commissioners*. The question before the Court was "[W]hether the Georgia Constitution requires a plaintiff to establish some cognizable injury to bring a lawsuit in Georgia courts, i.e., to have standing to sue, separate and apart from the statutory authorization to bring suit. This question has broad implications far beyond the underlying controversy." The published answer is: "[T]o invoke a Georgia court's 'judicial power,' a plaintiff must have a cognizable injury that can be redressed by a judicial decision. Courts are not vehicles for engaging in merely academic debates or deciding purely theoretical questions. We 'say what the law is' only as needed to resolve an actual controversy. To that end, only plaintiffs with a cognizable injury can bring a suit in Georgia courts. Unlike federal law, however, that injury need not always be individualized;

sometimes it can be a generalized grievance shared by community members, especially other residents, taxpayers, voters, or citizens." The Georgia Supreme Court continues: "The Georgia Constitution might impose a higher requirement when a plaintiff challenges the constitutionality of a statute; we have long held that in such cases, the plaintiff must show an actual, individualized injury. But we need not decide today whether this additional requirement arises from the Georgia Constitution, such that the General Assembly cannot abrogate it by statute, because the plaintiffs in this case do not challenge a statute as unconstitutional." "For the lesser requirement – that the plaintiff has suffered some kind of injury, albeit one that may be shared by all other members of the community – **Georgia has long recognized that members of a community, whether as citizens, residents, taxpayers, or voters, may be injured when their local government fails to follow the law. Government at all levels has a legal duty to its citizens, residents, taxpayers, or voters (i.e., community stakeholders), and the violation of that legal duty constitutes an injury that our case law has recognized as conferring standing to those community stakeholders, even if the plaintiff suffered no individualized injury.**" Emphasis added.

355. CCSA assert that as community stakeholders and as qualified voters, we have standing to claim injury and redress our collective grievances in court and in the State-based administrative complaint procedures.

356. CCSA, upon knowledge and belief, request a hearing to determine whether the Defendants violated both state and federal election law in conducting past elections, whether state officials illegally waived statutes by stipulated agreement resulting in erroneous Court decisions, and an audit to determine the impact of the violations on the outcome of the identified elections.

357. CCSA request a hearing officer be assigned immediately and outside of the influence of the Director of Elections, as outlined in the Hearing Officer's manual.

*Oct 31, 2022*

Dated                                      Citizen Complainants of the State of Alaska

                                           See Notarized Affidavits of Complainants (attached)

Affidavit of Complainant _Thomas W. Oels_

I, Citizen Complainant _Thomas W. Oels_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records of September 1, 2022, and the addendum of September 28, 2022, has now been supplemented by this Second Addendum, dated October 31, 2022.

I voted in the General Election of November 3, 2020, both the June 11, 2022, Special Primary Election and the August 16, 2022, Special General Election for U.S. Representative, and I am concerned the aforementioned elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election, the 2022 Special Primary, and the 2022 Special General Election in Alaska.

I currently reside at: _2841 W. Discovery Loop_

_Wasilla_ , Alaska _99654_

My mailing address is:

_PO Box 873562 Wasilla AK. 99687_

My email is: _Oels@msn.link.Net_ My phone number is: _907-232-6782_

_Oct 31, 2022_
Date

Signature of Person Making this Affidavit

_Thomas W. Oels_
Printed Name

Subscribed and sworn to or affirmed before me at _Wasilla_ , Alaska _10/31/2022_

(SEAL)

Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _12/2/25_ .

OLIVIA FARRELL
NOTARY
PUBLIC
STATE OF ALASKA
My Commission Expires December 2, 2025

Affidavit of Complainant  *Pamela Bickford*

I, Citizen Complainant *Pamela Bickford* the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records of September 1, 2022, and the addendum of September 28, 2022, has now been supplemented by this Second Addendum, dated October 31, 2022.

I voted in the General Election of November 3, 2020, both the June 11, 2022, Special Primary Election and the August 16, 2022, Special General Election for U.S. Representative, and I am concerned the aforementioned elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election, the 2022 Special Primary, and the 2022 Special General Election in Alaska.

I currently reside at: _16840 Tide View Drive,_
_Anchorage_, Alaska _99516_

My mailing address is:
_Same_

My email is: _pam.bickford @_ My phone number is: _(907) 223-8829_
_yahoo.com_

_10-31-2022_                                _Pamela Bickford_
Date                                        Signature of Person Making this Affidavit

_Pamela Bickford_
Printed Name

Subscribed and sworn to or affirmed before me at _Anchorage_, Alaska _10-31-22_

(SEAL)                                      _Lorily Amena_
                                            Clerk of Court, Notary Public, or other
                                            Person authorized to administer oaths.
                                            My commission expires _5-17-2025_

LORILY H. AMENA
Notary Public
State of Alaska
My Commission Expires May 17, 2025

Second Addendum                                          Page 5 of 9

**Affidavit of Complainant** _William deSchweinitz_

I, Citizen Complainant _William de Schweinitz_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records of September 1, 2022, and the addendum of September 28, 2022, has now been supplemented by this Second Addendum, dated October 31, 2022.

I voted in the General Election of November 3, 2020, both the June 11, 2022, Special Primary Election and the August 16, 2022, Special General Election for U.S. Representative, and I am concerned the aforementioned elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election, the 2022 Special Primary, and the 2022 Special General Election in Alaska.

I currently reside at: _3260 South Circle_

_Anchorage_, Alaska _99507_

My mailing address is:
_1530 Gambell St, Anchorage Alaska 99501_

My email is: _William.Z @AK.net_     My phone number is: _907 884 7001_

_10/31/2022_
Date

_WdeSchweinitz_
Signature of Person Making this Affidavit

_William de Schweinitz_
Printed Name

Subscribed and sworn to or affirmed before me at _Anchorage_, Alaska _10/31/22_.

(SEAL)

_____
Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _8/16/26_

Affidavit of Complainant _David H. Johnson_

I, Citizen Complainant _David H Johnson_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records of September 1, 2022, and the addendum of September 28, 2022, has now been supplemented by this Second Addendum, dated October 31, 2022.

I voted in the General Election of November 3, 2020, both the June 11, 2022, Special Primary Election and the August 16, 2022, Special General Election for U.S. Representative, and I am concerned the aforementioned elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election, the 2022 Special Primary, and the 2022 Special General Election in Alaska.

I currently reside at: _6360 East Homebuilt Circle_
_Wasilla_, Alaska _99654_.

My mailing address is:
_P.O. Box 870966 Wasilla Alaska 99687_
My email is: _dhjohnson113e.....,_ My phone number is: _907 232 6867_

_Oct 31 2022_
Date

Signature of Person Making this Affidavit

_David H Johnson_
Printed Name

Subscribed and sworn to or affirmed before me at _Wasilla_, Alaska _10/31/2022_.

(SEAL)

Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _12/02/2025_.

Affidavit of Complainant _Loy A. Thurman_

I, Citizen Complainant _Loy A. Thurman_, the undersigned individual, a citizen of the United States of America, a resident of the State of Alaska, deposes and says that the averments in the foregoing Complaint and Request for Records are true and correct to the best of my knowledge, information, and belief; and further that these averments are made without personal or financial benefit from access to the requested public records. This Complaint and Request for Records of September 1, 2022, and the addendum of September 28, 2022, has now been supplemented by this Second Addendum, dated October 31, 2022.

I voted in the General Election of November 3, 2020, both the June 11, 2022, Special Primary Election and the August 16, 2022, Special General Election for U.S. Representative, and I am concerned the aforementioned elections were not conducted in a free and fair manner as identified in the Citizen Complaint of September 1, 2022. As an Alaskan, I have the right to an election process that accurately counts every legal vote cast; and, our confidence in the integrity of that election process is paramount to the preservation of a free society; and, a full forensic audit of Alaska's election process may identify any weaknesses in that process and also provide Alaskans with the confidence that their vote, and the votes of our fellow Alaskans, are counted correctly; therefore, I stand with fellow citizens in demanding a full forensic audit of the 2020 General Election, the 2022 Special Primary, and the 2022 Special General Election in Alaska.

I currently reside at: _14166 W. Knights Dr._

_Wasilla_, Alaska _99623._

My mailing address is:
_PO Box 520011 Big Lake, AK. 99652_

My email is: _Loythurman@outlook.com_ My phone number is: _(907) 775-8899_

_Oct 31, 2022_
Date

_[signature]_
Signature of Person Making this Affidavit

_Loy Thurman_
Printed Name

Subscribed and sworn to or affirmed before me at _Wasilla_, Alaska _10/31/2022_.

(SEAL)

_[notary seal: OLIVIA FARRELL NOTARY PUBLIC STATE OF ALASKA My Commission Expires December 2, 2025]_

_[signature]_
Clerk of Court, Notary Public, or other
Person authorized to administer oaths.
My commission expires _12/2/2025_.

CERTIFICATE OF SERVICE

I certify that on _10-31-2022_ mailed (USPS) a copy of this Second Addendum document to the state officials listed below at the following addresses:

Governor Michael J. Dunleavy
State of Alaska
P.O. Box 110001
Juneau, Alaska 99811-0001

Lieutenant Governor Kevin Meyer
P.O. Box 110015
Juneau, Alaska 99811-0015

Attorney General Treg Taylor
P.O. Box 110300
Juneau, Alaska 99811

Director of Elections Gail Fenumiai
P.O. Box 110017
Juneau, Alaska 99811-0017

CERTIFICATE OF SERVICE

_Pamela L. Bickford_
Pamela L. Bickford, Pro Se Clerk

_10-31-2022_
Dated

# Exhibit N

Director's Office
240 Main Street Suite 400
P.O. Box 110017
Juneau, Alaska 99811-0017
☎ 907-465-4611 🖷 907-465-3203
elections@alaska.gov



Elections Offices ☎
Absentee-Petition 907-270-2700
Anchorage 907-522-8683
Fairbanks 907-451-2835
Juneau 907-465-3021
Nome 907-443-5285
Mat-Su 907-373-8952

STATE OF ALASKA
Division of Elections
Office of the Lieutenant Governor

October 17, 2022

Dear Complainants,

On September 2, 2022, calling yourselves the "Citizen Complainants of the State of Alaska," you submitted a "Complaint for Declaratory and Injunctive Relief Requesting Litigation Disclosure in the 'Public Interest' of Administrative Records and Waiver of All Costs and Fees to Conduct a Full Forensic Audit of 2020 Election Records" (Complaint) with the Division of Elections, the Office of the Governor, Office of the Lieutenant Governor, the Department of Administration, and Department of Law (Agencies).[1] The Complaint names the Agencies as "defendants" and also names several state officials as "defendants" who are "sued in [their] official capacit[ies]."[2] The Complaint explicitly invokes the Division's Help America Vote Act (HAVA) complaint procedures, 6 AAC 25.400–.490, but also asserts violations of the U.S. and Alaska Constitutions, various U.S. and Alaska statutes, and Alaska regulations. The Complaint also contained elements of a request under the Alaska Public Records Act (APRA). The Division requested clarification to allow it to evaluate the HAVA complaint and the potential APRA request, and included a link to the Division's HAVA complaint form. You responded with an "Addendum to Citizen Complaint of September 1, 2022" (Addendum), maintaining that the Complaint is sufficiently pled and asserting that the Division's request for clarification was inappropriate.

Absent the requested clarification, the Division treats the Complaint and Addendum as a HAVA complaint under 6 AAC 25.400–.490. The Division's HAVA complaint regulations are limited in scope and include strict pleading requirements. The Division must reject a complaint for filing if it fails to meet the criteria set forth in 6 AAC 25.430(d)(1)–(4). Because the Complaint fails to meet these requirements, the Division rejects the Complaint for filing.

### I. Legal Background

Congress passed HAVA in 2002 to modernize federal elections standards, create uniform procedures for provisional voting, and provide funds for states to replace outdated punch-card voting systems. As relevant here, HAVA required states to meet certain requirements, specifically 52 U.S.C. §§ 21081–21085. HAVA provides "State-based administrative complaint procedures" to allow members of the public to complain about perceived violations of these requirements.[3] Each state must also have a state plan, approved by federal authorities, that outlines the state's compliance with

---

[1]    Complaint ¶¶ 37–52.

[2]    Complaint ¶¶ 39 (Governor Michael Dunleavy), 42 (Lieutenant Governor Kevin Meyer), 44 (Direct of the Division of Elections Gail Fenumiai), 46 (Attorney General Treg Taylor).

[3]    52 U.S.C. § 21112.

www.elections.alaska.gov

October 17, 2022
2 | P a g e

HAVA. Alaska has an approved state plan,[4] and its HAVA complaint procedures are set forth at 6 AAC 25.400–.490. The Division provides a HAVA complaint form to help members of the public comply with the State's HAVA complaint requirements.[5]

In enacting HAVA, Congress did not give members of the public the ability to challenge state election practices on legal theories outside of HAVA. HAVA does not transform state elections offices into courts, give members of the public the power to compel civil discovery, or provide for citizen audits of federal elections.

The purpose of Alaska's HAVA complaint regulations "is to provide a uniform, nondiscriminatory procedure to the resolution of any complaint alleging a violation of" 52 U.S.C. §§ 21081–21085.[6] The regulations require complaints to be in writing and signed by the complainant under oath and notarized.[7] The complaint must contain the complainant's name and mailing address, "each provision of [52 U.S.C. §§ 21081–21085] for which a violation is claimed," and "a description of the facts constituting the claimed violation." The Division examines each complaint and will reject a complaint for filing if:

    (1)    it is not signed and notarized under oath;

    (2)    it does not identify the complainant or include an adequate mailing address;

    (3)    it does not, on its face, allege a violation of [52 U.S.C. §§ 21081–21085] with regard to a federal election; or

    (4)    more than 90 days have elapsed since the final certification of the federal election at issue.[8]

If a complaint falls short of any of these requirements, the Division must reject it.

## II. The Complaint and Addendum

Your Complaint is 37 single-spaced pages and includes 315 numbered paragraphs, some with discrete subparagraphs. The Complaint also includes eight "exhibits," designated A through H, which total 93 pages. The Complaint sets forth 279 paragraphs of factual allegations, quoted or paraphrased portions of various state and federal laws and regulations, and discovery demands.

The Complaint is extremely difficult to parse. It comingles references to 52 U.S.C. §§ 21081–21085 with various other legal authorities, including the APRA and the Administrative Procedures Act (APA), to such an extent that it is difficult to discern which portions of 52 U.S.C. §§ 21081–21085 the Complaint asserts are being violated.[9] The Complaint is almost exclusively focused on allegations and

---

[4]    http://www.elections.alaska.gov/doc/hava/StatePlan_6.30.2010_FINAL_to_EAC.pdf.

[5]    https://www.elections.alaska.gov/Core/helpamericavoteact.php.

[6]    6 AAC 25.400(a).

[7]    6 AAC 25.420(a).

[8]    6 AAC 25.430(d)(1)–(4).

[9]    *E.g.*, ¶¶ 104–117 (asserting the APA requires the State to enact regulations as statutes, demanding that the Division produce a broad range of elections records, and stating a request to

www.elections.alaska.gov

discovery demands relating to the 2020 general election. To the extent there are paragraphs that allege an ongoing or current violation of the Division's duties under 52 U.S.C. §§ 21081–21085, they are lost among the Complaint's 2020 allegations.

Paragraphs 280 through 315 are styled as four "causes of action," all of which allege violations of the U.S. Constitution and invoke the jurisdiction of 42 U.S.C. § 1983.[10] None of these "causes of actions" allege a violation of 52 U.S.C. §§ 21081–21085. These "causes of action" are followed by the following prayer for relief:

Wherefore, Plaintiffs pray judgment against Defendants as follows:

    a.  An order directing Defendants to preserve all voting machines, software, peripherals (including flash drives and other memory storage), computers, reports generated, and other data and equipment used to cast, examine, count, tabulate, modify, store or transmit votes or voting data in the November 2020 elections in Alaska for inspection and audit by experts;

    b.  An order directing Defendants to preserve all ballots, ballot envelopes, remade or duplicated ballots, adjudicated ballots and other documents used to cast votes in the November 2020 elections in Alaska for inspection and audit by experts;

    c.  An order, upon the collection of legislative records to affirm or deny, that the administration has failed to enact or amend Alaskan Statutes and administrative regulations to comply with the "minimum" federal requirements and by omission of those procedural requirements are responsible for breach of their official duty;

    d.  An order directing the appointment of one or more special masters to oversee the evidence preservation and audit process (depending on location of documents);

    e.  An order directing the appointment of one or more special masters to oversee and monitor the accuracy of vote counting in Alaska's upcoming federal elections;

    f.  An order of declaratory judgment that a forensic evaluation and audit of the 2020 General Election is required to determine the procedural and substantive violations;

    g.  An order of declaratory judgment that this litigation is indeed in "the public interest" and therefore waive cost and fees for all requested access to governmental records; and

---

"determine if the legislative records exist and the current citations and references in Alaskan [sic] statutes that correspond to the federal requirements specified in 52 U.S.C. 21018–21085 and 52 U.S.C. § 21112.").

[10]    Complaint ¶¶ 280–287 ("Violation of Elections Clause: Art. I, § 4, cl 1 of [the] U.S. Constitution"), 288–296 ("Denial of Equal Protection: 14th Amendment of [the] U.S. Constitution"), 297–308 ("Denial of Due Process: 14th Amendment of [the] U.S. Constitution"), 309–315 ("Denial of Guarantee Clause: Art. IV, § 4 of [the] U.S. Constitution").

      h.  Such other relief as is just and proper.

    The Division is an administrative agency created by statute. As a creature of statute, the Division only has those powers the legislature delegates to it in statute.[11] The Alaska Legislature has never enacted a statute that grants the Division the power to grant any of the judicial relief the Complaint requests. And none of the requested relief relates to 52 U.S.C. §§ 21081–21085.

    On September 19, 2022, the Division responded to your Complaint. The Division noted that the Complaint predominantly cited APRA and Alaska's HAVA complaint procedures, but explained that the Division was unable to determine if you intended the document as an APRA request or a HAVA compliant. The Division identified the jurisdictional limitations and specific pleading requirements of the HAVA complaint regulations and included a link to its HAVA complaint form, and asked the CCSA to clarify whether it sought a hearing. The Division also noted APRA's requirements. The Division requested that you separate your HAVA complaint and any APRA requests, eliminate any factual and legal allegations irrelevant to your complaints and requests, and provide the requisite level of clarity and specificity for the Division to evaluate your complaints and requests on their respective merits.

    On September 28, you submitted an "Addendum to Citizen Complaint of September 1, 2022" (Addendum). The Addendum asserts the following:

- the Agencies "cannot be confused as to the Complaints' objectives as all of the [Agencies] were notified of our concerns" by virtue of various court filings, "and may have even been aware of our correspondences with our legislators regarding election anomalies and advocacy for repairs to the Alaska election process."[12]

- the Complaint "leaves space for a Hearing Office Case number, requests litigation documents under AS 40.25.122 (paragraph 1(f)) (which requires the oversight of an officer not a 'records request'), and plainly identifies violations of law, both State and Federal, in the administration of Alaskan [sic] elections."[13]

- the "Cause of Action as presented by paragraphs 280 through 315 (Complaint pages 33–36) do not need to be supplemented at this time,"[14] but the "Prayer for Relief as presented on pages 36

---

[11]    *See Alaska State Comm'n for Hum. Rts. v. Anderson*, 426 P.3d 956, 962–63 (Alaska 2018) ("Administrative agencies are created by statute 'and therefore must find within the statute the authority for the exercise of any power they claim.'") (quoting *McDaniel v. Cory*, 631 P.2d 82 (Alaska 1981)).

[12]    Addendum ¶ 317.

[13]    Addendum ¶ 323. AS 40.25.122 provides:

A public record that is subject to disclosure and copying under AS 40.25.110–40.25.120 remains a public record subject to disclosure and copying even if the record is used for, included in, or relevant to litigation, including law enforcement proceedings, involving a public agency, except that with respect to a person involved in litigation, the records sought shall be disclosed in accordance with the rules of procedure applicable in a court or an administrative adjudication. In this section, 'involved in litigation' means a party to litigation or representing a party to litigation, including obtaining public records for the party.

[14]    Addendum ¶ 341.

www.elections.alaska.gov

and 37 must be supplemented to include the requested election records and full forensic audit of the 2022 primary election."[15]

The Addendum mentions one section of HAVA, 52 U.S.C. § 21083(a)(3), but only in passing.[16] While the Addendum appears to concern elections in 2022, it—like the Complaint—does not allege violations of 52 U.S.C. §§ 21081–21085.

### III. The Division's Review

The Division must "reject [a complaint] for filing if . . . it does not, on its face, allege a violation of [52 U.S.C. §§ 21081–21085] with regard to a federal election."[17] Here, the Complaint and Addendum fail on their face to allege a violation of 52 U.S.C. §§ 21081–21085. None of the Complaint's "causes of action" allege a violation of 52 U.S.C. §§ 21081–21085. The Complaint and Addendum seek relief that is entirely unrelated to 52 U.S.C. §§ 21081–21085, and which the Division is not empowered to provide. Even if the Complaint alleged, on its face, a violation of 52 U.S.C. §§ 21081–21085 with respect to the 2020 general election, the Complaint is untimely. The Division certified the results of the 2020 general election on November 30, 2020, more than 90 days ago.[18]

### IV. Conclusion

The Division accordingly rejects the Complaint for filing. If you believe there is a cognizable violation of 52 U.S.C. §§ 21081–21085, please ensure that any future complaint complies with 6 AAC 25.400–.490.

Sincerely,

Gail Fenumiai
Director, Division of Elections

---

[15]    Addendum ¶ 342.

[16]    Addendum ¶¶ 339–340.

[17]    6 AAC 25.430(d)(3).

[18]    6 AAC 25.430(d)(4).

www.elections.alaska.gov



Director's Office
240 Main Street Suite 400
P.O. Box 110017
Juneau, Alaska 99811-0017
☎ 907-465-4611 ☎ 907-465-3203
elections@alaska.gov

Elections Offices ☎
Absentee-Petition 907-270-2700
Anchorage 907-522-8683
Fairbanks 907-451-2835
Juneau 907-465-3021
Nome 907-443-5285
Mat-Su 907-373-8952

STATE OF ALASKA
Division of Elections
Office of the Lieutenant Governor

November 4, 2022

Dear Complainants,

The Division of Elections received your "Second Addendum to Citizen Complaint of September 1, 2022," dated October 31, 2022. Because the Division rejected your Complaint for filing, there will be no hearing or further action taken on your Complaint. Please ensure that any future complaint complies with 6 AAC 25.400–.490.

Sincerely,

Gail Fenumiai
Director, Division of Elections

Sent from my iPhone

Begin forwarded message:

> **From:** Pam Bickford <pam.bickford@yahoo.com>
> **Date:** December 5, 2022 at 2:30:35 PM AKST
> **To:** Tom Oels <toels2022@gmail.com>, dhjohnson113@gmail.com, Pam Bickford <pam.bickford@yahoo.com>, William Schweinitz 💎 <william.z@ak.net>, Loy Thurman 💎 <Loythurman@outlook.com>
> **Subject: Correspondence to DOE and state officials**

...

Sent from my iPhone

Begin forwarded message:

> **From:** Pam Bickford <pambickford2020@gmail.com>
> **Date:** December 5, 2022 at 2:18:08 PM AKST
> **To:** Pam Bickford <pam.bickford@yahoo.com>

Governor Michael J. Dunleavy
via. doa.commissioner@alaska.gov
Lieutenant Governor Kevin Meyer
lt.governor@alaska.gov
kevin.meyer@alaska.gov
Attorney General Treg Taylor
attorney.general@alaska.gov
Director of Elections Gail Fenumiai
elections@alaska.gov
gail.fenumiai@alaska.gov

December 5, 2022

Re: Request for an Impartial Hearing Officer to oversee amendment of the September 1, 2022 complaint in a pre-hearing conference

Dear State Officials;

In answer to the correspondence from Director Fenumiai of November 4, 2022 (mailed November 7, 2022), we have filed a Complaint 3AN- 22-9328 CI as per request to limit claims to the identified subjects identified by the Help America Vote Act, as repeatedly requested in your previous correspondence. However, upon your reconsideration, we propose that we file an amended complaint under the supervision of an IMPARTIAL Hearing Officer. We request that a Pre-Hearing Conference be scheduled without delay. All other issues can be considered at that time.

Sincerely,

Thomas W. Oels
toels2022@gmail.com
David H. Johnson
dhjohnson113@gmail.com
Pamela Bickford
pam.bickford@yahoo.com
William de Schweinitz
William.Z@AK.net
Loy A. Thurman
Loythurman@outlook.com

CC: all via email and U.S. Mail

Director's Office
240 Main Street Suite 400
P.O. Box 110017
Juneau, Alaska 99811-0017
☎ 907-465-4611  📠 907-465-3203
elections@alaska.gov

Elections Offices ☎
Absentee-Petition 907-270-2700
Anchorage 907-522-8683
Fairbanks 907-451-2835
Juneau 907-465-3021
Nome 907-443-5285
Mat-Su 907-373-8952



**STATE OF ALASKA**
**Division of Elections**
**Office of the Lieutenant Governor**

December 16, 2022

Dear Mr. Oels,

On December 5, 2022 the Division of Elections received an email from you and the four other plaintiffs in *Oels v. Meyer*, 3AN-22-9328 CI. You appear to request that the Division reconsider its rejection of your administrative complaint and assign a hearing officer to supervise your filing of an amended administrative complaint. Because the Division rejected the filing of your administrative complaint and you have since filed a complaint in superior court, the Division cannot assign a hearing officer.

As the Division explained previously, it is an executive branch agency with limited authority. The Help America Vote Act (HAVA) requires states to provide a specialized complaint procedure for asserting violations of the Act. The Division promulgated its HAVA complaint procedures, 6 AAC 25.400–.490, to meet HAVA's requirements. The regulations' gatekeeping provision, 6 AAC 25.430(d), prevents the Division from accepting complaints that do not allege violations of HAVA, 52 U.S.C. §§ 21081–21085, or that are filed more than 90 days after certification of the federal election at issue. Put simply, the Division does not have the authority to consider outdated or non-HAVA allegations. The administrative complaint you attempted to file primarily alleged violations of laws other than HAVA and related to the 2020 presidential election. Because you did not meet the threshold pleading requirements, the Division did not accept your complaint or refer it to a hearing officer. It is not the role of a hearing officer to help you file a valid administrative complaint.

The Division also notes that it did not request that you file a complaint in superior court. Now that you have, requests for hearings and other motions should be filed with the parties and the Court. Once the Division and the other parties are properly served, they will respond to your complaint.

Sincerely,

*Michaela M. Thompson*

Michaela Thompson
Acting Director, Division of Elections